No. 20-3058

In the
United States Court of Appeals
For the Seventh Circuit

William Dean,

*Plaintiff-Appellee/Cross-Appellant*,

v.

Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court for the Central District of Illinois,
No. 3:17-cv-03112, Hon. Sue E. Myerscough, Judge Presiding

## APPELLANTS/CROSS-APPELLEES' BRIEF

J. Timothy Eaton
Elizabeth E. Babbitt
Nicollette L. Khuans
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
Tel.: 312.527.4000

*Attorneys for Defendants-Appellants/Cross-Appellees*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Dean v. Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Taft Stettinius & Hollister LLP

    Cassiday Schade

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: J. Timothy Eaton    Date: January 15, 2021

Attorney's Printed Name: J. Timothy Eaton

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]    No [ ]

Address: Taft Stettinius & Hollister LLP

    111 East Wacker Drive, Suite 2800, Chicago, Illinois 60601

Phone Number: (312) 527-4000    Fax Number: (312) 966-8519

E-Mail Address: teaton@taftlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Dean v. Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Taft Stettinius & Hollister LLP

Cassiday Schade

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: Elizabeth E. Babbitt    Date: January 15, 2021

Attorney's Printed Name: Elizabeth E. Babbitt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: Taft Stettinius & Hollister LLP

111 East Wacker Drive, Suite 2800, Chicago, Illinois 60601

Phone Number: (312) 527-4000    Fax Number: (312) 966-8556

E-Mail Address: ebabbitt@taftlaw.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Dean v. Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Taft Stettinius & Hollister LLP

Cassiday Schade

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: Nicollette L. Khuans    Date: January 15, 2021

Attorney's Printed Name: Nicollette L. Khuans

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]    No [✔]

Address: Taft Stettinius & Hollister LLP

111 East Wacker Drive, Suite 2800, Chicago, Illinois  60601

Phone Number: (312) 527-4000    Fax Number: (312) 754-2341

E-Mail Address: nkhuans@taftlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF authorities ............................................................... i

JURISDICTIONAL STATEMENT .................................... 1

INTRODUCTION ............................................................... 2

ISSUES PRESENTED FOR REVIEW ................................ 4

STATEMENT OF THE CASE.............................................. 5

    A.   Procedural Background and Pretrial Ruling on the *Lippert* Reports. ......................................................................... 5

        1.   The Court Denied Defendants' Pretrial Motion to Exclude the *Lippert* Reports. ........................................ 5

        2.   The Trial and Verdict. ...................................... 8

            a.   Factual Background Testimony and Evidence. ...... 8

                i.   Plaintiff's Relevant Medical History............. 8

                ii.   Plaintiff is Evaluated for Hematuria............ 9

                iii.   Plaintiff's Renal Ultrasound is Misread by Radiologist. ................................................. 11

                iv.   A Urologist Diagnoses Plaintiff with Renal Cancer. ................................................. 12

                v.   Dr. Severino Consults with Other Medical Specialists in Order to Coordinate Plaintiff's Surgery. .................. 13

                vi.   Plaintiff Receives Oncological Care and Treatment Following His Surgery. ............. 16

            b.   Expert Testimony.................................... 17

            c.   Jury Verdict............................................ 19

        3.   Post-Trial Procedure.......................................... 19

SUMMARY OF THE ARGUMENT .................................. 21

STANDARD OF REVIEW ................................................. 23

A.    Judgment as a Matter of Law. ....................................................... 23

B.    New Trial and Evidentiary Rulings. ............................................ 23

B.    Remittitur of Punitive Damages. ................................................. 23

ARGUMENT ................................................................................................. 24

I.    The District Court erred in permitting Plaintiff to introduce
the highly prejudicial *Lippert* Reports for notice on liability. .............. 24

A.    The *Lippert* Reports Were Inadmissible. ................................... 25

B.    The District Court Erred in Admitting the *Lippert* Reports
for Notice. ..................................................................................... 25

C.    Any Alleged Probative Value of the *Lippert* Reports Was
Far Outweighed by the Unfair Prejudice to Defendants. .......... 27

II.    The District Court erred as a matter of law in denying judgment in
favor of Wexford on Plaintiff's Eighth Amendment claim because the
collegial review process did not deprive Plaintiff of his constitutional
rights. .............................................................................................................. 32

A.    Wexford's collegial review process facilitates proper patient
care and does not cause constitutional deprivation. ................. 33

B.    Plaintiff failed to show that Wexford was deliberately indifferent
to a known risk that its policy would lead to constitutional
violations. ..................................................................................... 35

C.    Plaintiff failed to show that Wexford's policy directly deprived
him of his rights. .......................................................................... 36

III.    The District Court erred in denying judgment as a matter of law in
favor of Doctor-Defendants on Plaintiff's Eighth Amendment claims
because they were not deliberately indifferent to Plaintiff's serious
medical needs. .............................................................................................. 37

A.    There was no evidence that Dr. Nawoor was deliberately
indifferent. .................................................................................... 39

B.    There was no evidence of Dr. Einwohner's deliberate
indifference. .................................................................................. 44

IV.    The District Court erred in permitting inadmissible character
evidence against Dr. Nawoor. ................................................................... 46

V.    There was no basis for punitive damages, and certainly not for the amount awarded. .................................................................................. 47

    A.    Plaintiff failed to present evidence demonstrating Defendants acted with ill will, spite, or indifference. ................ 47

    B.    Even if punitive damages were warranted, the punitive damages award against Wexford was unconstitutionally excessive. ......................................................................................... 48

        1.    Wexford's conduct was not sufficiently reprehensible to warrant a punitive damages award of $7,000,000. ...... 49

        2.    The 7:1 ratio of punitive to compensatory damages does not satisfy due process. ............................................ 51

CONCLUSION ............................................................................................. 53

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arnett v. Webster,*
658 F.3d 742 (7th Cir. 2011) ..................................................... 37, 38, 45

*Baker v. Wexford Health Sources, Inc.,*
118 F. Supp. 3d 985 (N.D. Ill. 2015) ............................................. 43, 44

*Bd. of County Com'rs of Bryan County, Okl. v. Brown,*
520 U.S. 397 (1997) ................................................... 32, 33, 34

*Beard v. Wexford Health Sources, Inc.,*
900 F.3d 951 (7th Cir. 2018) ......................................... 23, 51

*Bradford v. Wexford Health Sources, Inc.,*
16-cv-8112, 2020 WL 586810 (N.D. Ill. Feb. 6, 2020) .......................................... 25

*Brown v. Duncan,*
15-cv-3348, Dkt. 187 ....................................................... 28

*Collins v. Seeman,*
462 F.3d 757 (7th Cir. 2006) .................................................. 40

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,*
532 U.S. 424 (2001) ..................................................... 47

*Daniel v. Cook County,*
833 F.3d 728 (7th Cir. 2016) ................................................. 27

*Diaz v. Chandler,*
14-cv-50047, 2016 WL 1073103 (N.D. Ill. Mar. 18, 2016).................................... 31

*Donald v. Wexford Health Sources, Inc.,*
982 F.3d 451 (7th Cir. 2020) ................................................. 43

*Duckworth v. Ahmad,*
532 F.3d 675 (7th Cir. 2008) ............................................ 38, 39, 41, 42

*Epic Sys. Corp. v. Tata Consultancy Svcs. Ltd.,*
980 F.3d 1117 (7th Cir. 2020) ..................................... 23, 32, 52, 53

*Estelle v. Gamble,*
429 U.S. 97 (1976) .......................................... 37, 38

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ................................................................. 51

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................. 38

*Figgs v. Dawson*,
   829 F.3d 895 (7th Cir. 2016) .................................................... 40

*Gaston v. Ghosh*,
   2017 WL 5891042 (N.D. Ill. Nov. 28, 2017) .............................. 35

*Gonzalez v. Feinerman*,
   663 F.3d 311 (7th Cir. 2011) .................................................... 38

*Gracia v. SigmaTron Int'l, Inc.*,
   842 F.3d 1010 (7th Cir. 2016) .................................................. 23

*Green v. Howser*,
   942 F.3d 772 (7th Cir. 2019) .............................................. 48, 49

*Grieveson v. Anderson*,
   538 F.3d 763 (7th Cir. 2008) .................................................... 35

*Hildreth v. Butler*,
   960 F.3d 420 (7th Cir. 2020) .............................................. 27, 31

*Johnson v. Doughty*,
   433 F.3d 1001 (7th Cir. 2006) .................................................. 37

*Lust v. Sealy, Inc.*,
   383 F.3d 580 (7th Cir. 2004) .................................................... 51

*Monell v. New York City Dept. of Social Servs.*,
   436 U.S. 658 (1978) ...................................................... 32, 33, 35

*Perez v. Fenoglio*,
   792 F.3d 768 (7th Cir. 2015) .................................................... 32

*Petties v. Carter*,
   836 F.3d 722 (7th Cir. 2016), *as amended* (Aug. 25, 2016) ............ 42, 43

*Pyles v. Fahim*,
   771 F.3d 403 (7th Cir. 2014) .................................................... 39

*Quinn v. Wexford Health Sources, Inc.*,
   2020 WL 888048 (S.D. Ill. Feb. 24, 2020) ................................... 6

*Rosario v. Brawn,*
    670 F.3d 816 (7th Cir. 2012) ............................................................ 37

*Saccameno v. U.S. Bank Nat'l Ass'n,*
    943 F.3d 1071 (7th Cir. 2019) ........................................... 49, 51, 52, 53

*Smith v. Bray,*
    681 F.3d 888 (7th Cir. 2012) ............................................................ 44

*Smith v. Wade,*
    461 U.S. 30 (1983) ............................................................................ 48

*Spiegel v. McClintic,*
    916 F.3d 611 (7th Cir. 2019) ............................................................ 33

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) ...................................................................*passim*

*TXO Prod. Corp. v. All. Res. Corp.,*
    509 U.S. 443 (1993) .......................................................................... 51

*United States v. Boros,*
    668 F.3d 901 (7th Cir. 2012) ............................................................ 31

*United States v. Tanner,*
    628 F.3d 890 (7th Cir. 2010) ............................................................ 46

*Waid v. Merrill Area Public Schools,*
    130 F.3d 1268 (7th Cir. 1997) .......................................................... 23

*Walker v. Benjamin,*
    293 F.3d 1030 (7th Cir. 2002) .......................................................... 44

*Walker v. Wexford Health Sources, Inc.,*
    940 F.3d 954 (7th Cir. 2019) ............................................................ 41

*Whiting v. Wexford,*
    839 F.3d 658 (7th Cir. 2016) ............................................................ 41

*Willis v. Lepine,*
    687 F.3d 826 (7th Cir. 2012) ............................................................ 23

*Wilson v. Groaning,*
    25 F.3d 581 (7th Cir. 1994) .............................................................. 27

*Wilson v. Wexford Health Sources, Inc.,*
    932 F.3d 513 (7th Cir. 2019) ............................................................ 25

*Zaya v. Sood,*
    836 F.3d 800 (7th Cir. 2016) ................................................................ 38

**Statutes**

735 ILCS 5/2-1115 .................................................................................... 47

42 U.S.C. § 1983.......................................................................................... 32

**Other Authorities**

Fed. R. Evid. 403....................................................................................... 31

Fed. R. Evid. 404(b) ................................................................................. 46

## JURISDICTIONAL STATEMENT

Plaintiff brought this lawsuit in the U.S. District Court for the Central District of Illinois on April 21, 2017. Dkt. 1. The District Court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff brought suit pursuant to 42 U.S.C. § 1983, and supplemental jurisdiction of Plaintiff's state-law claims under 28 U.S.C. § 1367. Dkt. 1, 72. The District Court entered judgment against Defendants on December 18, 2019, awarding Plaintiff $1,000,000.00 in compensatory damages and $10,037,500.00 in punitive damages. AA01[1]. On January 15, 2020, Defendants timely filed a Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for a New Trial, or in the Alternative, Motions for Remittitur and Setoff. Dkt. 206, 207. Plaintiff moved for attorneys' fees, costs, and expenses. Dkt. 204, 205, 230. The District Court granted Defendants' Motion in part, remitting the punitive damages award against Wexford from $10,000,000.000 to $7,000,000.00. AA56. The District Court also awarded Plaintiff fees totaling $602,786.25, costs totaling $33,337.67, and expenses totaling $31,077.53. *Id.* The District Court entered amended judgment consistent with its post-trial ruling on September 28, 2020. AA57-58. On October 21, 2020, Defendants timely filed their notice of appeal. Dkt 255. Plaintiff filed a cross-appeal on November 2, 2020. Dkt. 258. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 1294, and the parties' appeals are timely under Federal Rule of Appellate Procedure 4(a).

---

[1] Citations to Defendants' Local Rule 30(a) and (b) appendices are referenced herein as "AA__" and "AB__," respectively.

## INTRODUCTION

This is a medical malpractice case brought by Plaintiff William Dean against physicians, Dr. Abdur Nawoor and Dr. Rebecca Einwohner ("Doctor-Defendants"), who cared for him while he was imprisoned, and against Doctor-Defendants' employer, Wexford Health Sources, Inc. ("Wexford"). Plaintiff claimed Doctor-Defendants were negligent in timely diagnosing and treating his cancer, and that Wexford was negligent as an institution in overseeing his care. A jury awarded Plaintiff $1,000,000.00 in compensatory damages for those injuries. But Plaintiff also sought punitive damages, which are unavailable in medical malpractice cases.

Plaintiff therefore claimed Doctor-Defendants displayed deliberate indifference toward him, which constituted "cruel and unusual punishment" in violation of the Eighth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983. As discussed below, Plaintiff had no evidence that Doctor-Defendants were deliberately indifferent, and even if he did, as to Wexford the law of this Circuit bars corporate liability under the *respondeat superior* doctrine for Section 1983 claims.

Plaintiff thus claimed Wexford's policy requiring its doctors to use a process called "collegial review," whereby physicians confer with each other to determine and coordinate patient care, was itself an Eighth Amendment violation for which Wexford could be held directly liable. Aside from the fact that Plaintiff had no expert who testified that collegial review itself makes for poor patient care, the difficulty with this claim was that it required Plaintiff to show that Wexford had notice that collegial

review harmed patients and that Wexford's use of collegial review was evidence of its deliberate indifference to patients.

Plaintiff alleged Wexford had notice of the unconstitutionality of collegial review from the controversial "*Lippert* Reports," particularly the second such report, the "Puisis Report," which concluded that collegial review was unsafe and should be abandoned. Those reports were prepared in a different lawsuit and evaluated different prison facilities. This Court and others have held the *Lippert* Reports inadmissible as unreliable hearsay and highly prejudicial. Further, the Puisis Report was issued *after* the events in question here occurred and, as a matter of law and logic, could not have put Wexford on notice of anything.

The District Court below nonetheless allowed Plaintiff to introduce the *Lippert* Reports' conclusions into evidence, ostensibly to prove notice. In actuality, Plaintiff repeatedly used them to inflame the passions of the jury which resulted in findings against all Defendants on all of Plaintiff's counts, as well as a punitive damages award exceeding $10 million. This and several other critical trial errors discussed below require the entry of judgment in favor of all Defendants on certain counts or, at the very least, a new, fair trial for these Defendants.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred in allowing Plaintiff, over Defendants' objections, to admit into evidence excerpts of the highly prejudicial *Lippert* Reports for notice of Defendants' liability for Plaintiff's Eighth Amendment Claims, and, if so, whether Defendants are entitled to a new trial on all counts as a result of that error.

2.      Whether the District Court erred as a matter of law in declining to enter judgment in Wexford's favor on Plaintiff's Eighth Amendment claim, or a new trial on that claim, where Plaintiff failed to show that Wexford's collegial review process constituted an unconstitutional policy, that Wexford acted deliberately indifferent, and that collegial review injured Plaintiff.

3.      Whether the District Court erred as a matter of law in declining to enter judgment in favor of Doctor-Defendants on Plaintiff's Eighth Amendment claims, or grant a new trial on those claims where there was no evidence of Doctor-Defendants' deliberate indifference.

4.      Whether the District Court erred in permitting inadmissible character evidence against Dr. Nawoor.

5.      Whether the District Court erred in not vacating the jury's punitive damages award, where Plaintiff failed to present any evidence that Defendants acted with ill will, spite, or for the purpose of injuring him, and in declining to reduce the punitive damages to a proper ratio commensurate with the compensatory damages award.

4

## STATEMENT OF THE CASE

### A.     Procedural Background and Pretrial Ruling on the *Lippert* Reports.

On April 21, 2017, Plaintiff filed a complaint against Wexford, Dr. Nawoor and Dr. Einwohner[2], asserting he was harmed by Defendants' alleged delays relating to the diagnosis, surgery, and treatment of his kidney cancer while imprisoned. Dkts. 1, 72[3]. The operative complaint at trial was filed on April 12, 2019. Dkt. 72.

Plaintiff was, during all relevant times, an Illinois Department of Corrections ("IDOC") inmate, incarcerated at the Taylorville Correctional Center ("Taylorville") located in central Illinois. Wexford provides health care services to Illinois prisons. Dkt. 201 at 699-700. Doctor-Defendants were Wexford employees at all times relevant to Plaintiff's complaint. Plaintiff brought deliberate indifference claims against all Defendants, in violation of the Eighth Amendment and 42 U.S.C. § 1983; medical malpractice claims against Doctor-Defendants, institutional negligence against Wexford, and a *respondeat superior* claim against Wexford relating to the claims against Doctor-Defendants.[4]

### 1.     The Court Denied Defendants' Pretrial Motion to Exclude the *Lippert* Reports.

A key pre-trial ruling was the court's denial of Defendants' motion to exclude the introduction of reports prepared by court-appointed expert witnesses in another

---

[2] Plaintiff dismissed his cause of action against Defendant Lisa Mincy before trial. Dkt. 202 at 914. The jury found in favor of Defendant Kathy Galvin. Dkt. 180.

[3] Unless otherwise indicated, all docket citations are to the District Court proceedings in this matter, 3:17-cv-3112, and pinpoint citations refer to transcript page numbers, pleading page numbers, or bates-label identifiers, not docket page numbers.

[4] The District Court dismissed Plaintiff's *respondeat superior* claim in a November 16, 2018 text order.

case, *Lippert v. Godinez*, 10-cv-4603 (N.D. Ill. filed July 23, 2010). Dkt. 170. There are two *Lippert* Reports: the December 2014 Shansky Report, and the October 2018 Puisis Report.[5] Dkt. 263-9; 263-11.

The *Lippert* court appointed Dr. Shansky to assist "the court in determining whether [IDOC] is providing health care service to the offenders in its custody that meet the minimum constitutional standards of adequacy." Dkt. 263-11 at PTX194-0004. Shansky evaluated certain IDOC facilities in 2013 and 2014, but not Taylorville, where Plaintiff resided. *Id.* In one of fifteen sections of his report, Shansky addressed Wexford's process of having on-site physicians coordinate with Wexford for referrals for off-site patient services: collegial review. *Id.* at 532. Shansky recommended improvements of collegial review record-keeping and suggested ways to expedite collegial review. *Id.* Shansky's criticisms were "directed at IDOC, not Wexford. Wexford is mentioned only in passing, and largely uncritically. The policies criticized are generally IDOC policies, not Wexford policies, and Shansky's ultimate conclusion is that it is the State of Illinois that failed to meet constitutional standards, not Wexford." *Quinn v. Wexford Health Sources, Inc.*, 17-cv-669-NJR, 2020 WL 888048, at *6 (S.D. Ill. Feb. 24, 2020), *appeal docketed*, 20-1483 (7th Cir. Mar. 25, 2020).

---

[5] Wexford was a *Lippert* defendant but dismissed by stipulation of the parties on December 18, 2013. *Lippert v. Godinez*, 10-cv-4603, Dkt. 242 (N.D. Ill. Dec. 18, 2013). On December 19, 2013, Judge Ellis entered an agreed order appointing Shansky as the court's expert. *Lippert*, Dkt. 240. Wexford did not move for Shansky's appointment, *id.*, and the court's order provided that Wexford could participate in the initial investigation meeting with Shansky and receive a draft of the confidential report. *Lippert*, Dkt. 244.

The second *Lippert* Report was prepared by another *Lippert* court-appointed expert, Dr. Puisis. Puisis was assigned the same tasks as Shansky, in addition to determining whether systemic deficiencies Shansky identified still existed in 2018. Dkt. 263-9 at PTX193-0005. Puisis was highly critical of collegial review, stating it was "a patient safety hazard and should be abandoned until patient safety is ensured." *Id.* at PTX193-0011. However, significantly here, Puisis was only appointed in *Lippert* on December 8, 2017, (*Lippert*, 10-cv-4603, Dkt. 593), and conducted his evaluations in 2018. Dkt. 263-9. Puisis published his Report in October 2018. *Id.* at PTX193-0001. Plaintiff's claims in this case centered on his treatment by Defendants in 2015 through 2017, before Puisis issued his Report.

Defendants argued for the *Lippert* Reports' exclusion because they were inadmissible hearsay, not authenticated by their authors or persons quoted therein, and highly prejudicial. Dkt. 170 at 4-5. Defendants further argued the second Report could not be offered to show "notice" to Wexford of issues with collegial review, because it was not even published until after the events in this case occurred. Dkt. 198 at 418. Plaintiff maintained throughout trial that the Reports were evidence that Wexford's collegial review process was unsafe, and that Wexford was on notice that it was unsafe. Dkt. 203 at 1331-32. Plaintiff also argued that Wexford's policy violated Plaintiff's Eighth Amendment rights.

The court denied Defendants' motion to exclude the *Lippert* Reports and overruled Defendants' objections at trial on the same issue. AB14-17. In ruling that that limited portions of the *Lippert* Reports were admissible, the court found that

7

they were not being introduced for the truth of the matters asserted therein, but rather for a non-hearsay purpose of providing Defendants notice of "reported systemic problems with the process for obtaining offsite diagnostic tests and offsite care." AB16. At trial, Plaintiff repeated Puisis's 2018 conclusion that collegial review was a patient safety hazard that should be abandoned six times at trial, both in witness examination and in closing. *See* Dkt. 201 at 746-47, 753, 831; 203 at 1312, 1330-31, 1359.

### 2. The Trial and Verdict.

#### a. Factual Background Testimony and Evidence.

The case proceeded to a jury trial. Plaintiff and Doctor-Defendants testified at length, as well as other fact witnesses, including other treating physicians and Wexford representatives. Plaintiff also introduced the testimony of three experts, and Defendants introduced two experts.

##### i. Plaintiff's Relevant Medical History.

Plaintiff testified about his medical history and treatment at Taylorville. Plaintiff had heart disease, a history of ischemic cardiomyopathy, hypertension, diabetes, obesity, and sleep apnea. Dkt. 264-4 at 25. He also had a history of kidney stones since approximately 2003. Dkt. 263-4 at 44. Plaintiff was treated for kidney stones in July and December 2014 while in Taylorville. Dkt. 197 at 283-84. Plaintiff understood from his treating physician that the treatment of his kidney stones in late 2014 meant he may have a recurrence of stones in one year. *Id.* at 285. Plaintiff suffered lower back pain from the kidney stones in 2014 but did not take pain medication. *Id.* at 287. Plaintiff experienced blood in his urine (or hematuria) on

occasion for years preceding his visit with Dr. Nawoor in December of 2015. *Id.* at 281-82. The hematuria was typically microscopic and invisible. *Id.*

Since 2012, Dr. Einwohner, a trained nephrologist, or kidney doctor, provided Plaintiff's kidney care. *Id.* at 287-88; 263-4 at 12. Dr. Einwohner was a Wexford telemedicine physician who provided support for Wexford's primary care physicians regarding kidney health. Dkt. 263-4 at 7-8, 11-12. She worked in Wexford's Pittsburgh office. *Id.* at 8. When Dr. Einwohner evaluated Plaintiff's kidney stones in 2014 (including through CAT scan), Plaintiff refused treatment—specifically, Plaintiff refused to have a urologist scope his kidneys because he feared the procedure and because he "wasn't really feeling any pain." Dkt. 197 at 287-88. Another CAT scan of Plaintiff's kidneys in July 2015 revealed a recurrence of kidney stones, but not cancer. Dkt. 263-4 at 30; 198 at 461, 467.

### ii.     Plaintiff is Evaluated for Hematuria.

Dr. Nawoor was hired as Wexford's Taylorville medical director on December 2, 2015, after retiring from 38 years as an internist in private practice. Dkt. 263-3 at 4-8. Plaintiff went to the Taylorville sick call[6] on December 23, 2015, a few days after he observed blood in his urine. *Id.* at 14-16; Dkt. 197 at 294-95. At sick call, Plaintiff told Dr. Nawoor he was not in pain. Dkt. 263-3 at 16. Dr. Nawoor evaluated Plaintiff, including by palpitating him around his kidneys, ordering testing of Plaintiff's blood and urine, and encouraging him to stay hydrated. *Id.* at 11, 17, 39. At that point, Dr.

---

[6] During sick call, an IDOC inmate visits the correctional center medical clinic. Dkt. 195 at 78.

Nawoor believed the potential causes for Plaintiff's hematuria was either a recurrence of kidney stones or cancer. *Id.* at 40.

Plaintiff's hematuria continued after his December 23, 2015 visit with Dr. Nawoor, but Plaintiff did not experience pain aside from the pain associated with passing blood clots in his urine. Dkt. 195 at 87-91. Plaintiff was evaluated by Dr. Einwohner during a January 7, 2016 telemedicine visit. Dkt. 263-4 at 25-27. Dr. Einwohner was not aware of Plaintiff's December 23, 2015 visit with Dr. Nawoor, but on January 7, Dr. Einwohner learned Plaintiff intermittently experienced painless blood in his urine, including blood clots. *Id.* at 24, 27.

Dr. Einwohner contacted Dr. Stephen Ritz, the Wexford physician who managed collegial reviews for Taylorville and other Wexford facilities, and suggested there be a collegial review to address Plaintiff's treatment plan. Dkt. 201 at 700-01; 263-4 at 28-31; 117-6 at 000061. Dr. Einwohner suggested that during collegial review, the physicians consider reimaging Plaintiff's kidneys. Dkt. 263-4 at 32; Dkt. 117-6 at 000061.

Collegial review is a process Wexford uses to coordinate patient care by having treating physicians (such as Dr. Nawoor) discuss with Wexford (here, through Dr. Ritz) referrals for off-site services. Dkt. 200 at 532; 201 at 719. Collegial review is a "forum for doctors to discuss cases," particularly as many of the Wexford on-site doctors work alone. Dkt. 201 at 777. Collegial review allows the physicians to determine the best course of treatment, based on input from treating physicians, specialists, and the utilization management overseer. Dkt. 200 at 507. During his

testimony regarding collegial review, Dr. Ritz was questioned by Plaintiff about the conclusions from the 2018 Puisis Report which suggested that collegial review was "unsafe" and should be abandoned by Wexford. Dkt. 201 at 746-47, 753, 831. Although Dr. Ritz did not say when he became aware of this conclusion, he did testify that he disagreed with it. *Id.* at 753.

### iii. Plaintiff's Renal Ultrasound is Misread by Radiologist.

Drs. Nawoor and Ritz participated in a January 13, 2016 collegial review to discuss Plaintiff's treatment. Dkt. 263-3 at 25. The doctors decided to have Plaintiff undergo a renal ultrasound. *Id.* Dr. Nawoor testified that he and Dr. Ritz chose a less invasive ultrasound, rather than a CAT scan, because Plaintiff had decreased kidney functioning, a history of kidney stones, and had already undergone two lithotripsies (procedures to destroy kidney stones using sound waves). *Id.* at 32; 201 at 813-14. In Dr. Ritz's experience, an ultrasound is usually the first step in working up someone presenting Plaintiff's symptoms. Dkt. 201 at 817.

On February 2, 2016, Plaintiff underwent a renal ultrasound conducted by a third-party technician who came on-site to Taylorville. Dkt. 263-3 at 45; 195 at 97; 263-4 at 38. Wexford engaged the services of Precise Specialties, a mobile-imaging company, because IDOC prefers medical services be provided on site when it is reasonable to do so. Dkt. 201 at 817; 203 at 1139-40. Once Taylorville requested an ultrasound, Precise Specialties typically performed the ultrasound within two to three weeks. Dkt. 203 at 1140.

Plaintiff's ultrasound results were reviewed by a radiologist not employed by Wexford. Dkt. 263-3 at 45-46, 100-12 at 001680. The reviewing radiologist misread the ultrasound, and reported that, aside from an enlarged kidney, the results of Plaintiff's ultrasound were normal. Dkt. 263-3 at 48-49, 63; 100-12 at 001680. The radiologist reported there was no evidence of mass lesions on the kidneys, and no evidence of hydronephrosis, the blockage of kidney draining that can occur when there is a mass on the kidney or stones. Dkt. 201 at 819-20. Dr. Nawoor testified that if the radiologist had correctly read the ultrasound and reported abnormalities in Plaintiff's kidneys, Plaintiff's treatment plan would have changed accordingly, and that Plaintiff would have undergone a CAT scan and a urology visit "right away," but the misread ultrasound "thr[e]w us off track here." Dkt. 263-3 at 32, 49, 59. Because of the misreading, Drs. Ritz and Nawoor "thought maybe the problem was not in the kidney, maybe in the bladder. That's why we sent him to a urologist for cystoscopy and further workup." *Id.* at 63; Dkt. 195 at 98; 201 at 820.

### iv.     A Urologist Diagnoses Plaintiff with Renal Cancer.

Plaintiff was evaluated by a urologist, Dr. William Severino, on March 10, 2016. Dkt. 195 at 99-100. This urology evaluation was originally scheduled for March 21, 2016, but moved up at Dr. Nawoor's request. Dkt. 202 at 977; 100-5 at 001351. Dr. Severino was a urologist at the Springfield Clinic, not a Wexford employee. Dkt. 203 at 1152-53. Dr. Nawoor testified that he spoke to Dr. Severino a few times before the March 10, 2016 visit to see if Plaintiff could be seen sooner. Dkt. 263-3 at 88. The records from Dr. Severino's office indicated that on or around March 1, 2016, a nurse called on Dr. Nawoor's behalf to determine whether Plaintiff could be seen sooner in

light of Plaintiff's ongoing bleeding. Dkt. 203 at 1174.[7] After the March 10, 2016 evaluation, Dr. Severino recommended Plaintiff undergo a CAT scan and a cystoscopy. *Id.* at 1159.

Drs. Nawoor and Ritz considered Dr. Severino's recommendations during a March 22, 2016 collegial review, and approved his cystoscopy request. Dkt. 263-3 at 105. Dr. Severino's CAT scan request was approved on March 30, 2016, and administered on April 12, 2016. *Id.* at 38, 110. That scan revealed that Plaintiff had renal cell carcinoma, and Dr. Severino stated that it appeared Plaintiff had "right kidney cancer with potential invasion of the vena cava," the main vein from his lower extremities to his heart. Dkt. 203 at 1160-61. Dr. Severino informed Plaintiff of his diagnosis on April 14, 2016. *Id.*; 197 at 170.

### v.   Dr. Severino Consults with Other Medical Specialists in Order to Coordinate Plaintiff's Surgery.

The same day he diagnosed Plaintiff's cancer, Dr. Severino contacted the prison, advising that the "situation [is] non-emergent. . . . [Plaintiff] may need r[igh]t nephrectomy [*i.e.*, kidney removal], needs MRI to determine extent of problem but has pacemaker so unable to do this. Plans are being set into motion for procedure. May need vascular surg[eon] to assist [with] procedure depends on size of thrombus and where it is situated." Dkt. 100-5 at 001361. Dr. Nawoor was informed of Dr. Severino's findings. Dkt. 200 at 589-90.

---

[7] Dr. Severino did not testify at trial; portions of his deposition testimony were read into the record. Dkt. 203 at 1150-1199.

Drs. Nawoor and Ritz approved the nephrectomy at a collegial review on or about April 21, 2016. Dkt. 263-3 at 116. The surgery was scheduled for May 11, 2016. Dkt. 203 at 1134. Plaintiff's surgery, according to Dr. Severino, was "[v]ery complex. As complex as it gets." *Id.* at 1156. Dr. Severino described it as a "major operation where they put him under hypothermic cardiac arrest. They basically bleed him out, stop your heart." *Id.* at 1157.

Dr. Severino wanted additional imaging of Plaintiff, but could not order an MRI because of Plaintiff's pacemaker. *Id.* at 1162-63. Plaintiff had a chest x-ray on April 22, 2016, which ruled out lung cancer. Dkt. 201 at 900, 903. Dr. Severino also consulted a vascular surgeon, Dr. Ryan (not employed by Wexford), regarding Plaintiff's surgery, to evaluate how high up in the vena cava the cancer progressed. Dkt. 203 at 1161, 1167. Dr. Ryan reported to Dr. Severino on May 5, 2016, that because of the location of the cancer, a cardiothoracic surgeon also might need to participate in the surgery, and suggested a cardiothoracic surgeon review Plaintiff's CAT scan. Dkt. 200 at 583-84; 203 at 1167-68.

Dr. Nawoor participated in a collegial review with another Wexford physician, Dr. Garcia, on or about May 4, 2016, and approved Plaintiff's cardiology evaluation. Dkt. 263-3 at 118. Plaintiff was evaluated by an outside cardiologist on May 6, 2016. *Id.* at 121. Plaintiff was cleared for surgery by the cardiologist, but the May 11, 2016 surgery date was pushed back because Dr. Severino wanted to confer with other surgeons due to the complexity of the case. Dkt. 203 at 1135. The IDOC medical records director made several attempts to contact Dr. Severino's office and determine

14

the rescheduled surgery date. *Id.* at 1136. On May 25, 2016, Dr. Nawoor also called Dr. Severino's office to ask when Plaintiff's surgery would be done. Dkt. 200 at 588.

In the meantime, Dr. Severino continued planning Plaintiff's complicated surgery. He had Plaintiff's CAT scan reviewed by Dr. Coakley, a radiologist not employed by Wexford who, upon reviewing the scan, suggested that additional imaging be conducted prior to surgery. *Id.* at 585; 203 at 1172. Plaintiff underwent additional imaging of his chest, abdomen, and pelvis on June 8, 2016. Dkt. 263-3 at 126, 128. Following additional imaging that suggested the cancer reached up further into the vena cava, Dr. Severino decided to involve a cardiothoracic surgeon in the surgery. Dkt. 203 at 1170. Dr. Severino explained that the timing of the surgery was contingent on getting "everybody on board. You know, get everybody seen and get it scheduled." *Id.* This was logistically challenging, as it required coordinating the simultaneous availability of three surgeons for a ten-hour surgery. *Id.* Plaintiff visited a cardiothoracic surgeon, Dr. Hazelrigg, on or about June 20, 2016, after Dr. Nawoor and Wexford approved of the cardiothoracic consultation on June 14, 2016.[8] Dkt. 197 at 203-04; 263-3 at 127-28.

Dr. Severino scheduled Plaintiff's surgery for July 19, 2016. Dkt. 203 at 1178. On or about June 23, 2016, Dr. Severino's office informed Taylorville of Plaintiff's scheduled surgery date. *Id.* Plaintiff underwent a second pre-operative cardiac clearance at Dr. Severino's request on June 28, 2016. Dkt. 263-3 at 129. Plaintiff underwent surgery on July 19, 2016; one of the most complex procedures in which

---

[8] Ultimately, Dr. Galpados, not Dr. Hazelrigg (both not Wexford employees), participated in Plaintiff's surgery. Dkt. 203 at 1177.

Dr. Severino had ever been involved. Dkt. 203 at 1176. The nine-hour surgery required a 10-person surgical team (not employed by Wexford), including three surgeons. *Id.* at 1177.

### vi. Plaintiff Receives Oncological Care and Treatment Following His Surgery.

Following surgery, Plaintiff remained hospitalized until his July 28, 2016 discharge. Dkt. 263-3 at 130. Dr. Severino evaluated Plaintiff on August 11, 2016, and thought Plaintiff was doing "unbelievably well." Dkt. 203 at 1180. Dr. Severino recommended Plaintiff have an oncology evaluation to determine a cancer treatment plan. *Id.* Wexford and Dr. Nawoor approved the oncologist visit on August 18, 2016, and Plaintiff met oncologist Dr. Guaglianone on August 26, 2016. Dkt. 263-3 at 134-35. Dr. Guaglianone, who was not employed by Wexford, requested a liver biopsy to evaluate metastasis (or cancer growth/spread) on September 22, 2016, which was approved by Wexford on September 27, 2016, and conducted on October 3, 2016. *Id.* at 141-42. The biopsy revealed metastasis of cancer to Plaintiff's liver. *Id.* at 143.

Over the course of Plaintiff's cancer treatment by Dr. Guaglianone, Plaintiff was prescribed four different chemotherapy drugs. Dkt. 197 at 224, 229-30, 234, 242, 251. Each medication was non-formulary, meaning they were not on the list of commonly-prescribed medications Wexford's patients receive, and therefore underwent a pharmacy review process by Wexford's clinical pharmacists. Dkt. 201 at 758-61. The pharmacists evaluated the non-formulary requests to confirm the medications requested were the safest, most effective, and medically and clinically

appropriate for the patient. *Id.* at 765. The medications cost between $10,000 and $15,000 per month. *Id.* at 772.

During the course of his treatment, Plaintiff was presented with a "Do Not Resuscitate" ("DNR") advanced directive, which he refused to sign. Dkt. 197 at 253-256. Plaintiff declined to sign the DNR and made it clear that he wanted all efforts exhausted to keep him alive. *Id.* In considering Plaintiff's post-surgical, oncological treatment, a Wexford pharmacist suggested that Plaintiff may benefit more from palliative care because of the spread of his cancer and other chronic co-morbidities. Dkt. 201 at 766-67. However, the decision of whether a patient receives palliative or hospice care is left to the patient. *Id.* at 770. Plaintiff elected to continue his treatment.

### b.    Expert Testimony.

At trial, Plaintiff introduced Dr. Adam Metwalli, a urologic oncologist and retained expert, who opined that Plaintiff "was not worked up appropriately in a timely fashion" upon presenting with hematuria, which resulted in an unnecessarily complicated surgery with higher risks and a longer recovery time. Dkt. 197 at 322, 336-37, 380. Dr. Metwalli also opined delays in Plaintiff's treatment breached the standard of care. *Id.* at 342-43. Dr. Metwalli testified that he did not believe there was evidence that the purported delays in Plaintiff's care between December 2015 and July 2016 caused metastasis of Plaintiff's cancer. *Id.* at 382.

Dr. Nivedita Dhar, Plaintiff's retained urology expert, opined that Defendants breached the standard of care by having Plaintiff assessed by a urologist in March

2016 and CAT-scanned in April 2016, which she characterized as treatment delays. Dkt. 198 at 426, 435-41, 446.

Dr. Bruce Barnett, a medical consultant specializing in correctional healthcare and another of Plaintiff's retained experts, opined that Doctor-Defendants breached the standard of care, and that the failure to follow Wexford's guidelines for administering collegial review put Plaintiff at greater risk of harm. Dkt. 200 at 486-87, 500, 505. Dr. Barnett opined that the "proper mission" of collegial review was to "protect the patient," (*id.* at 539-40), but that Defendants did not follow the proper collegial review protocols in treating Plaintiff. *Id.* at 506-07. Dr. Barnett remarked that "cost-effective medicine is safer medicine," and that, done right, collegial review would work "in the interest of the patient." *Id.* at 615.

Defendants offered the expert testimony of oncologist Dr. Richard Kosierowski. Dkt. 202 at 926-27. Dr. Kosierowski opined that Plaintiff had terminal cancer when he first presented with hematuria on December 23, 2015, (*id.* at 936), and that Defendants met the standard of care in treating Plaintiff and allowing Dr. Severino to manage his care from the cancer diagnosis through the July 2016 surgery. *Id.* Dr. Kosierowski also opined that Plaintiff did not experience unreasonable delays in his post-surgical oncological treatment, and that Plaintiff was not harmed from any purported delays in starting chemotherapy. *Id.* at 936-37.

Defendants also introduced the expert testimony of Dr. Michael Racenstein, a diagnostic radiologist. *Id.* at 1064-65. Dr. Racenstein reviewed imaging of Plaintiff's kidneys from 2014 through 2016, and opined that the February 2016 ultrasound

showed cancer in the right kidney, (*id.* at 1084, 1093), and the reviewing radiologist misread the image, possibly because of the infiltrative manner in which Plaintiff's cancer developed, rather than growing as a discrete mass. *Id.* at 1089-90.

### c.     Jury Verdict.

The jury found for Plaintiff and against Defendants on his Eighth Amendment (deliberate indifference) claims and against Doctor-Defendants on his medical malpractice claims. Dkt. 180. The jury also found in favor of Plaintiff and against Wexford on his institutional negligence claim. *Id.* The jury awarded Plaintiff $1,000,000.00 in compensatory damages: $100,000 for physical pain and suffering; $500,000 for emotional pain and suffering; $100,000 for the loss of normal life/diminished life expectancy; and $300,000 for future medical care and supplies. *Id.* The jury also awarded Plaintiff punitive damages totaling $10,037,500: $25,000 against Dr. Nawoor; $12,500 against Dr. Einwohner; and $10,000,000 against Wexford. *Id.* Judgment was entered on December 18, 2019. AA01.

### 3.     Post-Trial Procedure.

Defendants' Rule 50 motion for judgment as a matter of law at the conclusion of the proofs was denied. Dkt. 203 at 1248-52. Defendants renewed the motion for judgment as a matter of law under Rule 50(b), or alternatively, for a new trial under Rule 59, or alternatively for remittitur and setoff. Dkt. 206, 207. Plaintiff moved for attorneys' fees, costs, and expert witness deposition fees. Dkt. 204, 205, 230. The court denied Defendants' requests for judgment as a matter of law, a new trial, or setoff. AA55-56. The court remitted the punitive damages award against Wexford from $10,000,000.00 to $7,000,000.00 on the grounds that the $10,000,000.00 award was

unconstitutionally excessive. *Id.* The court awarded Plaintiff $602,786.25 in attorneys' fees, $31,077.53 in expenses, and $33,337.67 in costs. *Id.* Amended judgment consistent with the remittitur was entered on September 28, 2020. AA57-58. This appeal followed.

## SUMMARY OF THE ARGUMENT

The admission of the *Lippert* Reports[9] even as to "notice" was highly prejudicial and denied all Defendants a fair trial. First, the *Lippert* Reports are inadmissible, unauthenticated hearsay. They are not public records, and largely did not even address issues at Taylorville, where Plaintiff resided. Moreover, the mild criticism of collegial review in the first report (the Shansky Report) is more directed at IDOC and not as to any Defendant in this case.

Second, the Puisis Report was issued in 2018, after the events in question in Plaintiff's case, and could not possibly be "notice" to Defendants of anything. The Puisis Report also contained different findings and much harsher criticism of collegial review than the first Report, concluding it was unsafe and should be abandoned. Plaintiff at trial focused almost exclusively on the Puisis Report's findings. Any probative value of these Reports was far outweighed by the unfair prejudice to these Defendants, resulting in tainted findings against Defendants on all of Plaintiff's claims.

Plaintiff did not prove his Eighth Amendment claim against Wexford based upon Wexford's collegial review policy. Dr. Barnett, Plaintiff's expert, and the only one of Plaintiff's experts who opined on collegial review, acknowledged its benefit by observing "cost-effective medicine is safer medicine." Dr. Barnett was only critical of collegial review as it was applied to Plaintiff. Collegial review is not an

---

[9] The trial court considered "the complete reports before stating the Court's inclination to allow the admission of parts of the reports for the purpose of notice." Dkt. 267 at 3. However, only portions of the *Lippert* Reports were admitted into evidence and shown to the jury. *Id.*; *see also* AB18; AB25.

unconstitutional policy that demonstrated Wexford's deliberate indifference under the Eighth Amendment.

The Eighth Amendment claims against Doctor-Defendants also fall short. While there may be a fair disagreement as to whether Doctor-Defendants breached their standard of care in treating Plaintiff, there was no evidence that Doctor-Defendants did anything other than use their professional judgment in treating Plaintiff, and there was no evidence Doctor-Defendants acted with the "culpable state of mind" necessary to support constitutional violations. As to Dr. Nawoor specifically, the District Court's admission of unflattering character evidence was error because it impacted findings as to both the medical malpractice and Eighth Amendment claims against him.

Finally, Plaintiff was not entitled to punitive damages because there was no showing that Defendants' conduct in treating Plaintiff was motivated by "evil motive or intent" or "reckless or callous indifference." Additionally, the amount of punitive damages was grossly excessive and a violation of due process.

## STANDARD OF REVIEW

### A.   Judgment as a Matter of Law.

A district court's denial of a motion for judgment as a matter of law is reviewed *de novo*. *Epic Sys. Corp. v. Tata Consultancy Svcs. Ltd.*, 980 F.3d 1117, 1128 (7th Cir. 2020) (citations omitted). In evaluating the denial of such a motion, the reviewing court "construe[s] all evidence in the record—and inferences that can be reasonably drawn from that evidence—in favor of the party that prevailed at trial on the issue." *Id.* at 1129.

### B.   New Trial and Evidentiary Rulings.

A district court's denial of a motion for a new trial is reviewed for abuse of discretion. *Id.* This Court also reviews the trial court's evidentiary rulings for abuse of discretion. *Willis v. Lepine*, 687 F.3d 826, 838 (7th Cir. 2012). An evidentiary ruling may "warrant reversal when a trial judge bases his [or her] decision on an error of law." *Waid v. Merrill Area Public Schools*, 130 F.3d 1268, 1273 (7th Cir. 1997).

### B.   Remittitur of Punitive Damages.

The Seventh Circuit reviews a challenge to a punitive damages award *de novo* when constitutional issues are raised, and if no constitutional issue is raised, the punitive damages are reviewed for abuse of discretion. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016); *see also Epic*, 980 F.3d at 1140 (challenge to punitive damages award on basis that it violates due process rights is reviewed *de novo*). "[E]xcessive punitive-damages awards violate the Due Process Clause." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018).

## ARGUMENT

**I.    The District Court erred in permitting Plaintiff to introduce the highly prejudicial *Lippert* Reports for notice on liability.**

The crux of Plaintiff's deliberative indifference claims at trial was that Defendants, and Wexford in particular, were "on notice" of the purported problems with Wexford's collegial review process by virtue of the *Lippert* Reports, and that Defendants knew of the alleged problems and intentionally acted (or failed to act) in spite of the *Lippert* Reports' conclusions. *See* Dkt. 203 at 1330-31 (Plaintiff arguing Wexford was "on notice that their collegial review process is broken and it's a patient safety hazard. And they've been on notice of that since 2014. They were put on notice of that again in 2018."). But the two *Lippert* Reports differed in their conclusions and criticisms of collegial review, particularly as the first *Lippert* Report did not suggest that the process be abandoned but that it be modified in certain ways. And, the second *Lippert* Report was not published until October 2018, well after Plaintiff claimed injury, and therefore could not have provided Defendants notice that Puisis concluded collegial review was unsafe and should be abandoned.

Moreover, the Reports should never have been introduced into evidence or referred to in front of the jury because they are inadmissible hearsay and highly prejudicial. The extremely prejudicial impact of those Reports affected all of the claims against Defendants, including Plaintiff's claims for medical malpractice, and entitles all Defendants to a new trial.

24

### A.     The *Lippert* Reports Were Inadmissible.

Since their publication, the use of the *Lippert* Reports in litigation has routinely been rejected as inadmissible hearsay by trial courts. *See, e.g.*, *Bradford v. Wexford Health Sources, Inc.*, 16-cv-8112, 2020 WL 586810 at *11 (N.D. Ill. Feb. 6, 2020) (collecting cases); *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (same). This Court explained that "[t]he reports are not authenticated by their authors or the numerous persons quoted within them. They are not public records. Nor is the residual hearsay exception appropriate." *Wilson*, 932 F.3d at 522 (citing Fed. R. Evid. 801, 802, 803(8), 807). The *Wilson* court affirmed the trial court's exclusion of the *Lippert* Reports, noting that "[a]t best, these reports reveal problems with Stateville [an IDOC facility] generally without linking those problems to [Plaintiff]'s personal experience." *Id.* The same holds true here, rendering the trial court's admission of the *Lippert* Reports reversible error.

### B.     The District Court Erred in Admitting the *Lippert* Reports for Notice.

Despite Defendants' motion *in limine* (Dkt. 170) and objections at trial (Dkt. 203 at 1206; 201 at 666-69, 737-38, 740-47), the trial court admitted key *Lippert* Report excerpts into evidence, taking judicial notice thereof. Dkt. 201 at 742-43. In doing so, the trial court recognized that district courts and this Court have found the Reports are inadmissible hearsay when offered for the truth of the matter asserted. AB15. The trial court nevertheless found that the Reports were admissible for a nonhearsay purpose: to show notice to Defendants "that court-appointed experts had reported systemic problems with the process for obtaining offsite diagnostic tests and offsite care." AB16. This ruling was error.

Although Defendants could not have had notice in 2015, 2016, or 2017 of the 2018 Puisis Report, the district court held the Puisis Report put Defendants on notice because it "was a continuation of the 2014 report (the Shansky report)." AA14. In so ruling, the District Court ignored the substance of both Reports, which were distinct, particularly in their evaluations of collegial review. The Shansky Report offered certain critiques and suggestions regarding collegial review and scheduling, including concerns about delays and recommendations regarding how to prioritize off-site visits and improve documentation. Dkt. 266-11 at 32-33. The Shansky Report did not mention Taylorville, where Plaintiff was treated, and was not relevant to Plaintiff's claims. *Id.*

In contrast, Puisis reported that the "collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured." AB21. But, as explained above, Defendants did not—and could not have had—notice of the October 2018 Puisis Report conclusions at the time Plaintiff alleges he was injured between December 2015 and May 2017. Dkt. 72 at 7-16. Moreover, Plaintiff's own expert, Dr. Barnett, testified that as a general matter, collegial review is "designed to effect the safe delivery of health care by not overtreating or backing up a line of patients that makes it impossible to get to the people who really need help." Dkt. 200 at 531. Dr. Barnett's critique of the collegial review process focused on how it was applied to Plaintiff. *Id.* at 506-07. The Puisis Report was therefore irrelevant to the issue of notice and should not have been admitted into evidence on that basis.

While many district courts and this Court have held that the *Lippert* Reports are inadmissible hearsay, the trial court relied on *Daniel v. Cook County*, 833 F.3d 728, 743 (7th Cir. 2016), which said in *dicta* that certain reports offered in other litigation (including another Shansky report) were inadmissible hearsay to the extent they were offered for the truth of the matter, "but they may be admissible to show that the defendants were on notice of their contents." AB16 (citing *Daniel*, 833 F.3d at 743); *see also Hildreth v. Butler*, 960 F.3d 420, 433 (7th Cir. 2020) (Hamilton, J., dissenting), *reh'g denied*, 972 F.3d 645 (7th Cir. Aug. 19, 2020) *petition for cert. docketed*, No. 20-6872 (U.S. Jan. 13, 2021) (suggesting *Lippert* Reports may be admissible to show corporate knowledge of Wexford's policy failings). But, as the trial court recognized, the Puisis Report was "authored after the events in this case," (AB15), and therefore Defendants could not, and did not, have notice of its contents when treating Plaintiff in 2015-2017. The Shansky Report did not provide Defendants notice that the collegial review process was unsafe or should be abandoned. The court erred in admitting key portions of both Reports.

### C. Any Alleged Probative Value of the *Lippert* Reports Was Far Outweighed by the Unfair Prejudice to Defendants.

Even assuming, *arguendo*, that the *Lippert* Reports were admissible to establish notice, they should not have been admitted into evidence because the unfair prejudice to Defendants far outweighed the Reports' alleged probative value. A new trial is warranted where, as here, the erroneous admission of highly prejudicial evidence is substantial enough to deny the party of a fair trial. *Wilson v. Groaning*, 25 F.3d 581, 584 (7th Cir. 1994). Following the conclusion of this trial, the district

court in *Brown v. Duncan* granted Wexford's motion *in limine* to exclude the *Lippert* Reports.[10] 15-cv-3348; AB33-41. The *Brown* court rejected plaintiff's argument that the *Lippert* Reports were admissible for notice, recognizing that:

> [E]ven if you are admitting these opinions for purposes of notice, that the prejudicial effect on a jury could be substantial. Basically, it's a document that can't really be cross-examined. And to say that there's been an independent expert review that's found that Wexford has essentially engaged, at least in that context, in what precisely you're complaining about here, is akin to saying that someone else, you know, rendered a verdict in favor of Plaintiff in a case just like this. . . . So it's highly prejudicial.

AB40. The *Brown* court concluded that, "even if it were admissible for notice purposes, . . . just under Rule 403, the likelihood of unfair prejudice, just substantially outweighs any evidence of probative value." AB41. So too here.

As the *Brown* court recognized, even if the *Lippert* Reports could properly be admitted for notice, the Reports are highly and unfairly prejudicial. In this case, the conclusions from the Reports infected the entire trial on all of Plaintiff's claims such that it would be impossible for Plaintiff to cabin the impact of these highly prejudicial reports to just his Eighth Amendment claims. The prejudice created by those Reports undoubtedly spilled over into the jury's consideration of Plaintiff's medical malpractice and institutional negligence claims because those claims also dealt with the use of collegial review. In fact, the *Lippert* experts were expressly precluded from "provid[ing] opinions and/or testimony in unrelated cases based on knowledge and/or information gained in the course of performing their services" in the *Lippert* matter.

---

[10] The parties in *Brown v. Duncan* consented to the jurisdiction of the magistrate judge for trial. *Brown v. Duncan*, 15-cv-3348, Dkt. 187.

*Lippert*, 10-cv-4603, Dkt. 244, 593. Here, Defendants had no way to challenge the *Lippert* experts' opinions, which were essentially presented to the jury in this case as uncontroverted expert opinions.

The District Court instructed the jury that Wexford "disputes the truth of [the *Lippert*] reports and has not admitted liability in that case," and told it to "consider these reports only in deciding whether [Wexford] had notice and knowledge of the information in the reports, not whether the information in the reports is true." Dkt. 187 at 12. But, this did not cure the harm to Defendants. Plaintiff went to great lengths to suggest to the jury that the conclusions from the *Lippert* Reports were unassailable. *See* Dkt. 201 at 744 (emphasizing that Puisis was not a "retained expert[] hired by counsel," but "an expert appointed by the court as opposed to paid for by the parties," an "independent expert"); 203 at 1311-12 (arguing Shansky "is an independent expert provided to the Court; so not working for either of the parties, independent" and that Wexford denies "any of this [*Lippert* Reports] is true. But they know all about it.").

Plaintiff was permitted to repeat the Puisis Report conclusion that the collegial review process was a "patient safety hazard and should be abandoned" no fewer than six times at trial. *See* Dkt. 201 at 746-47, 753, 831 (presenting this Puisis Report conclusion three times to Dr. Ritz); 203 at 1312 (presenting conclusion to jury in closing), 1330-31, 1359 (same). In closing argument, Plaintiff's counsel even prominently displayed Puisis Report excerpts in slides to the jury, highlighting the

Puisis conclusion that collegial review "is a patient safety hazard and should be abandoned until patient safety is ensured." Dkt. 203 at 1312.

Plaintiff's counsel, in emphasizing this conclusion, reminded the jurors that they would "actually have these in the jury room. And they will go to the issue—as the Judge instructed you—of whether Wexford knew that it had problems. Whether it was on notice that it had problems with its collegial review process other than just this single lawsuit that we are in." *Id.* Plaintiff was permitted to continually suggest that the *Lippert* Reports, and in particular, the Puisis conclusion above, was information Defendants had when treating Plaintiff, despite the fact that the Puisis Report was issued nearly a year after Plaintiff's alleged injuries. The unfairly prejudicial impact of this is made clear considering that Plaintiff introduced no evidence beyond the *Lippert* Reports supporting the conclusion that collegial review led to any harm to other patients.

Plaintiff was essentially allowed to present the *Lippert* Reports' conclusions for the truth of the matter and argue that an independent court expert had already concluded that collegial review should be abandoned, that Defendants knew that conclusion when treating Plaintiff, but Defendants continued to use collegial review despite that purported knowledge.[11] This was the centerpiece of Plaintiff's deliberate indifference claims and deeply unfair. That the jury was informed that Defendants

---

[11] In fact, Plaintiff acknowledged that he wanted to use the Reports for the truth of the matter in opposing Defendants' summary judgment motion. Dkt. 117 at 34 n.7 (arguing court should accept Shansky Report for truth of the matter).

"denied" what was in the Reports without any further cross-examination on the point did not cure the substantial prejudice to Defendants.

The unfair prejudice to Defendants was further compounded by the trial court erroneously taking judicial notice of the *Lippert* Reports (Dkt. 201 at 743), despite them not being judicially noticeable documents under Fed. R. Evid. 201. *Diaz v. Chandler*, 14-cv-50047, 2016 WL 1073103, at *12 (N.D. Ill. Mar. 18, 2016) (quoting Fed. R. Evid. 201 and declining to take judicial notice of *Lippert* Report because it was "an authored report of unknown reliability prepared for another case," and therefore "not the type of evidence 'not subject to reasonable dispute'"); *see also Hildreth*, 960 F.3d at 433 (Hamilton, J., dissenting) (*Lippert* Reports "not the appropriate subjects for judicial notice"). The court's improper judicial notice of the Reports gave further, improper credibility to the Reports.

The verdict on the Eighth Amendment claims particularly, and as to all claims against all Defendants, should be overturned as a result of the court's errors in the treatment of the *Lippert* Reports. Any probative value of the *Lippert* Reports was low, and the Puisis Report in particular was irrelevant in that it did not provide notice to Defendants. In light of the significant prejudice to Defendants, particularly as the crux of the deliberate indifference claim against Wexford was Wexford's purported knowledge of a report that was published after the events in question, the trial court should have barred this evidence under Fed. R. Evid. 403. *See United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (probative value and prejudice must be evaluated in context; the less probative the evidence, the less risk of prejudice tolerated).

Without the *Lippert* Reports, no rational jury would have found in favor of Plaintiff on his deliberate indifference claims, and the verdict should be reversed on that basis. *See Epic*, 980 F.3d at 1129. This erroneous ruling on a critical evidentiary issue warrants a new trial on all of Plaintiff's claims, with the *Lippert* Reports appropriately excluded.

## II.  The District Court erred as a matter of law in denying judgment in favor of Wexford on Plaintiff's Eighth Amendment claim because the collegial review process did not deprive Plaintiff of his constitutional rights.

The District Court erred in affirming the jury's verdict in favor of Plaintiff on his Eighth Amendment claim against Wexford because the evidence at trial did not—and cannot—support a finding that Wexford's collegial review process caused a constitutional deprivation to Plaintiff. Wexford is entitled to judgment as a matter of law on that claim, or, alternatively, a new trial on the Eighth Amendment claim, because a finding for Plaintiff was fundamentally unfair and against the manifest weight of the evidence. Wexford's collegial review process was not unconstitutional. Wexford did not act with deliberate indifference, and the collegial review process did not cause Plaintiff's injuries.

In the Eighth Amendment context, this Court treats a private corporation that performs governmental functions like Wexford as a municipality. *Perez v. Fenoglio*, 792 F.3d 768, 780 (7th Cir. 2015). "A municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997). A private corporation like Wexford is only liable for an unconstitutional policy, custom, or practice that caused a constitutional deprivation. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).

32

To establish *Monell* liability, a plaintiff must prove three elements: (1) the existence of an express and unconstitutional policy that, when enforced, caused a constitutional deprivation, *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 51 (2019); (2) that its policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations, *Brown*, 520 U.S. at 407; and (3) that the policy "directly caused a deprivation of federal rights" as the "moving force" behind the plaintiff's injuries. *Id.* at 415, 397. Plaintiff offered no proof that Wexford's collegial review policy met any of these elements.

### A.   Wexford's collegial review process facilitates proper patient care and does not cause constitutional deprivation.

Plaintiff took issue with Wexford's collegial review policy, but nonetheless failed to demonstrate that Wexford's collegial review constitutes an unconstitutional policy or practice for purposes of satisfying the first *Monell* element. When used properly, collegial review facilitates coordination of patient care between the treating physicians and Wexford in order to manage off-site services and treatments. Dkt. 200 at 532; 201 at 719. It provides a platform to review requests for patient offsite services and serves as a forum for doctors to discuss their patients' cases and courses of treatment while considering the patient's medical history. Dkt. 201 at 777, 781. Collegial review does not dictate a patient's care to the primary care physician; in the event agreement about a particular treatment course is not reached, an appeal process permits further review. *Id.* at 779.

Collegial reviews generally occur weekly, (*id.* at 754), but in emergencies, collegial reviews are not necessary nor required. *Id.* at 709. Physicians must use their professional judgment to determine if there is a medical emergency. *Id.* at 778. Collegial review allows for urgent matters to be reviewed "usually the same day" or "immediate[ly]." *Id.*, *see also id.* at 709. Dr. Barnett, Plaintiff's expert on collegial review, recognized that collegial review allows treating physicians to act immediately, without approval, in emergency situations. Dkt. 200 at 506-07. For these reasons, when properly utilized, collegial review serves patients; its purpose is not to delay care or avoid costs. Dk. 201 at 777-78, 780. To the extent that collegial review manages costs, such results are indicative of "good medicine" in Dr. Barnett's opinion; "[c]ost-effective medicine is safer medicine" because it is "in the interest of the patient." Dkt. 200 at 615.

Plaintiff maintained that collegial review was a Wexford "policy" that caused unconstitutional delays to his diagnosis and care. Dkt. 203 at 1324. However, much of the purported delays were caused by Dr. Severino's need to carefully coordinate Plaintiff's surgery. As Dr. Severino testified, the timeframe of April to July 2016 between diagnosis and surgery was reasonable because he "would rather have [it] scheduled correctly than have a patient die on the table because you want to try and hurry up." *Id.* at 1179. Moreover, Plaintiff presented no evidence that collegial review and purported delays related to it harmed anyone else. The unrebutted evidence established that the policy is beneficial to the proper administration of inmate

healthcare. Dr. Barnett's testimony was critical not of collegial review itself, but rather of how the collegial review process was administered in Plaintiff's specific case.

While Doctor-Defendants and other witnesses testified about collegial review, they did so only with respect to Plaintiff's own treatment, offering no evidence that the process failed other inmates or constituted any type of constitutional deprivation generally. At best, Plaintiff put on evidence that the policy, as applied to him, may have breached the standard of care. Without more, Plaintiff falls well short of establishing an unconstitutional policy, practice, or custom. *See, e.g., Gaston v. Ghosh*, 11-cv-6612, 2017 WL 5891042, at *14 (N.D. Ill. Nov. 28, 2017) (plaintiff's allegations on own treatment insufficient to establish a policy for Eighth Amendment claim); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

### B. Plaintiff **failed to show that Wexford was deliberately indifferent to a known risk that its policy would lead to constitutional violations.**

Plaintiff relied on the *Lippert* Reports' conclusions to show Wexford was deliberately indifferent to a known risk, particularly the Puisis Report conclusion that collegial review should be abandoned because it was unsafe.

First, as discussed above, the *Lippert* Reports were improperly admitted, consequently rendering improper Plaintiff's reliance on those same reports to satisfy the second *Monell* element. By the same token, that "evidence" is only relevant if the *Lippert* Reports are accepted for the truth of the matter asserted (*i.e.*, not just notice, but the existence of an underlying risk), which, as also discussed above, is precisely what was impermissible as a matter of law. Without that "evidence," Plaintiff has no basis to assert that collegial review may have harmed other inmates.

35

As to Plaintiff's case, the trial record shows Wexford approved *each and every request* made by Plaintiff's physicians, including requests for diagnostic testing, outside specialist care, complex surgery, and non-formulary cancer treatment prescriptions. Dkt. 201 at 748. Moreover, delays attributed to collegial review were overstated by Plaintiff at trial, where significant delays were attributable to scheduling approved services through outside providers. Such delays did not rise to the level of constitutional violations. Again, although there may have been evidence that delays in Plaintiff's treatment breached the standard of care, that does not, without more, establish Wexford's indifference to a known risk of a constitutional violation, which is why the improper use of the *Lippert* Reports was so prejudicial.

### C.     Plaintiff failed to show that Wexford's policy directly deprived him of his rights.

Plaintiff does not argue, and the evidence cannot support that Wexford caused Plaintiff's kidney cancer. The evidence at trial did not support a finding that Wexford's policies or procedures directly caused a deprivation of Plaintiff's federal rights such that collegial review was the "moving force" behind his injuries. Collegial review alone was also not the "moving force" behind any "improper" delays to Plaintiff's diagnosis or treatment, given several significant intervening factors over which Wexford did not control, including an ultrasound misread by a non-Wexford employee and the scheduling complexities inherent to a complicated surgery involving several outside specialists.

For these reasons, the District Court erred in affirming the jury's verdict against Wexford on Plaintiff's Eighth Amendment claim.

**III.  The District Court erred in denying judgment as a matter of law in favor of Doctor-Defendants on Plaintiff's Eighth Amendment claims because they were not deliberately indifferent to Plaintiff's serious medical needs.**

Plaintiff also alleged Doctor-Defendants were deliberately indifferent to his serious medical needs because they delayed his cancer diagnosis, surgery, and oncologic treatment. Defendants do not argue there was no evidence to support the findings of medical malpractice against Doctor-Defendants because, even though they may disagree with the jury's findings, there was evidence on both sides as to whether Defendants breached the standard of care in treating Plaintiff. As argued above, those findings were severely compromised by the admission of the *Lippert* Reports and therefore a new trial is required on those claims as well. But, the evidence at trial did not demonstrate Doctor-Defendants' deliberate indifference. "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quotation omitted); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Plaintiff's medical needs were serious. However, the evidence demonstrated that Doctor-Defendants ordered diagnostic testing, made specialist referrals, and deferred to those specialists as to his cancer treatment. The evidence cannot support findings of Doctor-Defendants' deliberate indifference because their treatment decisions sounded in their professional judgment. Plaintiff's burden of proving deliberate indifference is a "high hurdle," *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012), which Plaintiff did not meet.

The Eighth Amendment requires government officials to provide prisoners healthcare. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Prison officials are liable

under the Eighth Amendment "if they intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." *Gonzalez v. Feinerman*, 663 F.3d 311, 313 (7th Cir. 2011). To establish an Eighth Amendment claim against a prison physician for failure to provide adequate care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. A claim of deliberate indifference to a serious medical need requires that: (i) plaintiff's medical need was "objectively, 'sufficiently serious;'" and (ii) the prison official subjectively acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation omitted).

A jury may infer deliberate indifference when a physician's treatment decision is "so far afield of accepted professional standards" that it appears to not be based on medical judgment. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Deliberate indifference exists where the doctor's response is such that "no minimally competent professional would have so responded under those circumstances." *Arnett*, 658 F.3d at 751 (quotation omitted). A treatment decision based upon a physician's professional judgment cannot show deliberate indifference because professional judgment "implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

## A.   There was no evidence that Dr. Nawoor was deliberately indifferent.

At trial, Plaintiff alleged Dr. Nawoor's actions between December 23, 2015 through May 4, 2017 demonstrated his deliberate indifference to Plaintiff. However, as a matter of law, the evidence presented at trial was insufficient to demonstrate that Dr. Nawoor acted with the culpable mental state necessary to support a finding of deliberate indifference. Rather, the evidence showed that between December 23, 2015 (when Dr. Nawoor first saw Plaintiff for his hematuria), and March 10, 2016 (when Plaintiff first saw urologist Dr. Severino), Dr. Nawoor exercised professional judgment to make appropriate decisions for Plaintiff's care. *See Duckworth*, 532 F.3d at 680.

When Plaintiff first presented his hematuria to Dr. Nawoor in December 2015, Dr. Nawoor acknowledged that, while Plaintiff could have had cancer, he believed Plaintiff's symptoms were also consistent with a recurrence of kidney stones. Dkt. 263-3 at 32, 40, 45. As a result, Dr. Nawoor believed Plaintiff's history of kidney stones was the most likely cause of his hematuria, not cancer, and tailored his treatment plan accordingly. *Id.* at 48-49. Based on Plaintiff's symptoms and medical history—namely, his diminished kidney function and recurring kidney stones—Dr. Nawoor arranged for Plaintiff's renal ultrasound, a less invasive procedure than a CAT scan. *Id.* at 48. Plaintiff's experts, Drs. Metwalli and Barnett, confirmed that using an ultrasound diagnostically—rather than a CAT scan—constituted an appropriate use of medical judgment. Dkt. 197 at 393; 200 at 579, 591; *see also Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("the decision to forgo diagnostic tests is a classic example of medical judgment") (quotation omitted). Defendants' expert, Dr.

Kosierwoski, further testified that the risks associated with the IV contrast dye used in CAT scans were "significant" for Plaintiff given his compromised kidneys and heart. Dkt. 202 at 970.

After Plaintiff's ultrasound was misread in February 2016 by a radiologist not employed by Wexford, Dkt. 263-3 at 48-49, Dr. Nawoor arranged for a urology consultation for Plaintiff because, even though he believed the ultrasound was normal, Dr. Nawoor sought to identify other issues, including in the bladder. *Id.* at 95, 99; 195 at 99-100; 201 at 820. Dr. Nawoor's actions were not deliberately indifferent, or "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (quotation omitted). At most, Dr. Nawoor mistakenly believed that the ultrasound ruled out cancer, but mere negligence does not meet the higher bar of deliberate indifference. *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016); (deliberate indifference requires "more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk").

Plaintiff then saw Dr. Severino on March 10, 2016, who requested a cystoscopy and CAT scan of Plaintiff's chest, abdomen, and pelvis, Dkt. 203 at 1159, requests approved in collegial review. Dkt. 263-3 at 105. Plaintiff's April 12, 2016 CAT scan revealed renal cancer. Dkt. 203 at 1160-61. Following Plaintiff's diagnosis, Dr. Severino led Plaintiff's treatment, including coordinating and performing a complex surgery. *Id.* at 1165-1179. Dr. Nawoor cannot be held liable for purported delays in

coordinating Plaintiff's surgery because the evidence shows Dr. Nawoor "did what he could within the limits of his role to move the ball forward" and Dr. Nawoor had no control over the post-diagnosis period to surgery. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). Following Plaintiff's surgery, Dr. Nawoor also took steps to ensure that Plaintiff had access to four chemotherapy drugs. Dkt. 197 at 224, 229-30, 234, 242, 251.

Despite Dr. Nawoor's efforts to advance Plaintiff's treatment, Plaintiff nonetheless alleged at trial that Dr. Nawoor unconstitutionally delayed aspects of his care in terms of both diagnosis and treatment. Eighth Amendment claims based on alleged delayed cancer diagnoses require evidence that the defendant "knew better" than to pursue the chosen clinical course. *See Whiting v. Wexford*, 839 F.3d 658, 663 (7th Cir. 2016). The facts of *Duckworth* are analogous to the instant matter and should guide this Court's analysis in determining that Dr. Nawoor was not deliberately indifferent to Plaintiff.

In *Duckworth*, the plaintiff had hematuria and alleged a constitutional violation arising from two physicians' decision to not immediately order a cystoscopy to rule out cancer. 532 F.3d at 679. The evidence showed that one physician did not suspect cancer, and the other knew of the cancer risk, but believed that plaintiff had another condition and pursued treatment consistent with that diagnosis. *Id.* at 680-81. Even though the plaintiff's urology expert testified that cancer should always be ruled out when a patient presents hematuria, *id.* at 681, this Court affirmed summary judgment in defendants' favor, finding that the expert testimony showed only "how a

reasonable doctor would treat [plaintiff's] symptoms, but it [did] not shed any light into [the defendant's] state of mind." *Id.*

Here, Dr. Nawoor's conduct leading to Plaintiff's cancer diagnosis was appropriate, as he reasonably believed Plaintiff's hematuria was consistent with his history of kidney stones. Dr. Kosierwoski opined that, given renal cancer's typically slow growth rate, Plaintiff's normal July 2015 CAT scan made kidney stones the likely underlying cause. Dkt. 202 at 938-40, 961. Like *Duckworth*, Dr. Nawoor's decision to initially order an ultrasound, not a CAT scan, was appropriately based on his professional judgment. When Plaintiff's ultrasound came back normal, Dr. Nawoor arranged for a urology consultation, Dkt. 263-3 at 63, and took steps to expedite Plaintiff's visits with specialists. Dkt. 202 at 977; 263-3 at 88; 203 at 1174.

Moreover, Dr. Nawoor testified that, had the ultrasound been read correctly, Plaintiff would have undergone a CAT scan and a urology visit "right away." Dkt. 263-3 at 32, 49, 59. Plaintiff presented no evidence showing Dr. Nawoor knowingly ignored a known risk to Plaintiff's medical needs. At trial, Plaintiff's expert did not dispute that the steps taken in Plaintiff's workup between presentation and cancer diagnosis were clinically appropriate, Dkt. 200 at 590-91; rather, he challenged the timing of those steps. *Id.*

An "inexplicable delay in treatment which serves no penological interest" can support an inference of deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), *as amended* (Aug. 25, 2016). But, as this Court recognizes, delays in

prisons are often common, and the propriety of such delays "depends on the seriousness of the condition and the ease of providing treatment." *Id.*

In this case, delays to Plaintiff's diagnosis and treatment were not inexplicable. Dr. Nawoor appropriately advanced Plaintiff's diagnosis by ordering and approving tests to determine the cause of the hematuria. *See, e.g., Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 3d 985, 995 (N.D. Ill. 2015) (defendant-physician not deliberately indifferent where she exercised medical judgment to diagnose plaintiff by ordering imaging and referrals to specialists for further evaluation, and was "not aware of the need for more urgent care"). Dr. Nawoor's efforts were hindered by a misread ultrasound, which nevertheless led Dr. Nawoor to refer Plaintiff to Dr. Severino for further evaluation and, ultimately, diagnosis.

Importantly, after Plaintiff's April 2016 cancer diagnosis and through the date of his surgery on July 19, 2016, Dr. Severino, an employee of the Springfield Clinic, not Wexford, was the specialist leading Plaintiff's treatment plan. In that role, Dr. Severino coordinated efforts inherent to a highly complex surgery, which necessarily—but not inexplicably—delayed Plaintiff's ultimate surgery date. Dkt. 203 at 1176. Dr. Severino ordered additional diagnostic tests, recruited surgeons, and decided Plaintiff's surgery date. At trial, Plaintiff offered no evidence to suggest that Dr. Severino's plan of care was blatantly inappropriate; nor was Dr. Nawoor's deference to that plan. *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 462-63 (7th Cir. 2020) (no deliberate indifference where no evidence that doctor-defendant

knew specialists' advice was "blatantly inappropriate" and where following specialist's advice is not evidence of deliberate indifference).

For purposes of the Eighth Amendment, individual liability also requires personal involvement. *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). Dr. Nawoor was not responsible for alleged delays to Plaintiff's treatment that may have occurred while Dr. Severino coordinated Plaintiff's surgery, as those delays were beyond Dr. Nawoor's control. *Baker*, 118 F. Supp. 3d at 996 ("someone else was responsible for the alleged delays" during plaintiff's wait for surgery because specialists assumed responsibility for surgery); *see also Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (no deliberate indifference by prison-physician where no evidence delays were in physician's control).

### B.    There was no evidence of Dr. Einwohner's deliberate indifference.

The jury also found against Dr. Einwohner on Plaintiff's Eighth Amendment claim, and although the district court acknowledged that "[t]he evidence of deliberate indifference against. . . Dr. Einwohner was not as extensive as that against Dr. Nawoor," AA07, it nonetheless erred in affirming the verdict.

In her capacity as a telemedicine physician, Dr. Einwohner saw Plaintiff on several occasions. She began assisting in Plaintiff's renal care in or around May 2012, and was aware of his kidney stones. Dkt. 263-4 at 18, 44. At their January 7, 2016 meeting, Plaintiff complained of painless hematuria. *Id.* at 27. At that time, Dr. Einwohner was aware that Plaintiff's July 2015 CAT scan showed no mass or renal calculi. *Id.* at 30. Dr. Einwohner emailed Dr. Ritz to suggest a collegial review,

recommending re-imaging and a urology consultation, and followed up to confirm Plaintiff's case would be discussed. Dkt. 201 at 749; 263-4 at 28, 31, 37. The collegial review occurred within a week, and an ultrasound was scheduled. Dkt. 263-3 at 25.

Dr. Einwohner saw Plaintiff again on February 8, 2016. Dkt. 263-4 at 38. Dr. Einwohner was aware that Plaintiff had undergone an ultrasound since their last visit. *Id.* at 42. Plaintiff's case was discussed in collegial review two days later, and Plaintiff was approved for urology consultation. Dkt. 263-3 at 63. Dr. Einwohner followed up with a Wexford nurse to move the collegial review forward, confirm the collegial occurred, and confirm Plaintiff would see a urologist. Dkt. 363-4 at 37, 53.

This evidence cannot support a finding that Dr. Einwohner was deliberately indifferent. Dr. Einwohner recommended Plaintiff see a urologist and referred his case to collegial review following their visits. The collegial reviews followed shortly thereafter. Plaintiff did not present any evidence that Dr. Einwohner ignored a known risk in her treatment of Plaintiff. Moreover, and for the same reasons that Dr. Nawoor cannot be held liable for delays that may be inexcusable and were not attributable to him, Dr. Einwohner likewise cannot be held liable for delays in scheduling Plaintiff's surgery.

Finally, it was certainly not enough for the court to conclude Doctor-Defendants were deliberately indifferent based on their demeanors at trial. Deliberate indifference is established through the physician's state of mind at the time of treatment. *See Arnett*, 658 F.3d at 751. Yet, rather than focus on Doctor-Defendants' mental states during treatment, the court instead improperly concluded

that "Dr. Nawoor's demeanor allowed a reasonable inference that Dr. Nawoor was indifferent to Plaintiff's repeated pleas for help and Plaintiff's real and substantial risk of kidney cancer," that "the most damaging evidence against Dr. Nawoor was Dr. Nawoor's own testimony and demeanor throughout the trial," and that Dr. Einwohner's demeanor "could have reasonably be perceived as evasive and defensive." AA7, AA22. Such findings were erroneous, and Plaintiff failed to present sufficient evidence of Doctor-Defendants' deliberate indifference.

## IV.  The District Court erred in permitting inadmissible character evidence against Dr. Nawoor.

The District Court erred in upholding its erroneous admission of character evidence against Dr. Nawoor. AB12; AB02-04; Dkt. 201 at 876-86; AA20-21; 263-3 at 168. The court permitted Plaintiff to introduce irrelevant and unfairly prejudicial character evidence suggesting Dr. Nawoor was a bad, inattentive doctor in instances unrelated to Plaintiff. Specifically, Nurse Mincy testified Dr. Nawoor did not follow Wexford's rules, policies, and procedures. Dkt. 201 at 876. The court also permitted Plaintiff (over objection) to introduce through Mincy an email she wrote criticizing Dr. Nawoor's treatment of other patients. *Id.* at 878-887. This character evidence was inadmissible character evidence under Federal Rule of Evidence 404(b), which prohibits evidence of specific bad acts to prove a person's character to show that, on a particular occasion, the person acted in accordance with their character. *United States v. Tanner*, 628 F.3d 890, 904 (7th Cir. 2010). Here, the unfairly prejudicial evidence substantially outweighed any probative value, and directly impacted the

jury's findings against Dr. Nawoor on Plaintiff's medical malpractice and Eighth Amendment claims against him.

## V.   There was no basis for punitive damages, and certainly not for the amount awarded.

The jury returned a verdict against Defendants, awarding Plaintiff $1,000,000 in compensatory damages and an aggregate punitive damages award of $10,037,500 ($25,000 against Dr. Nawoor individually; $12,500 against Dr. Einwohner individually; and $10,000,000 against Wexford). Dkt. 180. In ruling on Defendants' post-trial motion, the District Court reduced the punitive damages assessed against Wexford to $7,000,000. AA56. Although remitted, any award of punitive damages in this case was erroneous.[12] Review of punitive damages awards for constitutional issues is *de novo. See supra* at 22.

### A.   Plaintiff failed to present evidence demonstrating Defendants acted with ill will, spite, or indifference.

Unlike compensatory damages, punitive damages do not address the "concrete loss that Plaintiff has suffered by reason of the defendant's wrongful conduct," rather, they "are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citing *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). Punitive damages are "an expression of [a jury's] moral condemnation" and serve to punish reprehensible conduct. *Cooper Industries*, 532 U.S. at 432.

---

[12] If Plaintiff does not prevail on his Eighth Amendment claims, he cannot, as a matter of law, be entitled to punitive damages. *See* 735 ILCS 5/2-1115.

47

In the context of Eighth Amendment claims, punitive damages are recoverable "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves a reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Defendants did not act with deliberate indifference as to Plaintiff's serious medical needs. *See supra* at 34-45. As a result, and without evidence demonstrating Defendants' evil motive or reckless disregard for Plaintiff's serious medical needs, Plaintiff is not entitled to punitive damages.

### B.    Even if punitive damages were warranted, the punitive damages award against Wexford was unconstitutionally excessive.

Even if Plaintiff could establish Defendants acted with such an evil motive or reckless disregard to warrant punitive damages, Plaintiff could not show a degree of reprehensibility to justify punitive damages seven times the amount of compensatory damages. It is "well established that there are procedural and substantive constitutional limitations" on punitive damages awards. *State Farm*, 538 U.S. at 416 (citations omitted). The Fourteenth Amendment's Due Process Clause "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor" because excessive awards "further[] no legitimate purpose and constitute[] an arbitrary deprivation of property." *Id.* at 416-17.

In evaluating the constitutional fairness of a punitive award, this Court considers: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by Plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Green v.*

*Howser*, 942 F.3d 772, 781-82 (7th Cir. 2019) (quotation omitted). Of these factors, the degree of reprehensibility is the most important. *Id.* at 782.

Assuming, *arguendo*, a punitive damages award was warranted, the punitive damages awarded against Wexford were too high. In remitting the punitive damages awarded against Wexford, the trial court focused on the second factor, the ratio of punitive damages to compensatory damages, to correctly conclude that $10,000,000 in punitive damages was unconstitutionally excessive. However, a review of each of the three factors reveals that the remitted punitive damages award of $7,000,000 against Wexford is still unconstitutionally excessive, and must be further reduced.

### 1.   Wexford's conduct was not sufficiently reprehensible to warrant a punitive damages award of $7,000,000.

This Court evaluates five considerations relevant to the reprehensibility factor:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019), *cert. denied sub nom. Saccameno v. Ocwen Loan Servicing, LLC*, 140 S. Ct. 2674 (2020) (quoting *State Farm*, 538 U.S. at 419). Since a plaintiff is presumed to be made whole by compensatory damages, punitive damages should be awarded only if the defendant's conduct is "so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419.

Wexford's conduct falls well short of justifying a punitive award seven times the compensatory award. While the medical harms alleged by Plaintiff are physical

in nature, at most, the harm resulted from medical malpractice and institutional negligence.

Second, and as detailed above, Wexford did not act with indifference or a reckless disregard to Plaintiff's health or safety to justify such a large punitive award. Wexford did not deny tests, evaluations, or treatments recommended by Plaintiff's treating physicians and specialists. Dkt. 201 at 748. Rather, Wexford arranged for Plaintiff to undergo diagnostic testing, facilitated a complex surgery by outside specialists, and approved prescriptions for non-formulary cancer treatments. Moreover, Plaintiff's failure to demonstrate that Wexford's collegial review policy generally resulted in constitutional deprivations further frustrates any suggestion that Defendants were indifferent to or disregarded the health and safety of "others."

Third, Plaintiff did not demonstrate that any alleged harms he suffered occurred "repeatedly" in the context of Wexford's treatment of other inmates. To the extent he contends his harms were the result of repeated delays specific to his own case, Plaintiff likewise failed to show that Wexford's policies caused the harm. And, finally, for the same reasons Plaintiff could not demonstrate that Defendants acted with deliberate indifference, his harm was not the result of intentional malice, trickery, or deceit to justify such an excessive award.

On balance, the reprehensibility factors do not support the amount of punitive damages awarded. At most, Plaintiff experienced delays common in the managed healthcare system that were also the result of conduct attributable to non-Wexford institutions and individuals. Defendants' acts and omissions may evidence negligence

but were not so reprehensible to justify any amount close to the punitive damages awarded here.

### 2.     The 7:1 ratio of punitive to compensatory damages does not satisfy due process.

In determining whether the ratio of punitive to compensatory damages passes constitutional muster, the Supreme Court instructs that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425). The damages ratio is flexible. It is guided by the amount of the compensatory damages award: higher ratios may be appropriate in instances of lesser compensatory damages, while substantial compensatory damages require a lesser ratio "perhaps only equal to compensatory damages." *Saccameno*, 943 F.3d at 1088.

This Court has noted that capping the ratio (at 1:1, for instance) "makes sense only when the compensatory damages are large." *Lust v. Sealy, Inc.*, 383 F.3d 580, 591 (7th Cir. 2004); *see also Beard*, 900 F.3d at 957 (7th Cir. 2018) (Court had yet to find "any federal statute that authorizes a multiplier greater than three," such that "[t]his might suggest that punitive-damages awards under § 1983 also should be limited to treble damages or less."). Finally, the ratio may also consider potential harm that may result from a defendant's conduct. *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993). "[B]y most accounts the median ratio of punitive to compensatory awards has remained less than 1:1," meaning that the compensatory award exceeds the punitive award in most cases. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 498 (2008).

The district court readily acknowledged that the 7:1 ratio of its remitted punitive damages award was more than the ratio awarded in the majority of the cases to which it cited, and yet it concluded that "a higher ratio is justified by the evidence that supported a reasonable conclusion that Wexford's practices will foreseeably continue to cause constitutional violations unless there is a change." AA41. The district court's attempt to justify its departure from comparable awards was unavailing. Moreover, punitive damages cannot be awarded against Wexford to deter its practices in this case, where Plaintiff's only evidence as to the purported unconstitutionality of collegial review applied only to Plaintiff.

"When compensatory damages are substantial, then a lesser ratio [of punitive damages to compensatory damages], *perhaps only equal to compensatory damages*, can reach the outermost limit." *Saccameno*, 943 F.3d at 1088 (emphasis added). In *Saccameno*, this Court cited to three cases where compensatory awards less than $1,000,000 were found "substantial" under *State Farm* such that a ratio closer to 1:1 was appropriate. *Id.* at 1090. Although the meaning of "substantial" compensatory damages is contextual, *id.*, the District Court itself acknowledged that the $1,000,000 compensatory award *in this very case* constitutes a substantial award. AA39 ("The Court is upholding the entire compensatory damage award of 1 million dollars, a *substantial* amount.") (emphasis added).

This Court's recent holding in *Epic* is also instructive. 890 F.3d at 1140. In *Epic*, this Court considered the constitutionality of $280,000,000 in punitive damages and $140,000,000 in compensatory damages assessed against the defendant for

misappropriation of trade secrets and confidential information. *Id.* Noting the compensatory damages in *Epic* were "high," this Court remarked that "the $140 million award in this case far exceeds what other courts have considered 'substantial.'" *Id.* at 1143 (citation omitted). This Court ultimately held that "a 2:1 ratio exceeds the outermost limit of the due process guarantee in this case because [the defendant's] conduct, while reprehensible, was not egregious" and relied on the *Saccameno* holding to conclude that the punitive damages should not exceed a 1:1 ratio because the compensatory damages award was "substantial." *Id.* at 1144-45.

A further remittitur of the punitive damages award against Wexford to a ratio of, at most, 1:1 is appropriate, to the extent Eighth Amendment liability is upheld. As *Epic* illustrates, courts evaluating the constitutionality of punitive damages awards have found compensatory damages awards totaling less than $1,000,000 to be substantial for the purpose of the *State Farm* analysis. Here, and as the District Court itself acknowledged, the $1,000,000 compensatory damages award to Plaintiff is *substantial* such that the $7,000,000 in punitive damages against Wexford must be further remitted.

## CONCLUSION

This case concerns whether Drs. Nawoor and Einwohner and Wexford properly cared for and treated Plaintiff in 2015-2017 while he was incarcerated. Plaintiff claimed Defendants breached the standard of care in his treatment by delaying the diagnosis of his cancer and his subsequent treatment. Both sides had experts opine on whether the standard of care was breached. What is undisputed is that Plaintiff was ultimately correctly diagnosed, that he survived a very complicated surgery by a

team of non-Wexford specialists, and that he received post-surgical cancer treatment while incarcerated. But the introduction of excerpts of the highly prejudicial *Lippert* Reports into evidence made any fair consideration of Plaintiff's medical malpractice claims impossible.

Moreover, there was no evidence that Defendants treated Plaintiff with deliberate indifference. There may have been some criticism of Plaintiff's care and treatment, which was disputed by Defendants' experts, but the evidence did not prove the strict requirements necessary to sustain an Eighth Amendment violation. And, any fair consideration by this jury of those Eighth Amendment claims was made impossible by the highly prejudicial, improperly admitted *Lippert* Reports.

Finally, there was no basis in the evidence to support an award of punitive damages, and even if Defendants' conduct barely met the high threshold required for a punitive damages award (it did not), a 7:1 ratio of a substantial compensatory award to the punitive award violated Due Process.

Wherefore, for all the reasons stated above, Defendants respectfully request that:

1.    The verdict against all Defendants on Plaintiff's Eighth Amendment claims and punitive damages awards be vacated and judgment as matter of law be entered on those claims in favor of Defendants;

2.    The verdict on all counts of Plaintiff's Complaint be vacated and a new trial on all of Plaintiff's claims be ordered;

3.     Alternatively, the verdict against all Defendants on Plaintiff's Eighth Amendment claims be vacated and a new trial ordered on those claims;

4.     The amount of the punitive damages award against Wexford be remitted to an amount consistent with due process; and

5.     If this judgment against Defendants is modified and/or vacated then the matter should be remanded for reconsideration of attorneys' fees, costs, and expenses.

Dated:  January 15, 2020

Respectfully submitted,

WEXFORD HEALTH SOURCES, INC., DR. ABDUR NAWOOR, and DR. REBECCA EINWOHNER

By: *s/ J. Timothy Eaton*
        One of Their Attorneys

J. Timothy Eaton
jeaton@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Nicollette L. Khuans
nkhuans@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

## CERTIFICATE OF COMPLIANCE

The undersigned, an attorney, certifies that Defendants-Appellants/Cross-Appellees Brief conforms to the requirements of Fed. R. App. P. 32 and Cir. R. 32.  The length of this Brief excluding the items listed in Fed. R. App. P. 32(f) is 13,897 words.

Dated: January 15, 2021

/s/ J. Timothy Eaton

28583968v1

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2021, I electronically filed the foregoing Appellant/Cross-Appellee's Brief with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

The electronic case filing system sent a "Notice of E-Filing" to the following:

Joseph N. Rupcich
jrupcich@cassiday.com
Cassiday Schade LLP
111 North Sixth Street, 2nd Floor
Springfield, Illinois 62701

Craig C. Martin, Esq.
Chloe E. Holt
Christopher Matthew Walling
cmartin@willkie.com
cholt@willkie.com
cwalling@willkie.com
Willkie Farr & Gallagher LLP
300 North LaSalle Street, Suite 500
Chicago, Illinois 60654
(312) 728-9000

Robert J. Palmersheim
William M. Strom
rjp@thepmlawfirm.com
wms@thepmlawfirm.com
Palmersheim & Matthew LLP
401 N. Franklin Street, Suite 4S
Chicago, Illinois 60654

Joel T. Pelz
jpelz@jenner.com
Jenner & Block LLP
353 N. Clark Street
Chicago, Illinois 60654-3456

*/s/ J. Timothy Eaton*

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Court Rules 30(a) and (b) are included in this appendix.

Dated: January 15, 2021

_/s/ J. Timothy Eaton_

# APPENDIX A

### APPENDIX A

| Docketed Date | Dkt. | Document | Appendix Pages |
|---|---|---|---|
| 12/18/2019 | 188 | Judgment in favor of Plaintiff and against Defendants Wexford Health Sources, Inc., Dr. Abdur Nawoor, and Dr. Rebecca Einwohner | AA01 |
| 09/28/2020 | 253 | Trial Court's Order denying the Defendants' post-trial motion in part | AA02 |
| 09/28/2020 | 254 | Amended Judgment in favor of Plaintiff and against Defendants Wexford Health Sources, Inc., Dr. Abdur Nawoor, and Dr. Rebecca Einwohner | AA57 |

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT

for the
Central District of Illinois

| | | |
|---|---|---|
| **WILLIAM KENT DEAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case Number: 17-3112** |
| | ) | |
| **WEXFORD HEALTH SOURCE,** | ) | |
| **DR. ABDUR NAWOOR, UNKNOWN** | ) | |
| **HEALTH CARE EMPLOYEES,** | ) | |
| **DR. REBECCA EINWOHNER,** | ) | |
| **KATHY GALVIN, and LISA MINCY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## JUDGMENT IN A CIVIL CASE

☒ **DECISION BY THE COURT.**    This action came before the Court, and a decision has been rendered.    Defendant Unknown Health Care Employees was dismissed and terminated on 8/16/2018.    Defendant Lisa Mincy was dismissed and terminated on 12/16/2019.

☒ **JURY VERDICT.**    This action came before the Court for a trial by jury.    The issues have been tried and the jury has rendered a verdict for Plaintiff again Defendants Abdur Nawoor, Rebecca Einwohner, and Wexford Health Source.    The jury rendered a verdict for Defendant Kathy Galvin.

IT IS ORDERED AND ADJUDGED Plaintiff recovers compensatory damages in the amount of $1,000,000 from the Defendants Abdur Nawoor, Rebecca Einwohner, and Wexford Health Source, joint and severally.    Plaintiff does not recover any damages from Kathy Galvin.

IT IS FURTHER ORDERED AND ADJUDGED Plaintiff recovers punitive damages under his Eighth Amendment claim, as follows:    Abdur Nawoor in the amount of $25,000.00; Rebecca Einwohner in the amount of $12,500.00; and Wexford Health Sources, Inc. in the amount of $10,000,000.00.    This action is closed.

**Dated:    December 18, 2019**

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

Approved:    s/ Sue E. Myerscough
Sue E. Myerscough
U.S. District Judge

AA01

E-FILED
Monday, 28 September, 2020  09:40:46 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WILLIAM KENT DEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17-CV-3112 |
| | ) | |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE.**

Plaintiff, with the assistance of pro bono counsel, pursued claims arising from alleged delays in the diagnosis and treatment of Plaintiff's kidney cancer during his incarceration in Taylorville Correctional Center.

After a seven-day trial in December 2019, the jury found against three of the defendants, Wexford Health Sources, Inc., Dr. Abdur Nawoor, and Dr. Rebecca Einwohner, awarding $1 million dollars in compensatory damages and over $10 million dollars in punitive damages to Plaintiff.

AA02

Defendants[1] move for judgment in their favor or a new trial, or for a reduction of damages and a setoff.  Plaintiff seeks attorneys' fees, expenses, and costs.

For the reasons below, the punitive damages against Wexford Health Sources, Inc., are reduced from ten million dollars to seven million dollars.  The jury's verdict is otherwise upheld.  Plaintiff's counsel is awarded $633,863.78 8 in fees and expenses, which is required to be paid from the jury's award.  Plaintiff's counsel is also awarded $33,337.67 in statutory costs.

## Discussion

## I.  Judgment as a matter of law is not warranted because legally sufficient evidence supports the verdict and the damages.

A motion for judgment as a matter of law requires the Court to decide if legally sufficient evidence was presented at trial to support the jury's verdict.  In making that decision, the Court draws all reasonable inferences in favor of Plaintiff, the prevailing party, and disregards Defendants' evidence which the jury did not have to believe.  The Court cannot weigh evidence or make credibility

---

[1] For ease of reference, when the Court uses the term "Defendants" in this order, the Court is referring to Defendants Wexford Health Source, Inc., Dr. Nawoor, and Dr. Einwohner. Defendant Mincy settled before the trial concluded, and the jury found in favor of Defendant Garst.

AA03

determinations.  "[A] motion for a judgment as a matter of law can be granted only if the court—after viewing the evidence in the light most favorable to the non-movant—believes that the evidence 'supports but one conclusion—the conclusion not drawn by the jury.'" Mejia v. Cook County, 650 F.3d 631, 634 (7th Cir. 2011)(*quoting* Ryl–Kuchar v. Care Ctrs., Inc., 565 F.3d 1027, 1030 (7th Cir.2009)).

Defendants move for judgment as a matter of law on Plaintiff's Eighth Amendment claims for deliberate indifference to Plaintiff's serious medical needs and on the damages awarded.  Defendants do not move for judgment as a matter of law on Plaintiff's negligence claims.

To uphold the Eighth Amendment verdict against a particular Defendant, sufficient evidence must have been presented for a rational juror to find that that the Defendant was deliberately indifferent to Plaintiff's serious medical need.  Knowing and repeated delays in needed medical treatment, delays which serve no legitimate purpose, are evidence of deliberate indifference.  *See* Goodloe v. Sood, 947 F.3d 1026, 1031 (7th Cir. 2020)("[O]ur cases likewise establish that 'inexplicable delay' in responding to an

AA04

inmate's serious medical condition can reflect deliberate indifference. . . . That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering.")(internal cite omitted)(reversing summary judgment and finding that jury could infer deliberate indifference in three month delay to see specialist).

Deliberate indifference is a state of mind—a conscious disregard of an "'excessive risk to inmate health or safety.'" Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016)(quoting Farmer v. Brennan, 511 U.S. 825, 837). "The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." Id. That a defendant should have known is not enough to prove deliberate indifference. "Should have known" falls into malpractice (negligence) territory, which is a state law claim, not a federal constitutional claim. Pierson v. Hartley, 391 F.3d 898, 902 (7th Cir. 2004)("Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk.").

AA05

Direct evidence of a person's state of mind is rarely available, particularly in a case like this, which involves inadequate medical attention rather than no medical attention at all.  *See*  Whiting, 839 F.3d  at 662; Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016)("Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'").  More typically, actions and inactions over a period of time together form a picture of a deliberately indifferent state of mind, as in this case.

Defendant Dr. Nawoor argues that "Plaintiff identified no particular action or inaction that independently constituted deliberate indifference by Dr. Nawoor, instead relying on the entirety of his conduct between December 23, 2015 and May 4, 2017." [d/e 207, p. 2.]  However, the totality of care provided by Dr. Nawoor is the focus, Petties, 836 F.3d at 728, not one particular action or inaction.

The jury heard testimony which allowed the rational conclusion that the only acceptable medical approach to a patient like Plaintiff presenting with painless and visible blood in his urine was a CT scan to rule out cancer.  That was not done until months after Plaintiff presented with gross, painless hematuria.  The jury

AA06

also heard ample evidence of how Dr. Nawoor shared personal responsibility for the delays in Plaintiff's receipt of the CT scan and other indisputably necessary tests and treatment, as detailed in Plaintiff's response. [d/e 228, p. 28].

Further, a defendant's demeanor and credibility on the stand—how the Defendant explains his or her actions or inactions—is an important factor in the deliberate indifference inquiry. Dr. Nawoor's demeanor allowed a reasonable inference that Dr. Nawoor was indifferent to Plaintiff's repeated pleas for help and Plaintiff's real and substantial risk of kidney cancer. That Dr. Nawoor provided some care did not preclude an inference of deliberate indifference against him.

The evidence of deliberate indifference against Defendant Dr. Einwohner was not as extensive as that against Dr. Nawoor but was still legally sufficient to support the verdict against Dr. Einwohner. A reasonable juror could have found that Dr. Einwohner, a nephrologist, knew that Plaintiff needed a CT scan and a urology referral but only suggested that course in an ambiguous email and did nothing further. Dr. Einwohner's demeanor at trial also could have been reasonably perceived as evasive and defensive.

As to Wexford Health Sources, Inc. ("Wexford"), the evidence allowed a reasonable inference that Wexford's practices were a moving force behind the delays and that Wexford knew that its practices would lead to inexplicable delays for an urgently needed diagnosis and treatment of life-threatening conditions.  This inference would have been reasonable with or without the admission of the <u>Lippert</u> reports.  Both Dr. Einwohner and Dr. Nawoor testified to the practices they were required to follow, including repeated collegial reviews which seemed to serve no purpose.  Wexford's representatives testified to the appropriateness of those practices even in a case like Plaintiff's, but the jury did not have to believe their testimony.  The jury could have believed that the practices presented an obvious risk to Plaintiff and other inmates presenting with potentially life-threatening conditions.  A reasonable juror could have found that those practices on their faces would obviously and inevitably delay urgently needed treatment for some inmates, including Plaintiff.  *See* <u>Woodward v. Correctional Medical Services of Illinois, Inc.</u>, 368 F.3d 917, 930 (7th Cir. 2004)("The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger

municipal liability if the violation was a 'highly predictable consequence' of the municipality's failure to act.")(quoted cite omitted).  Judgment as a matter of law on the Eighth Amendment claims is denied.

Defendants also move for judgment as a matter of law on the compensatory damages awarded for disability and loss of a normal life/decreased life expectancy and future medical expenses and supplies.  The jury awarded $100,000 for physical pain and suffering; $500,000 for emotional pain and suffering; $100,000 for disability and loss of normal life/diminished life expectancy; and, $300,000 for future medical care and supplies.

Defendants argue that no evidence supported damages for a decreased life expectancy or future medical care.  However, Plaintiff's expert, Dr. Metwalli, testified that catching cancer earlier generally leads to better prognosis and survival, that the progression of Plaintiff's tumor thrombus would have been expected to be less if the CT had been done earlier, which would have positively impacted the prognosis and made the surgery less complicated.  [*See, e.g.,* Metwalli Tr. [Vol. 2] 405:15-26; 406:1-6.] Even if the reduction of life expectancy could not be stated with a

AA09

reasonable degree of certainty, the $100,000 is supported by evidence of loss of a normal life—enduring a more complicated surgery, longer recovery from that surgery, and possibly unnecessary chemotherapy.

Sufficient evidence also supported the award of $300,000 in future medical expenses.  Defendants do not dispute that the cancer medications cost $10,000-$15,000 per month.  As Plaintiff points out, $300,000 assumes that Plaintiff had about 18 months to live at the time of the verdict.  Defendants argue that Plaintiff would have had these expenses regardless, but a reasonable jury could have found that chemotherapy might not have been required or would have been required to a lesser extent, if the delays had not occurred.

Defendants also argue that judgment as a matter of law is warranted on punitive damages.  The same evidence that supports the jury's finding of deliberate indifference also supports an award of punitive damages.  Woodward v. Correctional Medical Serv. of Ill., Inc., 368 F.3d 917, 930 (7th Cir. 2004).  A reasonable juror could conclude that Defendants were recklessly, callously indifferent to the serious risk of substantial harm facing Plaintiff.  Judgment as a

AA10

matter of law is denied as to the assessment of damages. However,

the punitive damages will be reduced as discussed below.

## II.  A new trial is not warranted.  The verdict was not against the manifest weight of the evidence, and the trial was fair.

The new trial standard differs from the standard for judgment

as a matter of law.  "'A new trial is appropriate if the jury's verdict is

against the manifest weight of the evidence or if the trial was in

some way unfair to the moving party.'" Martinez v. City of Chicago,

900 F.3d 838, 844 (7th Cir. 2018)(quoted cite omitted); Johnson v.

Gen. Bd. of Pension & Health Benefits of the United Methodist

Church, 733 F.3d 722, 730 (7th Cir. 2013)("A new trial is

appropriate where the verdict is against the clear weight of the

evidence or the trial was not fair to the moving party.").[2]

### A.  Manifest Weight

Unlike the judgment as a matter of law standard, when

assessing whether the verdict was against the manifest weight of

the evidence, the Court "has the power to get a general sense of the

weight of the evidence, assessing the credibility of the witnesses and

the comparative strength of the facts put forth at trial." Mejia v.

---

[2] "Clear" and "manifest" are used interchangeably in this context.

AA11

Cook County, 650 F.3d 631, 634 (7th Cir. 2011).  The Court

considers all the evidence presented, disregarding only evidence

"'reasonable persons could not believe'" because that evidence

"'contradicts indisputable physical facts or laws.'" Id. at 633.

(quoted cite omitted).

Though the standards differ, the same reasons set forth above

for denying judgment as a matter of law also support the denial of a

new trial.  Considering all the evidence presented by both sides, the

weight of the evidence and the witnesses' credibility strongly favored

Plaintiff as to his claims against Dr. Nawoor and Wexford, in the

Court's judgment.  The verdict could have gone either way as to Dr.

Einwohner, thus was not against the manifest weight of the

evidence.

**B.  Evidentiary Rulings**

Defendants challenge multiple evidentiary rulings.  Erroneous

evidentiary rulings do not alone warrant a new trial.  A new trial is

warranted "'only if the error had a substantial influence over the

jury, and the result reached was inconsistent with substantial

justice.' . . . 'Evidentiary errors satisfy this standard only when a

significant chance exists that they affected the outcome of the

trial.'" <u>EEOC v. Management Hospitality of Racine, Inc.</u>, 666 F.3d 422, 440 (7th Cir. 2012)(quoted and other cites omitted); <u>Burton v. City of Zion</u>, 901 F.3d 772, 777 (7th 2018)("[T]here must be a significant chance that the flawed ruling affected the outcome of the trial.").

### 1. **<u>Lippert</u> Reports**

Defendants argue that admission of two expert reports from another case, <u>Lippert v. Godinez</u>, 10-cv-4063 (N.D. Ill.), was error. The reports were admitted as to notice, and the Court gave a limiting instruction. The Court's limiting instruction advised that Wexford disputed the truth of the reports and that the reports could be considered "only in deciding whether Defendant Wexford Health Sources, Inc., had notice and knowledge of the information in the reports, not whether the information in the reports is true." [Jury Instr., page 12.]

Recognizing that this ruling could have significance beyond this case, the Court entered a written order explaining the reasons for that ruling after the trial. [12/20/19 Order.] The Court assumes familiarity with that order.

Defendants argue that the report authored in October 2018 (the Puisis report) could not have given notice to the events in this case, which all occurred before that report issued.  The Puisis report, however, was a continuation of the 2014 report (the Shansky report).  Both were relevant to Wexford's notice from independent court experts that its procedures, including collegial review, caused significant and unnecessary delays in the delivery of off-site care.  *See* Hildreth v. Butler, 960 F.3d 420, 433 (7th Cir. 2020)(Hamilton, J., dissenting)(observing in dicta that the Lippert reports "would be admissible to show corporate knowledge of Wexford's policy failings and of the risks that inmates faced)(*citing* Daniel v. Cook County, 833 F.3d 728, 743 (7th Cir. 2016)[3]; Von Ryburn v. Obaisi, 2020 WL 3868715 (N.D.Ill.)(Lippert report admissible for nonhearsay purpose of notice)(*citing* Hildreth, this case, and Boyce v. Wexford Health Sources, Inc., 2017 WL 1436963, *15 n.12 (N.D. Ill.) (holding documents from other jail-condition case were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain" but "may

---

[3] Judge Hamilton, Judge Rovner, and Judge Scudder recently dissented from the denial of rehearing en banc. Hildreth v. Butler, --- F.3d ---,  2020 WL 4815844 (7th Cir. 2020).

be admissible to show that the defendants were on notice of their contents")).

Defendants also argue that <u>Daniel v. Cook County</u>, 833 F.3d 728, 743 (7th Cir. 2016), which this Court cited to support admission of the reports as to notice, is distinguishable.  In <u>Daniel</u>, a court-appointed monitor issued a report regarding the progress in meeting the conditions of an agreed order about the delivery of healthcare to Cook County Jail detainees.  The Seventh Circuit stated that the agreed order and monitor's report were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain, but they may be admissible to show that the defendants were on notice of their contents, or perhaps for other purposes."  <u>Id.</u>; <u>J.K.J v. Polk County</u>, 960 F.3d 367, 379 (7th Cir. 2020)(municipality must be on notice that practice will cause constitutional violations).  Wexford attempts to distinguish <u>Daniel</u> on the grounds that Wexford had no opportunity in <u>Lippert</u> to challenge the reports because Wexford was dismissed before the reports were filed.  In <u>Daniel</u>, the defendant, Cook County, did have the opportunity to challenge the reports.

AA15

That distinction is a distraction, though.  The issue here is notice of the reports' statements, not the truth of those statements. Wexford had notice of the reports as their representatives admitted at trial and as is obvious from the docket sheet in <u>Lippert</u>.  <u>Daniels</u> supports the admission of the <u>Lippert</u> reports as to notice.

Defendants also contend that the <u>Lippert</u> reports' statements were too inflammatory and unfairly prejudicial, outweighing any probative value as to notice, and that the Court "compounded the prejudice by vouching for the <u>Lippert</u> reports' reliability by erroneously taking judicial notice in front of the jury."  [207, p. 9.] In particular, Defendants point to the Puisis report's conclusion that "[t]here was no improvement since the first Court's expert report.  Our opinion is that the specialty care process of collegial review is a patient safety hazard and should be abandoned until such time that patient safety is ensured."  This statement was relevant as to notice of the statements in the first expert report and also relevant to rebut the suggestion of a lack of notice that the same problems continued to exist at the time of the trial.  The judicial notice taken was to the fact of the filing in <u>Lippert</u>, not to

the truth of the matter asserted in the filing.  That was made clear

through the Court's limiting instruction, which read:

> You have heard evidence about reports filed in a
> different case regarding the delivery of healthcare to inmates
> in the Illinois Department of Corrections. Defendant Wexford
> Health Sources, Inc., disputes the truth of those reports and
> has not admitted liability in that case. You may consider
> these reports only in deciding whether Defendant Wexford
> Health Sources, Inc., had notice and knowledge of the
> information in the reports, not whether the information in the
> reports is true. Remember, the issue is whether Defendants
> violated Plaintiffs rights as I describe those rights to you in
> these instructions.

[Final Jury Instructions, d/e 182, p. 12.]

The probative value of the <u>Lippert</u> reports as to notice was not

outweighed by the danger of unfair prejudice.  The reports'

statements are critical of Wexford but not inflammatory, and any

potential unfair prejudice was mitigated by the Court's limiting

instruction and by the opportunity of Wexford representatives to

testify that they disagreed with the reports' conclusions.

Further, even if admission of the <u>Lippert</u> reports was error,

ample other evidence supported a finding that Wexford's practices

were deliberately indifferent and that Wexford was on notice of this

problem.  The testimony of Wexford's own doctors supported the

conclusion that Wexford's practices caused delays in urgently

AA17

needed care for no legitimate reason.  Admission of the <u>Lippert</u>
reports did not affect the outcome of the trial to any significant
degree.

## 2.  Plaintiff's Closing Argument in Rebuttal

Defendants argue that the Court should have sustained
Defendants' objection to a statement by Plaintiff's counsel in
rebuttal that Plaintiff's disease became metastatic during
Defendants' delays. "Reversible error [in closing arguments] occurs
only if the statement was 'plainly unwarranted and clearly
injurious.'" <u>Smith v. Hunt</u>, 707 F.3d 803 (7th Cir. 2013)(quoted cite
omitted).

A reasonable juror could conclude that, had Plaintiff been
given a CT scan in the weeks after presenting with visible, painless
blood in his urine, he would have been diagnosed with cancer
months earlier and would have been able to have the surgery
months earlier.  While the experts could not pinpoint when the
cancer spread, a reasonable juror could conclude from the evidence
that the cancer continued to grow and spread between December
2015 and July 2016, when the surgery occurred, even if the cancer
was already spreading before December 2015.  The remark in

closing was not "plainly unwarranted" and, in any event, did not render the entire trial unfair.

Defendants maintain in a footnote to this section in their brief that the Court "allowed Plaintiff's counsel to improperly bolster the diminished life expectancy claim by letting counsel directly address the jury during evidence to 'introduce' Plaintiff's elderly father, who was not a witness, in an obvious attempt to garner sympathy and suggest that Deans live to an old age." [d/e 207, n. 1.]  After a break in Plaintiff's direct testimony, the Court explained to the jury that one of Plaintiff's attorneys was not present because that attorney was with the doctor who would be testifying in the afternoon, and that other attorneys may be leaving for similar reasons at various times throughout the trial.  Plaintiff's counsel then introduced Plaintiff's father and sister, who were sitting in the well near the table of Plaintiff's counsel.  The Court permitted them to sit in the well in order to accommodate Plaintiff's father, who appeared frail, had difficulty hearing, and needed help from Plaintiff's sister to move about.

The Court allowed the introduction of Plaintiff's father and sister for the same reason the Court explained the absence of one of

Plaintiff's lawyers—so the jury would not be distracted speculating about why the people by Mr. Dean's table changed throughout the trial. The Court sees nothing improper or prejudicial about the introduction. [Tr. Vol. 3, pp. 199-203.]

Defendants also assert in a footnote that the Court allowed Plaintiff to testify that his life expectancy was going down every day he waited for surgery. Plaintiff testified that was his understanding about cancer: "[J]ust pretty much common sense the longer you wait, the bigger it's going to grow, the more it's going to spread. I didn't know anything about this spreading at this point." [Tr. Vol. 2 p. 190.] Mr. Dean was expressing the fear he felt at the time and that evidence was appropriately allowed.

### 3. Dr. Nawoor

Defendants also argue that character evidence was improperly admitted against Dr. Nawoor. Evidence was presented that, during the relevant time period in this case, Dr. Nawoor had been disciplined for sleeping on the job and had been reported for not following procedures and not ordering necessary follow-up care for Plaintiff and other inmates. At a sidebar, Defendants objected on

AA20

the grounds of hearsay, inadmissible character evidence, and lack of probative value.  [Tr. Vol. 5, p. 877.]

The evidence was properly admitted to show that Dr. Nawoor's inaction towards Plaintiff was no accident.  The evidence also was relevant to show that Dr. Nawoor was on notice of reports of his inattention in April 2016, when Plaintiff was diagnosed with cancer, and also in August 2016, after Plaintiff's surgery.  Fed. R. Evid. 404(b)(evidence of other bad acts may be admissible to show intent, motive, lack of accident).  These incidents are also evidence that Wexford knew about Dr. Nawoor's inattention and inadequate medical care to Plaintiff.

These incidents were probative of the deliberate indifference inquiry because the incidents tend to make it more probable that Dr. Nawoor and Wexford knew that Plaintiff was not getting adequate care and knew that the inadequate care would continue unless a change was made.  The probative value of this evidence was not outweighed by the danger of unfair prejudice that the jurors would find against Dr. Nawoor because he was a "bad doctor," as Dr. Nawoor argues.

The Court also agrees with Plaintiff that the most damaging evidence against Dr. Nawoor was Dr. Nawoor's own testimony and demeanor throughout the trial.  A reasonable juror could have found Dr. Nawoor's attitude disdainful and disinterested.  Dr. Nawoor also appeared to be sleeping at times throughout the trial.  A reasonable inference of deliberate indifference arose against Dr. Nawoor even without admission of these incidents.

### 4.  Plaintiff's Calendars

Defendants also assert that Plaintiff's calendars on which Plaintiff kept notes should not have been admitted into evidence and that Plaintiff should not have been allowed to read from the calendars.  The calendars were appropriate to refresh Plaintiff's recollection when needed, [*see, e.g.,* Tr. Vol. 2 169-170; Fed. R. Evid. 803(5)(recorded recollection)], but if refreshing recollection were the only use, Defendants are correct that the calendars should not have been admitted into evidence, and Plaintiff should not have read from them.  Fed. R. Civ. P. 803(5); <u>Beauty Enterprises, Inc. v. Gregory</u>, --- Fed Appx. ---, 2020 WL 5089558 *3 (7th Cir. 2020)(not reported in Fed. Rptr.).  The Court also agrees with Defendants that

the calendars did not meet the business records exception to hearsay under Fed. R. Evid. 803(6).

However, the residual exception under Federal Rule of Evidence 807 supports the admission of the calendars.  *See* <u>United States v. McPartlin</u>, 595 F.2d 1321, 1350 (7th Cir. 1979)(even if diary not admissible under business records exception, diary was admissible under residual exception or as co-conspirator statement).  Plaintiff's calendar entries were probative of Plaintiff's state of mind when he made the entries and the timing of that state of mind with the physical symptoms he was experiencing.  The entries were corroborated by medical records and other evidence, and Plaintiff was an in-court witness who could be and was cross-examined on those entries.  *See* 2019 *comment to Fed. R. Evid. 807* ("In deciding whether the statement is supported by sufficient guarantees of trustworthiness, the court should not consider the credibility of any witness who relates the declarant's hearsay statement in court."); <u>McPartlin</u>, 595 F.2d at 1350 ("Furthermore the degree of reliability necessary for admission is greatly reduced where, as here, the declarant is testifying and is available for cross-

examination, thereby satisfying the central concern of the hearsay rule.").

In any event, even if the Court erred, Defendants do not explain how that error prejudiced them. Regardless of the calendars' admissibility, Plaintiff would have been able to consult his calendar to refresh his recollection to answer any question. The substance of Plaintiff's testimony would have only taken longer to elicit but would not have changed. Further, many of the entries in the calendar itself about medical appointments were corroborated, and most of the other entries unsurprisingly reflected Plaintiff's frustration and fears, something which Plaintiff testified to himself without the calendar. Not admitting the calendars into evidence would have had no effect on the verdict.

### 5. Dr. Severino's Statements to Plaintiff

Defendants also argue that Plaintiff should not have been allowed to testify that Dr. Severino told Plaintiff that Plaintiff needed surgery "right away" and "as soon as possible." These statements were admissible to show the effect the statements had on Plaintiff's state of mind. United States v. Leonard–Allen, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness

is reporting what he heard someone else tell him for the purpose of explaining what the *witness* was thinking, at the time or what motivated him to do something.")(emphasis in original).  Defendants assert that the statements were unfairly prejudicial, but Defendants had the opportunity and did rebut those statements with evidence that Dr. Severino did not characterize the surgery as emergent.

### 6.  Dr. Barnett

Defendants argue that the Court improperly allowed Dr. Barnett, Plaintiff's expert in correctional medicine, to give unfounded and undisclosed testimony about the timing of presenting patients with advanced directives.  Dr. Barnett testified that not providing Plaintiff with an opportunity to sign an advance directive before the surgery was a deviation from the standard of care. [Tr. Vol. 4, 549-50.]  Instead, Plaintiff was presented with that opportunity in November 2016 when Plaintiff was receiving chemotherapy.  Defendants maintain that Dr. Barnett's testimony improperly implied that Defendants were trying to save money on chemotherapy by obtaining Plaintiff's refusal for treatment.

Dr. Barnett testified in his deposition that he considered himself an expert in advanced directives and agreed that discussion

of a "do not resuscitate order" was appropriate if a patient is terminal.  [Barnett Dep. 54-56.]  Dr. Barnett's trial testimony was a natural extension of his deposition testimony and did not unfairly surprise Defendants.  No prejudice resulted because Defendants had the opportunity to explain why the advance directive was not presented to Plaintiff until November.  Further, this dispute was inconsequential in the overall trial.  Striking Dr. Barnett's statement would have had no effect on the jury's decision.

Defendants also maintain that Dr. Barnett was improperly allowed to testify on Plaintiff's emotional injury and cancer growth.  [Defs.' Mot. p. 15, d/e 207.]  (Defendants cite to pages 548-550 of volume 3 of the transcript, but they appear to mean volume 4 because volume three does not contain those page numbers.)  Dr. Barnett was asked whether Dr. Barnett had an opinion on how Plaintiff's consideration of an advance directive in November 2016 "contributed to Mr. Dean's pain, suffering, mental anguish."  [Tr. Vol. 4, p. 550.]  Dr. Barnett answered, over objection:

> "I do believe it indicates the – the severity of his
> condition.  And it would be a naturally difficult thing for
> anyone to re-visit, which is your imminent mortality.
> And it comes with the territory if you have cancer, you're
> going to be scared, you're going to be worried.  And each

intervening episode, a visit to the doctor, an x-ray report, they're all going to create anxiety. And this POLST [Physician's Order for Life-Sustaining Treatment] is going to create this anxiety that everyone needs to get through because they need this information.  They need to know what do you want us to do.

Id. at 551.

This testimony stands for the unsurprising proposition that being confronted with one's mortality is upsetting, particularly when diagnosed with a terminal illness.  The testimony was in further explanation of Dr. Barnett's opinion that Plaintiff should have been presented with the advance directive before Plaintiff's surgery, which, as was discussed above, was an issue that was inconsequential in the overall trial.

Defendants next assert that Dr. Barnett improperly testified to Defendants' mental states.  Defendants cite to pages 500-506, but it is not clear which parts of those pages are at issue.  The Court assumes that Defendants mean Dr. Barnett's testimony at page 506 [Tr. Vol. 4], that was based on Dr. Barnett's review of the medical records, depositions, and also based on hearing Dr. Nawoor's in-court testimony:

[I]t appears that the defendants were aware that the failure to follow the guidelines as even promulgated by Wexford itself was going to cause harm or put the patient at risk of greater harm because the patient was at risk from cancer and that was apparent – that was evident early on.  And not treating cancer meant there would be an unmitigated propagation or growth of that cancer which would, of course, be harmful.

Dr. Barnett then explained that he drew this conclusion from Wexford's own guidelines calling for radiologic studies and cystoscopy on presentation of gross hematuria.  Id.

An expert is not prohibited from opining on ultimate issues.  Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue."); Pittman by and through Hamilton v. County of Madison, Ill., 970 F.3d 823, 829 (7th Cir. 2020)(expert testimony offering "outcome-determinative opinions" was not automatically barred).  Dr. Barnett's opinion that he believed Defendants were aware of the danger of gross hematuria from Wexford's own policies assisted the jury and was admissible, in the Court's judgment.  In any event, this testimony did not deprive Defendants of a fair trial.

AA28

As to Defendants' assertion that Dr. Barnett was not
qualified to testify about "cancer growth kinetics," Defendants
do not point the Court to what testimony they challenge.  If
they challenge, as Plaintiff guesses, Dr. Barnett's testimony to
the effect that "untreated cancer continued to grow" [d/e 228,
p. 50], that observation is within Dr. Barnett's experience as a
physician.

## C.  Jury Instructions

A new trial is warranted when a jury instruction inaccurately
states the law, and the instruction prejudiced a party by confusing
or misleading the jury.  O'Donnell v. Caine Weiner Co., LLC, 835
F.3d 549, 553 (7th Cir. 2019).

### 1.  Deliberate Indifference and Reasonableness

Defendants take issue with the adjective "reasonable" used in
the Court's jury instruction setting forth the elements for the Eighth
Amendment claim.   The Court's instruction required Plaintiff to
prove that he had a serious medical need, that a Defendant was
aware of the serious medical need, and that the Defendant
"consciously failed to take reasonable measures to provide
treatment for the serious medical need."  The instruction then listed

factors to consider in determining whether reasonable measures were taken.  [Final Jury Inst., d/e 182, pp. 27-28.)  This instruction was based on the Seventh Circuit pattern instruction 7.17 (2017 rev.).

Defendants argue that reasonableness is a negligence standard and that the instruction allowed the jury to find an Eighth Amendment violation based on negligent conduct.  The instructions on the negligence claim also incorporated the concept of reasonableness, defining negligence as the "failure to do something that a reasonably careful doctor or nurse would do . . . ."  [Jury Inst. p. 34.]

The concept of a reasonable response has been part of Eighth Amendment law for decades.  Farmer v. Brenan, 511 U.S. 825 (1994)("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."(*cites omitted);* Walker v. Wexford Health Sources, Inc., 940 F.3d 954, 965 (7th Cir. 2019)(affirming summary judgment where prisoner doctor made "reasonable medical judgment"); Sanville v. McCaughtry, 266 F.3d 724, 740–41 (7th Cir.2001) ("[t]o

Page **29** of **55**

be liable under the Eighth Amendment for an inmate's suicide, 'a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act'").

The definitions of negligence and deliberate indifference do overlap in their use of the concept of reasonableness but part ways in the subjective element required. No subjective element is required in a negligence claim.  A prison doctor could be found negligent even if he or she was unaware of having responded unreasonably to an inmate's medical condition.  In contrast, a prison doctor could be found deliberately indifferent only if he or she was aware of having responded unreasonably.  The word "consciously" makes all the difference.  *See* 7th Cir. Pattern Instruction 7.17 (2017 rev.)(requiring awareness of serious medical need and conscious failure to take reasonable measures to treat that need).  The Seventh Circuit pattern instruction accurately states the law.

### 2.  Issues Instruction

Defendants assert that the Court erred by not giving their tendered issues instruction for the negligence claims, listing the actions or inactions which Plaintiff contended constituted negligence.  *See* Illinois Pattern Jury Instruction 20.01.

A federal court is not required to give a state law pattern instruction.  Schwartz v. American Honda Motor Co., Inc., 710 F.2d 378, 382 (7th Cir. 1983)(giving federal instruction over Illinois pattern instruction was not grounds for reversal where instruction given was not faulty and did not cause prejudice);  Welch v. United States, 604 F.3d 408, 421 n.15 (7th Cir. 2010)("'Illinois Pattern jury instructions are not binding.'")(quoting People v. Peete, 743 N.E.2d 689, 695 (Ill. 2001)).

An issues instruction in some cases could assist the jury but not in this case.  In this case, an issues instruction accurately stating each alleged act of negligence would have been sprawling, confusing, and possibly misleading. *See, e.g.,* Plaintiff's partial list of Dr. Nawoor's failings, d/e 228 p. 28; Howat v. Donelson, 305 Ill.App.3d 183 (5th Dist. 1999)(reversing for giving misleading issues instruction).  The issues in the case were explained to the jury in the statement of the case and presented thoroughly during the trial.

AA32

No issues instruction was needed, and the jury instructions accurately set forth the elements of the negligence claims.

## III.  A Remittitur of the Compensatory Damages Awarded is not Warranted.

The jury awarded $100,000 for Plaintiff's physical pain and suffering, $100,000 for disability/loss of normal life/diminished life expectancy, $300,00 in future medical expenses, and $500,000 for emotional pain and suffering.  Defendants argue that the Court must remit the $500,000 for emotional pain and suffering to $100,000 or less.

These awards were based on both the federal and state claims, so whether federal or state law applies is unclear.  Both parties cite federal law.[4]  The legal standard is "whether the jury's verdict is rationally related to the evidence and 'whether the award is roughly comparable to awards made in similar cases.'"  Green v. Howser, 942 F.3d 772, 781 (7th Cir. 2019)(quoting Adams v. City of Chicago, 798 F.3d 539, 543 (7th Cir. 2015).  The "monstrously excessive" factor quoted by the parties "is simply another way of expressing

---

[4] The difference appears to be that Illinois law does not require a comparison to other awards.  Rainey v. Taylor, 941 F.3d 243, 253 (7th Cir. 2019)("Under Illinois law it's neither necessary nor appropriate to evaluate a jury's compensatory award against awards in similar cases; a comparative analysis is not part of the state framework.").

Page **32** of **55**

the 'rational connection' factor," according to <u>Green</u>, 942 F.3d at

n.2, though more recent Seventh Circuit opinions seem to make the

rational-connection and monstrously-excessive inquiries

overlapping but independent.  *See* <u>Vega v. Chicago Park District</u>,

954 F.3d 996, 1008 (7th Cir. 2020); <u>Kaiser v. Johnson and Johnson</u>,

947 F.3d 996, 1019 (7th Cir. 2020).  Here, the difference is

immaterial, if there is a difference.  The compensatory damages are

rationally related to the evidence and are not monstrously

excessive.

A rational juror could believe that Dr. Nawoor told Plaintiff

from Plaintiff's first report of painless, visible urine in Plaintiff's

blood that Plaintiff could have cancer.  Plaintiff testified extensively

to his emotional distress for the months that followed before

Plaintiff was properly tested, and then more months after that to

have surgery, and then more delays after that for the necessary

follow-up and chemotherapy.  At one point during the trial, Mr.

Dean broke down crying, testifying that he felt that his inability to

obtain medical care was his fault because if he were not in prison,

then he could have walked into any emergency room to obtain a

diagnosis and treatment.  A juror could have reasonably found this

AA34

testimony sincere and compelling.  Tullis v. Townley Eng. & Mfg. Co., 243 F.3d 1058, 1068 (7th Cir. 2001)(jury has the role of assessing credibility on emotional distress testimony).

As for comparisons to other cases, Defendants cite cases which award less money or which award more money but which Defendants maintain had more evidence of metastasis or harm. Plaintiff aligns his case with the cases awarding more damages and points out additional cases which support his award.  On this record, the Court cannot conclude that $500,000 is so far outside the norm that the jury's judgment must be disturbed.

## IV.  The punitive damages against Wexford are remitted to 7 million dollars.

The jury awarded $10 million in punitive damages against Wexford.  Wexford argues that this amount is unconstitutionally excessive.

This inquiry turns on the reprehensibility of Wexford's conduct, the difference between the harm or potential harm suffered and the punitive damages, and the difference between the punitive damages and civil penalties allowable or imposed in comparable cases.  Green, 942 F.3d at 782 (citing State Farm Mut.

Page **34** of **55**

Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003)).  The degree

of reprehensibility is the most important, measured by the nature of

the harm and the nature of the conduct.  In particular, relevant

factors are whether:

> the harm caused was physical as opposed to economic;
> the tortious conduct evinced an indifference to or a
> reckless disregard of the health or safety of others; the
> target of the conduct had financial vulnerability; the
> conduct involved repeated actions or was an isolated
> incident; and the harm was the result of intentional
> malice, trickery, or deceit, or mere accident.

Id. (quoting State Farm, 538 U.S. at 419).

Here, all of these factors support a punitive damage award.

Plaintiff suffered physical harm; Defendants were indifferent to

Plaintiff's health; Plaintiff was vulnerable financially and at the

mercy of Defendants; the delays were repeated, not isolated; and,

intentional malice could be inferred from Wexford's relentless and

rigid application of corporate practices which served no legitimate

purpose.

Further, the jury could have reasonably found from the

testimony at trial, including Defendants' own witnesses, that

Wexford continues to be indifferent to how its practices put inmates

with potentially life-threatening diseases at a substantial risk of serious harm.  A reasonable jury could have gotten the impression that a substantial punitive damages award was required to deter Wexford from similar conduct in the future.  The 1:1 ratio that Wexford seeks would arguably not deter or serve as adequate punishment.

The Supreme Court has stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm, 538 U.S. at 425.  A higher ratio could be warranted in the right circumstance, for example if compensatory damages are small or the conduct is "particularly egregious." Id.  "[E]ven if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than the other two." Rainey v. Taylor, 941 F.3d 243, 255 (7th Cir. 2019).  That makes sense, because comparing cases is an imprecise endeavor at best. Reading the facts of another trial on paper is quite different than experiencing the trial first hand. Many of the factors that inform a punitive damages award do not translate well to paper.

AA37

The ratio of punitive damages in this case was 10:1. This is higher than the Supreme Court's "single digit" remark and higher than the ratios cases cited by Defendants where significant compensatory damages were awarded. *See*, *e.g.*,, Epic Systems Corp. v. Tata Consultancy Services Ltd., 2020 WL 4882891 (7th Cir. 2020)($140 million for unjust enrichment, reducing punitives to, at most, $140 million)(1:1 ratio, though this is distinguishable because the compensatory damages were much higher than the $1 million in this case).

Plaintiff points out that the cases cited by Defendants involved less egregious facts or only economic damage. Plaintiff cites cases in which a 10:1 ratio or greater was sustained. *See* TXO Prod. Corp. v. Alliance Res. Corp, 509 U.S. 443, 453 (1993)($19,000 compensatory, $10 million punitive (526:1)(plurality, fraudulent plan to take back royalties); Mathias v. Accor Economy Lodging, Inc., 347 F.3d 672 (7th Cir. 2003)(reinstating punitive damages of $186,000 to the $5,000 compensatory damages awarded for being bitten by bed bugs at a motel); Johnson v. Howard, 24 Fed.Appx 480, 486-87 (6th Cir. 2001)($30,000 compensatory, 3 million punitive where inmate savagely beaten with hands behind back);

<u>Murphy v. Gilman</u>, 551 F.Supp. 2d 677, 685-86 (W.D.

Mich.)($250,000 compensatory, 2.5 million punitive where inmate

died from dehydration).

Plaintiff also argues that the fees and costs awarded become

part of the compensatory damages, thus reducing the ratio between

punitive and compensatory damages.  The cases cited for that

proposition, however, are cases in which the plaintiff was actually

compensated with an attorney fee award.  Here, because of the

Prison Litigation Reform Act, the award of attorney fees will come

from the judgment and reduce the amount of money received by

Plaintiff.  Adding the fee award to the compensatory damages for

purposes of the punitive damages analysis is not warranted.

After careful consideration of the evidence, the Supreme

Court's guidelines, and roughly comparable cases, the Court

concludes that ten million dollars in punitive damages is

unconstitutionally excessive. The Court is upholding the entire

compensatory damage award of 1 million dollars, a substantial

amount.  The cases cited by Plaintiff in which the ratio was 10:1 or

greater had smaller compensatory damage awards, justifying a

higher punitive damage award to fairly represent the egregiousness

of the misconduct.  The cases cited by Defendants and additional
cases of which the Court is aware do not support a 10:1 ratio where
the compensatory award is 1 million.  *See, e.g.*, <u>Estate of Moreland
v. Dieter</u>, 395 F.3d 747 (7th Cir. 2005)($29 million compensatory,
$27.5 million punitive damages awarded; excessive force against jail
detainee caused detainee's death)(though this could be
distinguished by the fact that $27.5 million is an extraordinary
amount to begin with); <u>Fox ex. rel Fox v. Barnes</u>, 2013 WL 2111816
(N.D. Ill. 2013)($11 million compensatory; $1 million in punitive
damages; inmate's seizure caused permanent mental
damage)(though Wexford settled out for 14 million); <u>Degorski v.
Wilson</u>, 2014 WL 3511220 (N.D.Ill.)($225,000 compensatory,
$226,000 punitive damages; inmate's face fractured by repeated
punching by guard); <u>McCroy v. IDOC</u>, 02-CV-3171 (C.D. Ill)(inmate
lost eye; jury awarded $810,000 compensatory and $90,000
punitive damages); <u>Williams v. Patel</u>, 104 F.Supp.2d 984 (C.D. Ill.
2000)(1 million compensatory damages, punitive damages remitted
to $750,000; inmate lost eye).

    The Court concludes that the punitive damages should be
remitted to $7 million dollars.  This amount recognizes the

reprehensibility of Wexford's conduct and the harm Plaintiff suffered, should be sufficient to deter future similar conduct, and also stays within the bounds of due process, in the Court's judgment.  A seven to 1 ratio is still more than most of the other cases cited above, but a higher ratio is justified by the evidence that supported a reasonable conclusion that Wexford's practices will foreseeably continue to cause constitutional violations unless there is a change.

## V.  Defendants have not shown that they are entitled to a set-off.

Defendant Mincy, who was employed by the Illinois Department of Corrections, settled for $10,000 early in the trial. Defendants argue that they are entitled to reduction of the award by this amount to prevent double recovery on the Eighth Amendment claim.

This issue is more complicated than Wexford's analysis.  *See* Fox ex rel. Fox v. Barnes, 2013 WL 2111816 (N.D. Ill. 2013)(discussing whether state or federal law applies, different methods of calculating set-off under federal law, whether settlement allocating proceeds to certain damages was in good faith, and the

non-settling party's burden of demonstrating set off is required).

Defendants have not met their burden of showing that they are

entitled to a setoff.

## VI. Plaintiff's Motion for Attorneys' Fees and Expenses

42 U.S.C. § 1988(b) allows the Court to allow "the prevailing

party, . . . a reasonable attorney's fee as part of the costs . . . ." in

certain actions, including actions under 42 U.S.C. § 1983 like this

one.  Calculating a reasonable fee begins with the

"lodestar" method--multiplying the reasonable hours expended by a

reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433

(1983).  The lodestar amount may then be revised in either direction

upon consideration of additional factors not considered in

determining the lodestar.  World Outreach Conference Center v.

City of Chicago, 896 F.3d 779, 783 (7th Cir. 2018).

However, Congress has placed limits on the attorneys' fees

recoverable on civil rights cases filed by prisoners.  42 U.S.C. §

1997e(d).  A verbatim recitation of those limits will be more

accurate than a paraphrase attempt:

**(d) Attorney's fees**

(1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—

(A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

(B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

(ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel.

(4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to section 1988 of this title.

AA43

In effect, this statute means that the attorneys' fees cannot exceed 150% of the jury award, which is not a problem here, since Plaintiff's fee request amounts to about 16% of the $8 million award. The parties appear to agree that the cap on the hourly attorney fee rate (150% of the Criminal Justice Act rate, or CJA rate), has ranged from $198.00 to $228.00 in this case. Twenty-five percent of the remitted judgment is roughly $2 million, which means that, even if the Court awards the total amount of attorneys' fees and expenses Plaintiff seeks, Defendants will not pay more out-of-pocket. This is different from a nonprisoner civil rights case in which the losing party pays the plaintiff's attorneys' fees in addition to the amount the jury awards.

Plaintiff seeks a total of $1,234,600.50 in attorneys' fees and $79,490.28 in nontaxable expenses.[5] Plaintiff's counsel does not seek reimbursement for any partner time [651 hours of reduction] and has further reduced the hours sought for reimbursement by 790.50. [d/e 230, p. 2; d/e 205, p. 3.] According to the fee petitions, the hours cut total a 31.37% reduction. The total attorney hours sought are 2,395, and the total paralegal hours

---

[5] Plaintiff's original petition was supplemented with additional fees and costs incurred after the trial.

sought (at $125/hour) are 758.25.  According to Plaintiff, applying 150% of the applicable CJA rate to the attorney hours and $125 to the paralegal rate comes to $617,300.25.  Plaintiff asks that this amount be doubled to fairly compensate them.

The first step is to determine whether the 2,395 attorney hours and 758.25 paralegal hours spent on this case were reasonable.  For the most part, yes.  Plaintiff's pro bono counsel were appointed in May 2017 and took the case through settlement talks, extensive and difficult fact and expert discovery, opposing a motion to dismiss, opposing an extensive summary judgment motion, opposing Defendants' attempts to move the trial date out, responding to and pursuing many motions in limine, and litigating a seven-day, contentious trial.

The Court is confident that these hours were necessary to prove the violation of Plaintiff's Eighth Amendment rights.  This case was about a kind of deliberate indifference that is more subtle and insidious than the kind of deliberate indifference that screams out with obvious, easy-to-find evidence.  The skill, resources, and tenacity of Plaintiff's attorneys are the reason Plaintiff was able to uncover and prove deliberate indifference.  Plaintiff's counsel has

already culled substantial time from the fee petition.  The Court

does not see that much further culling is necessary.

However, Defendants do point out some deductions that the

Court will make.  The 15.5 hours spent on clemency and

compassionate or geriatric release issues ($3,069 deduction)[6] will

be deducted.  Four and ¼ hours will be deducted as duplicative for

preparing a timeline ($841.50 reduction).  The time spent on mock

closings by attorneys who did not give closing is deducted (13.25

hours, $2,623.50 reduction).  Mr. Strom's travel time to Chicago on

December 14, 2019, the weekend after the trial started, is deducted

(3 hours, $594.00).  Mr. Sawyer's hourly rate as a law student is

reduced to $125, the same as the paralegal rate.  Mr. Sawyer's time

spent reviewing materials and attending meetings and depositions

is deducted (13.5 hours, $2,673 reduction).  The remainder of Mr.

Sawyer's time in June 2018 (24.75 hours) was reasonable, but is

reduced by $1,806.75 to reflect the reduction in hourly rate.

Defendants assert that the hours spent by Attorney Chloe Holt

when she was a law student should also be reduced, but

Defendants have not set forth those entries in their response.

---

[6] Defendants do not set forth the applicable CJA rate when this time was billed, so the Court
uses $198.00).

Defendants also point out block billing and time entries that they maintain are insufficiently described.  The Court has reviewed those entries and finds that the work done is either described sufficiently in the entry or is clear when considered in context with the surrounding entries.

Defendants next argue that 61.25 attorney hours and 119.75 support hours reflect administrative tasks that are not appropriately billed as attorney or paralegal time.  The Court has reviewed those entries and concludes that those entries do not, by and large, appear to be solely administrative tasks. The complexity and the amount of the evidence in this case required extensive organization by individuals with the legal training and familiarity with the case to understand how that evidence should be best organized and summarized to prepare for trial.  The Court's count of entries that might be purely administrative amounts to 23.25 hours of support staff time, most of that occurring after the trial by Mr. Garcia.  Removing that time results in a deduction of $2,906.25.

The Court has carefully reviewed the remainder of the time entries set forth in Defendants' response and finds the time spent

AA47

was directly and reasonably incurred to prove a violation of Plaintiff's Eighth Amendment rights.  The rates are more than reasonable, given the PLRA limits.  The lodestar is 2,345.5 attorney hours at a CJA rate of $198-$228 (depending on the time frame) and $125 for Mr. Sawyers time, plus 734.75 hours at a paralegal rate of $125.  The total dollar amount deducted from the attorneys' fees is $11,607.75.  The total dollar amount deducted from the paralegal fees is $2,906.25.  These deductions leave a total fee award of $602,786.25.

Defendants assert that the fees should be denied or reduced because Plaintiff's counsel voluntarily took the case pro bono and benefited from the case's publicity and training opportunities for associates.  A firm's commitment to pro bono work does not preclude a fee award, nor does the existence of intangible benefits from that work.

Defendants maintain that a reduction is in order to reflect that Plaintiff did not obtain a jury verdict against two Defendants.  The jury returned a verdict in favor of Defendant Galvin, and Defendant Mincy settled before the trial concluded.  These individuals' testimony, though, was important in proving the deliberate

AA48

indifference of the other Defendants, particularly of Dr. Nawoor and

Wexford.  The discovery against Defendants Mincy and Galvin

would have been necessary even if they had not been named as

Defendants, and their testimony at trial would also have been

necessary.  The Court will not deduct the time spent or the costs

incurred relating to Defendants Mincy and Galvin.

Plaintiff asks that the lodestar be multiplied by two because

the PLRA rates undervalue the superior representation and

excellent results achieved in this case.  However, "[t]here is a strong

presumption that the lodestar calculation yields a reasonable

attorneys' fee award." Pickett v. Sheridan Health Care Center, 664

F.3d 632, 639 (7th Cir. 2011).

Plaintiff cites a Ninth Circuit Court of Appeals case subject to

the PLRA hourly rate which upheld a multiplier of two due to

counsel's superior performance under extreme time pressure and to

help attract competent counsel in the future.  Kelly v. Wengler, 822

F.3d 1085 (9th Cir. 2016).[7]  The district court cases cited by Plaintiff

---

[7] More recently, the Ninth Circuit has held in a PLRA case that the quality of performance and novelty/complexity of the issues are already factored into the lodestar and therefore cannot be considered when determining whether an enhancement is warranted.  Parsons v. Ryan, 949 F.3d 443, 467 (9th Cir. 2020).  Parsons, however, confirmed that the lodestar may be enhanced in a PLRA case.

which follow this approach are also in the Ninth Circuit.  Plaintiff does not cite any cases in the Seventh Circuit addressing whether a lodestar enhancement is permissible in PLRA cases, nor has the Court found any.  Defendants argue that a lodestar enhancement would be an end-run around the hourly rate limit.

This important question is a question for another day.  The Court need not decide whether the hourly rate limit precludes an enhancement of the lodestar because the Court finds that the lodestar is reasonable.  Plaintiff's counsel achieved extraordinary results, which the Court believes is already reflected in the lodestar.

Defendants also maintain that the travel costs and expert witness fees recoverable as nontaxable expenses are excessive. They assert that the partners did not need luxurious accommodations at $142.38 per night for the partners and that attorneys should have shared hotel rooms.  The Court does not find $142.38 per night excessive and finds the need for separate rooms necessary and reasonable.  Defendants point out that it appears that some of the hotel rooms were not used on the weekend.  The Court will, therefore, deduct the cost of two nights for Mr. Wackman ($194.36) and one night for Mr. Pelz ($142.38).  The Court will also

AA50

deduct Mr. Strom's $343.62 car rental and $244.89 for Dr.
Barnett's nonrefundable airline ticket.

As for the expert expenses, Defendants assert that Dr. Dhar's
expert charges of $29,512.50 are excessive and should be brought
more in line with the payments to Plaintiff's other experts.
Defendants do not dispute that expert witness fees are recoverable
under § 1988, and Plaintiff cites a district court case concluding
that expert witness fees are recoverable.

However, 42 U.S.C. § 1988(c) limits recovery of expert witness
fees to cases brought pursuant to 42 U.S.C. § 1981 and 1981a, and
this case was not brought under either of those sections.  This case
was brought under 42 U.S.C. § 1983, which means that expert fees
are not recoverable under § 1988.  Jackson v. Birkey, 2019 WL
2305135 * 6 (C.D. Ill.); Fields v. City of Chicago, 2018 WL 253716 *
11 (N.D. Ill. 2018); Thorncreek Apartments I, LLC v. Village of Park
Forest, 2016 WL 4503559 * 11 (N.D. Ill. 2016).  Expert witness fees
are not recoverable under Fed. Rule of Civil Procedure 54 either.
Chambers v. Ingram, 858 F.2d 351, 360 (7th Cir. 1988).

Accordingly, the expert fees of $47,487.50 will be deducted.
Lastly, Defendants object to the $16.95 spent for a book co-

authored by Dr. Barnett, *Essentials of Correctional Nursing*.

Defendants argue that, "[i]n the event the Court taxes this cost to

Defendants, Plaintiff should give the book to counsel for

Defendants."  [Rep. p. 52.]  This expenditure was reasonably

necessary in vetting and qualifying Dr. Barnett as an expert.  The

Court will not deduct this expense.

The total deductions for the expenses is $48,412.75.

Therefore, the total nontaxable expenses awarded as part of the fee

award is $79,490.28 minus $48,412.75, or $31,077.53.

The total amount awarded pursuant to 42 U.S.C. § 1988 is

$633,863.78 ($602,786.25 in attorney/paralegal fees plus

$31,077.53 in expenses). This is less than 25% of the jury award

and is, therefore, applied against the jury award.

## VII.  Plaintiff's bill of costs is allowed in the amount of $33,337.67.

Plaintiff seeks $36,943.64 in costs pursuant to Federal Rule of

Civil Procedure 54(d) and 28 U.S.C. § 1920.  Defendants bear the

burden of demonstrating a cost should be disallowed.  Crosby v.

City of Chicago, 949 F.3d 358, 363 (7th Cir. 2020)("Challenging a

district court's award of costs is an uphill battle. 'We have made it

clear that Rule 54(d) creates a presumption that the prevailing
party will recover costs, and that the ultimate decision to award
costs is within the district court's discretion.'")(*quoted cite omitted*).

Defendants challenge the admission fees for Attorneys Holt
and Wackman, which totaled $462.00.  Defendants argue that they
should not pay for these attorney admissions if these attorneys will
continue to practice in this District.  However, though this Court
will sometimes allow pro hac vice admission for pro bono counsel,
the Central District of Illinois does not generally allow pro hac vice
admission, *see* United States v. Emergency Med. Assoc. of Ill., Inc.,
436 F.3d 726, 730 (7th Cir. 2006)(affirming taxing of cost of pro hac
vice admissions), and these attorneys' admissions were necessary
for them to represent Plaintiff.  These costs are allowed.

Defendants next challenge the amounts spent for serving Dr.
Severino and Dr. Guaglianone—$75.00 for the standard service fee,
$50.00 for same day service, and $45 and $90 (respectively) for
tendering the witness fees ($385.00 total).  The parties agree that
costs for service are generally limited to the fee that would have
been charged by the U.S. Marshal, which the parties agree is
$65.00 per hour.  The hours necessary to serve these two witnesses

AA53

are not set forth, so the Court awards $65 for each, totaling $130.00. The Court cannot determine whether same day service was necessary or whether the advanced check fee represents the actual witness fees or a service charge. Accordingly, only $130 will be allowed.

Defendants' argument that Plaintiff should not recover the costs related to Defendants Mincy and Galvin is rejected, for the reasons explained above.

Defendants next argue that the descriptions for the $14,584.65 in printing costs are too vague to determine whether the costs were necessary or reasonable. Many of the entries state only "color copy" or "B&W copy," while a few entries contain more description. Some description is necessary, but within reason. Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co. 924 F.2d 633, 643 (7th Cir. 1991)(party "was not required to submit a bill of costs containing a description so detailed as to make it impossible economically to recover photocopying costs. Rather, Commercial was required to provide the best breakdown obtainable from retained records.").

AA54

Defendants ask that the entire $14,584.65 be deducted, but certainly copies were necessary in this case. The copying entries which exceed $15.00 from November and December 2019 total $11,233.68, and this was during the time when the parties were in the midst of summary judgment, final pretrial, and trial proceedings. The Courts find that $11,233.68 was reasonable and necessary even with the lack of description during this time. Therefore, the copying charges allowed are reduced by $3,350.97 ($14,584.65 minus $11,233.68). Added to the reduction in service charges of $255, the total reduction of costs is $3,605.97, leaving an award of costs for $33,337.67.

**IT IS ORDERED:**

**(1) Defendants' motion to cite additional authority is granted. [250.] The Court has considered the additional authority.**

**(2) Defendants' motion for judgment as a matter of law, a new trial, remittitur, and setoff is granted in part and denied in**

AA55

part. [206.]  The punitive damages are remitted to $7,000,000.00.[8] The motion is otherwise denied.

(3)  Plaintiff's motion for attorneys' fees and costs is granted in part. [205.]  Attorneys' fees are awarded in the amount of $602,786.25.  Nontaxable expenses are awarded in the amount of $31,077.53.  Accordingly, the total amount awarded pursuant to 42 U.S.C. § 1988 is $633,863.78.

(4)  Costs are awarded to Plaintiff in the amount of $33,337.67.

(5) The clerk is directed to file an amended judgment to reflect the award of costs and attorneys' fees.

ENTERED: **September 28, 2020**

FOR THE COURT:        **s/Sue E. Myerscough**
                      SUE E. MYERSCOUGH
                      UNITED STATES DISTRICT JUDGE

---

[8]Saccomeno v. U.S. Bank Nat'l Assoc., 943 F.3d 1071, 1092 (7th Cir. 2019)("a court is empowered to decide the [constitutionally] maximum permissible amount without offering a new trial.").

Page **55** of **55**

E-FILED

Monday, 28 September, 2020 03:28:52 PM

Clerk, U.S. District Court, ILCD

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

| | |
|---|---|
| **WILLIAM KEN DEAN** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )     **Case Number: 17-3112** |
| | ) |
| **WEXFORD HEALTH SOURCES, INC.,** | ) |
| **DR. ABDUR NAWOOR, UNKNOWN** | ) |
| **HEALTH CARE EMPLOYEES,** | ) |
| **DR. REBECCA EINWOHNER,** | ) |
| **KATHY GALVIN, and LISA MINCY.** | ) |
| | ) |
| **Defendants.** | ) |

## JUDGMENT IN A CIVIL CASE

☒ **DECISION BY THE COURT**.    This action came before the Court, and a decision has been rendered.    Defendant Unknown Health Care Employees was dismissed and terminated on 8/16/2018.    Defendant Lisa Mincy was dismissed and terminated on 12/16/2019.

☒ **JURY VERDICT**.    This action came before the Court for a trial by jury.    The issues have been tried and the jury has rendered its verdict for Plaintiff against Defendants Abdur Nawoor, Rebecca Einwohner, and Wexford Health Sources, Inc.    The jury rendered a verdict for Defendant Kathy Galvin.

**IT IS ORDERED AND ADJUDGED** that Plaintiff recovers compensatory damages in the amount of $1,000,000.00 from the Defendants Abdur Nawoor, Rebecca Einwohner, and Wexford Health Source, joint and severally.    Plaintiff does not recover any damages from Kathy Galvin.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff recovers punitive damages under his Eighth Amendment claim, as follows:    Abdur Nawoor in the amount of $25,000.00; Rebecca Einwohner in the amount of $12,500.00; and Wexford Health Sources, Inc. in the amount of $7,000,000.00.

**IT IS FURTHER ORDERED AND ADJUDGED** that attorneys' fees are awarded in the amount of $602,786.25.    Nontaxable expenses are awarded in the amount of $31,077.53.    The total amount awarded pursuant to 42 U.S.C. § 1988 is $633,863.78.    Costs are awarded to Plaintiff in the amount of $33,337.67.

**Dated: 9/28/2020**

AA57

Judgment in a Civil Case (02/11)

s/ Shig Yasunaga
Shig Yasunaga
Clerk, U.S. District Court

Approved:    s/ Sue E. Myerscough
Sue E. Myerscough
U.S. District Judge