# UNITED STATES COURT OF APPEALS

*for the*

## SEVENTH CIRCUIT

Appeal Nos. 20-3058 & 20-3139

William Dean,

*Plaintiff-Appellee/Cross-Appellant*,

v.

Wexford Health Sources, Inc., Dr. Abdur Nawoor, Dr. Rebecca Einwohner,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court for the Central District of Illinois,
No. 3:17-cv-03112, Hon. Sue E. Myerscough, Judge Presiding

## PLAINTIFF-APPELLEE/CROSS-APPELLANT'S BRIEF

Craig C. Martin
  *Counsel of Record*
Chloe E. Holt
Christopher M. Walling
WILLKIE FARR &
GALLAGHER LLP
300 North LaSalle
Chicago, Illinois 60654
Tel.: (312) 728-9000
Fax: (312) 728-9199
cmartin@willkie.com
cholt@willkie.com
cwalling@willkie.com

Joel T. Pelz
JENNER &
BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 923-2609
Fax: (312) 840-7609
jpelz@jenner.com

Robert J. Palmersheim
William M. Strom
PALMERSHEIM &
MATHEW LLP
401 N. Franklin Street, Suite 4S
Chicago, IL 60654
Tel: (312) 319-1791
Fax: (312) 878-2890
rjp@thepmlawfirm.com
wms@thepmlawfirm.com

*Counsel for William Dean*

Dated: February 16, 2021

## ORAL ARGUMENT REQUESTED

# DISCLOSURE STATEMENTS

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-3058

Short Caption: William Kent Dean v. Wexford Health Systems et. al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 William Kent Dean

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Willkie Farr & Gallagher LLP;   Joel T. Pelz, Jenner & Block LLP;

 William M. Strom, Palmersheim & Mathew

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and
 N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
 N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
 N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
 N/A

Attorney's Signature: s/ Craig C. Martin     Date: 10/21/2020

Attorney's Printed Name:  Craig C. Martin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]   No [  ]

Address:  Willkie Farr & Gallagher LLP,

 300 N. LaSalle, Chicago, IL 60654-3406

Phone Number: 312-728-9050     Fax Number:  312-728-9199

E-Mail Address: cmartin@willkie.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Kent Dean v. Wexford Health Systems, et al.,

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

William Kent Dean

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Joel T. Pelz, Jenner & Block, LLP; William M. Strom, Palmersheim & Matthew;

Craig Martin, Chloe Holt, Willkie Farr & Gallagher LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Joel T. Pelz    Date: 10/22/20

Attorney's Printed Name: Joel T. Pelz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 353 N. Clark Street

Chicago, IL 60654

Phone Number: (312) 923-2609    Fax Number: (312) 840-7609

E-Mail Address: Jpelz@Jenner.com

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-3058

Short Caption: William Kent Dean v. Wexford Health Systems et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

　　☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　William Kent Dean

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　Willkie Farr & Gallagher LLP; Jenner & Block LLP; Palmersheim & Mathew LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　N/A

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　N/A

Attorney's Signature: s/Robert J. Palmersheim　　　　Date: 10/27/2020

Attorney's Printed Name:  Robert J. Palmersheim

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☑

Address:  Palmersheim & Mathew LLP

　　401 N. Franklin St., Suite 4S, Chicago IL, 60654

Phone Number: 312-319-1791　　　　Fax Number:  312-878-2890

E-Mail Address: rjp@thepmlawfirm.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Kent Dean v. Wexford Health Systems et. al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 William Kent Dean

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Willkie Farr & Gallagher LLP; Jenner & Block LLP; Palmersheim & Mathew LLP

(3)     If the party, amicus or intervenor is a corporation:

     i)        Identify all its parent corporations, if any; and

         N/A

     ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: s/William M. Strom                    Date: 10/22/2020

Attorney's Printed Name:   William M. Strom

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✓]

Address:   Palmersheim & Mathew LLP

     401 N. Franklin St., Suite 4S, Chicago IL, 60654

Phone Number:  312-319-1791                    Fax Number:  312-878-2890

E-Mail Address:  wms@thepmlawfirm.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Kent Dean v. Wexford Health Systems, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

William Kent Dean

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Willkie Farr & Gallagher LLP; Jenner & Block LLP; Palmersheim & Mathew LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Chloe E. Holt    Date: 11/5/2020

Attorney's Printed Name: Chloe Holt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 300 North LaSalle Street

Chicago, IL 60654

Phone Number: 312-728-9031    Fax Number: 312-728-9199

E-Mail Address: cholt@willkie.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-3058

Short Caption: William Kent Dean v. Wexford Health Systems, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  William Kent Dean

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  Willkie Farr & Gallagher LLP; Jenner & Block LLP; Palmersheim & Mathew LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

  N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

  N/A

Attorney's Signature: /s/ Christopher M. Walling    Date: 11/5/2020

Attorney's Printed Name:  Christopher M. Walling

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]  **No** [✓]

Address:  300 North LaSalle Street

    Chicago, IL 60654

Phone Number: 312-728-9014    Fax Number:  312-728-9199

E-Mail Address: cwalling@willkie.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................iii

JURISDICTIONAL STATEMENT ......................................................................................1

STATEMENT OF THE ISSUES............................................................................................2

STATEMENT OF THE CASE.................................................................................................3

      A.     Mr. Dean Developed Cancer While Under Defendants' Care.....................3

      B.     Proceedings in the District Court ...............................................................9

            1.     The Lawsuit .................................................................................9

            2.     The Trial....................................................................................10

            3.     The Verdict ................................................................................14

            4.     Post-Trial Motions ....................................................................15

      C.     Proceedings on Appeal .............................................................................17

SUMMARY OF ARGUMENT ...............................................................................................18

STANDARDS OF REVIEW ...................................................................................................20

ARGUMENT.............................................................................................................................20

I.     The *Lippert* Reports Were Properly Admitted to Show Wexford Was On Notice
     of the Deficiencies of Collegial Review. ............................................................20

      A.     Both *Lippert* reports were admissible. .....................................................21

      B.     The *Lippert* reports were not unfairly prejudicial to Defendants. .............24

      C.     Any error in admitting the *Lippert* reports was harmless. .........................25

II.    The District Court Properly Upheld the Jury Verdict and Denied Wexford's
     Motion for Judgment as a Matter of Law on Mr. Dean's *Monell* Claim Against
     Wexford. ...............................................................................................................26

      A.     Wexford's collegial review process imposed excessive,
            unconstitutional delays to Mr. Dean's care that did not serve a
            valid penological or medical purpose. .......................................................27

B.     Collegial review, as applied to Mr. Dean, was Wexford's deliberate, generally applied policy. ..........................................31

C.     Wexford's argument that collegial review delays in treating Mr. Dean did not cause his unconstitutional injury is belied by the evidence and common sense. ...................................................35

III.    The District Court Properly Denied Defendants' Post-Trial Motion on Mr. Dean's Claims Against the Doctor-Defendants Because Overwhelming Evidence Supports the Jury's Verdict. ..............................................36

A.     There was legally sufficient evidence that the Doctor-Defendants were deliberately indifferent. ...................................37

B.     The Doctor-Defendants' Failure To Address Evidence Supporting the Verdict Is Dispositive. .........................................41

IV.    The District Court Properly Admitted Evidence About Dr. Nawoor's Conduct. ..............42

V.    The Jury Had Ample Basis to Award Punitive Damages, and the Amount of Damages it Awarded Is Constitutionally Valid. ..............................................44

A.     Punitive damages are appropriate where a jury finds deliberate indifference. ...............................................44

B.     The remitted punitive damages award is constitutionally permissible. ...............................................45

C.     Wexford's conduct was plainly reprehensible. .........................46

D.     The ratio of punitive to compensatory damages is reasonable. .................47

E.     Comparable cases do not justify remittitur and Defendants have waived arguments to the contrary. .........................................51

CROSS-APPEAL ...............................................................................53

I.    This Court Should Reinstate the Jury's Initial Punitive Damages Award. ........................53

CONCLUSION ...............................................................................54

CERTIFICATE OF COMPLIANCE ..................................................55

CERTIFICATE OF SERVICE ..........................................................56

CIRCUIT RULE 30(D) STATEMENT .............................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beard v. Wexford Health Sources, Inc.*,
    900 F.3d 951 (7th Cir. 2018) ................................................................................ 46

*Blount v. Stroud*,
    915 N.E.2d 925 (Ill. App. Ct. 2009) ..................................................................... 49

*BMW of N. Am. v. Gore*,
    517 U.S. 559 (1996) ............................................................................................... 52

*Burton v. City of Zion*,
    901 F.3d 772 (7th Cir. 2018) ................................................................................ 43

*Collignon v. Milwaukee County,*
    163 F.3d 982 (7th Cir. 1998) ................................................................................ 40

*Common v. City of Chicago*,
    661 F.3d 940 (7th Cir. 2011) ................................................................................ 24

*Duckworth v. Ahmad*,
    532 F.3d 675 (7th Cir. 2008) ................................................................................ 41

*Epic Systems Corp. v. Tata Consultancy Services Ltd.*,
    971 F.3d 662 (7th Cir.  2020) ......................................................................... 50, 51

*Estate of Moreland v. Dieter,*
    395 F.3d 747 (7th Cir. 2005) ........................................................................... 45, 52

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ..................................................................................... 30, 35, 36

*Gicla v. United States*,
    572 F.3d 407 (7th Cir. 2009) ................................................................................ 36

*Glisson v. Indiana Dep't of Corr.*,
    849 F.3d 372 (7th Cir. 2017) (en banc) ....................................... 25, 27, 31, 33

*Goodloe v. Sood*,
    947 F.3d 1026 (7th Cir. 2020) .............................................................................. 36

*Gracia v. Sigmatron Int'l, Inc.*,
    842 F.3d 1010 (7th Cir. 2016) ........................................................................ 20, 52

*Grieveson v. Anderson*,
   538 F.3d 763 (7th Cir. 2008) ........................................................... 37

*Hendrickson v. Cooper*,
   589 F.3d 887 (7th Cir. 2009) ........................................................... 45

*Howell v. Wexford Health Sources, Inc.*,
   No. 19-3210, 2021 WL 405006 (7th Cir. Feb. 5, 2021) ...................... 27

*In re USA Commercial Mortg. Co.*,
   802 F. Supp. 2d 1147 (D. Nev. 2011) ............................................... 49

*Iskander v. Vill. Of Forest Park*,
   690 F.2d 126 (7th Cir. 1982) ..................................................... 14, 26

*J.K.J. v. Polk Cty.*,
   960 F.3d 367 (7th Cir. 2020) (en banc) ..................................... passim

*Johnson v. Howard*,
   24 F. App'x 480 (6th Cir. 2001) ....................................................... 49

*Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*,
   518 F.3d 459 (7th Cir. 2008) ........................................................... 21

*Mathias v. Accor Econ. Lodging, Inc.*,
   347 F.3d 672 (7th Cir. 2003) ..................................................... 47, 49

*Mejia v. Cook County*,
   650 F.3d 631 (7th Cir. 2011) ........................................................... 42

*Merriweather v. Family Dollar Stores*,
   103 F.3d 576 (7th Cir. 1996) ........................................................... 53

*Monell v. Dep't of Soc. Servs. of the Cirty of New York*,
   436 U.S. 658 (1978) ........................................................................ 26

*Murphy v. Gilman*,
   551 F. Supp. 2d 677 (W.D. Mich. 2008) .......................................... 49

*Passananti v. Cook Cty.*,
   689 F.3d 655 (7th Cir. 2012) ........................................................... 42

*Petties v. Carter*,
   836 F.3d 722 (7th Cir. 2016) (en banc) ........................... 35, 36, 37, 40

*Rainey v. Taylor*,
   941 F.3d 243 (7th Cir. 2019) .................................................... passim

*Roe v. Elyea*,
   631 F.3d 843 (7th Cir. 2011) ................................................ 38

*Ryl-Kuchar v. Care Ctrs., Inc.*,
   565 F.3d 1027 (7th Cir. 2009) .............................................. 42

*Saccameno v. United States Bank National Association*,
   943 F.3d 1071 (7th Cir. 2019) ................................ 50, 51, 53

*Shields v. Ill. Dep't of Corrections*,
   746 F.3d 782 (7th Cir. 2014) ................................................ 14

*Smith v. Hunt*,
   707 F.3d 803 (7th Cir. 2013) ........................................ 20, 42

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ................................................... passim

*Thomas v. Cook Cty. Sheriff's Dept.*,
   604 F.3d 293 (7th Cir. 2010) ................................................ 33

*Turner v. Miller*,
   301 F.3d 599 (7th Cir. 2002) ................................................ 42

*TXO Prod. Corp. v. Alliance Resources Corp.*,
   509 U.S. 443 (1993) ........................................................... 49

*United States v. Adams*,
   628 F.3d 407 (7th Cir. 2010) ................................................ 43

*United States v. Moore*,
   824 F.3d 620 (7th Cir. 2016) ................................................ 23

*Walsh v. Mellas*,
   837 F.2d 789 (7th Cir. 1988) ........................................ 44, 45

*Wheeler v. Sims*,
   951 F.2d 796 (7th Cir. 1992) ................................................ 26

*Williams v. Dieball*,
   724 F.3d 957 (7th Cir. 2013) ................................................ 42

*Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*,
   399 F.3d 224 (3d Cir. 2005) .......................................... 48, 49

*Wilson v. Wexford Health Sources, Inc.*,
   932 F.3d 513 (7th Cir. 2019) ................................................ 24

*Woodward v. Corr. Med. Servs. of Illinois, Inc.*,
 368 F.3d 917 (7th Cir. 2004) ................................................................. 25, 31, 44, 45

*Young v. James Green Mgmt., Inc.*,
 327 F.3d 616 (7th Cir. 2003) ................................................................................. 25

*Zaya v. Sood*,
 836 F.3d 800 (7th Cir. 2016) ................................................................................. 39


**Statutes**

42 U.S.C. § 1997e(d)(2) ........................................................................................... 49


**Rules**

Fed. R. App. P. 28 .................................................................................................... 43

Fed. R. Evid. 403 ............................................................................................... 24, 42

Fed. R. Evid. 404 .................................................................................................... 42

Fed. R. Evid. 807 ............................................................................................... 22, 23

Fed. R. Evid. 901 .................................................................................................... 21

# JURISDICTIONAL STATEMENT

Defendants' jurisdictional statement is complete and correct as to Defendants' appeal.

The district court had subject-matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because Plaintiff William Dean sued Defendants under 42 U.S.C. § 1983. The district court had supplemental jurisdiction of Mr. Dean's state-law claims under 28 U.S.C. § 1367.

The district court entered judgment against the Defendants-Appellants/Cross-Appellees after a jury trial on December 18, 2019. (Dkt. 188.) Mr. Dean filed a timely Motion for Attorney's Fees on January 9, 2020, after the district court granted his Motion for an Extension of Time on December 31, 2019. (Dkt. 194, 205.) Defendants then filed a renewed Motion for Judgment as a Matter of Law, New Trial, Remittitur, and Setoff on January 15, 2020. (Dkt. 206.)

The district court entered a final order on September 28, 2020, ruling on Mr. Dean's and Defendants' post-trial motions, granting in-part Defendants' motion for remittitur and awarding part of Mr. Dean's requested costs and attorney's fees. (Dkt. 253.) The district court also entered, on the same day, a judgment adjudicating all claims against all parties. (Dkt. 254.) Plaintiff filed a cross-appeal on November 2, 2020, appealing the September 28, 2020 judgment. (Dkt. 258.)

This Court has appellate jurisdiction of this case under 28 U.S.C §§ 1291 and 1294, and both parties' appeals are timely under Fed. R. of App. P. 4(a).

## STATEMENT OF THE ISSUES

1.      Did the district court abuse its discretion in admitting excerpts of the *Lippert* reports into evidence for the limited purpose of notice?

2.      Did the district court err in refusing to vacate the jury verdict in favor of Mr. Dean on his Eighth Amendment claims against Wexford Health Sources, Inc.?

3.      Did the district court err in refusing to vacate the jury verdict in favor of Mr. Dean on his Eighth Amendment claims against the Doctor-Defendants, Dr. Nawoor and Dr. Einwohner?

4.      Did the district court abuse its discretion in admitting evidence of Dr. Nawoor's deliberate indifference?

5.      Did the district court err in refusing to remit Mr. Dean's punitive damages against Wexford even further?

6.      Did the district court err when it remitted Mr. Dean's punitive damages against Wexford, based, in part, on a miscalculation of Mr. Dean's compensatory award?

**STATEMENT OF THE CASE**

This lawsuit stems from Defendants' documented, enduring indifference towards William Dean's terminal cancer. For months beginning in December 2015, Mr. Dean, then an inmate at Taylorville Correctional Center ("Taylorville"), presented to Defendants with symptoms of a serious illness: gross, painless hematuria, "a warning sign for cancer" that "demand[ed] an *immediate* investigation." (Dkt. 200 at 504:25-505:1 (emphasis added).) For months, Defendants disregarded the well-established standard of care and delayed taking any action to identify cancer as the cause of Mr. Dean's hematuria. Mr. Dean's cancer was not diagnosed until April 2016 because Defendants failed to ensure Mr. Dean received adequate—or proper—diagnostic testing in a timely manner. Delays continued to plague Mr. Dean's treatment even after diagnosis. Defendants knew Mr. Dean's condition was to be treated as "a malignancy . . . until proven otherwise" (Dkt. 198 at 435:20-436:15), but their indifference—combined with processes that purposely embedded delays in every step of Mr. Dean's care—allowed his cancer to grow and spread to the point that by the time it was identified and treated, it was a death sentence. Defendants' actions and inaction violated Mr. Dean's Eighth Amendment right to adequate medical care.

**A.    Mr. Dean Developed Cancer While Under Defendants' Care.**

On December 23, 2015, Mr. Dean presented to Defendant Dr. Abdur Nawoor, the Medical Director at Taylorville and an employee of Defendant Wexford Health Sources, Inc. ("Wexford"), with symptoms consistent with cancer: painless, gross hematuria.[1] (Dkt. 195 at 80:24-83:18; Dkt.

---

[1] Gross hematuria is visible blood in the urine. (Dkt. 198 at 429:10-11; Dkt. 203 at 1158:18-22.) Because the blood in Mr. Dean's urine was painless and visible, it was more likely that cancer was the cause than if

263-3 at 4:1-18, 11:8-18.)  Dr. Nawoor immediately recognized cancer as a possibility, telling Mr. Dean that day that it could be "kidney stones or cancer."  (Dkt. 195 at 81:22-82:3; Dkt. 263-3 at 40:13-41:1.)  Dr. Nawoor expected Mr. Dean would be "nervous and worried" while awaiting a diagnosis, but did not indicate how long that process would take.  (Dkt. 263-3 at 41:10-17.)

Evidence at trial confirmed the standard of care for hematuria is to refer the patient to a urologist and order a CT scan and cystoscopy.  (Dkt. 198 at 432:23-433:1, 439:17-440:18, 441:5-445:8, 449:7-11, 460:19-23, 462:22-463:7; Dkt. 263-3 at 17:15-18:9; Dkt. 263-4 at 54:16-55:24.)  Dr. Nawoor knew the standard of care, and recognized a urology referral was necessary, but neither requested a CT scan and cystoscopy nor referred Mr. Dean to a urologist.  (Dkt. 263-3 at 17:15-18:9, 23:18-24:13, 39:14-25; 87:3-8.)  Instead, after confirming the presence of blood in the urine, Dr. Nawoor advised Mr. Dean to drink more water.  (Dkt. 195 at 83:10-18; Dkt. 263-3 at 39:14-20, 40:6-9.)  Mr. Dean, who continued to urinate visible blood and blood clots resembling "coffee ground[s]" and "gummy worms," feared he was going to die.  (Dkt. 195 at 86:7-89:23; Dkt. 197 at 140:15-141:3.)

On January 7, 2016, Mr. Dean attended a renal teleclinic appointment with Defendant Dr. Rebecca Einwohner.  (Dkt. 195 at 94:11-96:25.)  Dr. Einwohner is a nephrologist and part-time, as-needed telemedicine physician for Wexford, and had been treating Mr. Dean in relation to his kidney health since 2012.  (Dkt. 263-4 at 5:5-19; 7:8-8:7; 25:10-14.)  Mr. Dean told Dr. Einwohner about the blood in his urine, and that he was "scared and needed to know what was going on." (Dkt. 197 at 141:18-144:20.)  Dr. Einwohner, who described her role within Wexford's system as

_____

his hematuria had been microscopic (non-visible) or accompanied by pain.  (Dkt. 198 at 436:5-23; Dkt. 203 at 1186:16-1187:11.)

only "supportive," viewed hematuria as "beyond the scope of" her clinic, and emailed Dr. Stephen Ritz, Wexford's corporate medical director for utilization management, suggesting a collegial review to consider "re-imaging" and a urology evaluation. (Dkt. 263-4 at 12:4-17, 27:21-32:22, 43:14-44:2.)

"Collegial review" is the term Wexford assigns to the process through which it reviews requests for offsite services. (Dkt. 201 at 776:19-777:21; PTX 142.) If a patient needs an offsite service, Wexford's policy requires a correctional center's medical director, like Dr. Nawoor, to submit a request to Dr. Ritz, who can approve or deny it. (Dkt. 200 at 635:14-636:3, 647:20-657:4; Dkt. 201 at 776:19-777:21; Dkt. 263-3 at 50:4-12, 84:9-23.)[2] Dr. Ritz works at Wexford's headquarters outside of Pittsburgh, Pennsylvania, and does not see, speak to, treat, or even remember the patients whose cases he reviews. (Dkt. 201 at 699:1-8, 701:21-702:7.) Only Dr. Ritz and Dr. Nawoor participate in collegial reviews related to Taylorville patients. (Dkt. 263-3 at 52:21-53:5.) Other Wexford physicians who treat Taylorville patients, including Dr. Einwohner, are not included in collegial review. (Dkt. 263-3 at 52:21-53:5; Dkt. 263-4 at 19:22-20:9.) Despite submitting a recommendation for Mr. Dean's care to Dr. Ritz, Dr. Einwohner did not follow up with Dr. Ritz to ensure her recommendation was followed or even discussed at collegial review, and did not communicate with Dr. Nawoor or Dr. Ritz about Mr. Dean's symptoms beyond her initial email. (Dkt. 263-4 at 34:21-36:2, 38:25-39:23, 52:4-17.) In fact, Dr. Einwohner never communicated with Dr. Nawoor. (Dkt. 263-4 at 25:1-9, 34:21-36:2, 36:7-37:13.)

_____

[2] Although Dr. Ritz testified collegial review "has a lot of clinical value" because it "serve[s] as a forum for doctors to discuss cases" (Dkt. 201 at 776:19-778:3), he conceded that 85 to 90 percent of collegial review cases involve no discussion at all (Dkt. 201 at 748:4-7).

On January 13, 2016—three weeks after Mr. Dean first presented with gross hematuria—Mr. Dean's case was brought to collegial review for the first time, and Dr. Ritz ordered a renal ultrasound. (Dkt. 263-3 at 31:20-32:2.) Ultrasounds are performed on-site at Taylorville, and Wexford is not financially responsible for ultrasounds under its contract with the state. (Dkt. 200 at 632:9-633:9.) Unlike a CT scan, which can identify a renal mass 95 to 98 percent of the time, an ultrasound detects a renal mass only 50 percent of the time. (Dkt. 198 at 444:19-445:8, 448:7-18.) Dr. Nawoor knew that an ultrasound could not rule out cancer. (Dkt. 263-3 at 60:16-61:12.) Even before the ultrasound was ordered, he knew Wexford would still need to send Mr. Dean to a urologist. (Dkt. 263-3 at 61:13-15.) Yet Dr. Nawoor insisted at trial that an ultrasound was appropriate because Mr. Dean had compromised renal function. (Dkt. 263-3 at 32:14-21.) No documents corroborated his testimony that these concerns factored into Dr. Ritz's decision to order an ultrasound (Dkt. 263-3 at 31:16-19, 33:4-17), and Dr. Ritz admitted he had no independent recollection of this or any other collegial review involving Mr. Dean (Dkt. 201 at 702:8-703:15, 704:11-706:14).[3] Dr. Nivedita Dhar, Mr. Dean's expert urologist, and Dr. Adam Metwalli, Mr. Dean's expert urologic oncologist, testified that Mr. Dean's medical history did *not* present any concerns that would justify ordering an ultrasound instead of a CT scan under these circumstances. (Dkt. 197 at 402:12-405:1; Dkt. 198 at 445:9-21, 463:2-464:5.)

Mr. Dean received the ultrasound on February 2, 2016—six weeks after he first presented with gross hematuria. (Dkt. 195 at 97:4-6.) The ultrasound, as expected, did not rule out the

---

[3] Dr. Ritz denied receiving a request for a urology evaluation and testified he approved a request for an ultrasound, even though the documents and the doctors' testimony show a urology referral was recommended (PTX061), and Dr. Ritz made the decision to proceed otherwise (Dkt. 201 at 749:16-750:3).

possibility of cancer,[4] and Mr. Dean's case was re-submitted to collegial review on February 10. (Dkt. 201 at 819:22-820:23.) Dr. Ritz approved Mr. Dean to see a urologist, but he did not approve a CT scan at that time. (Dkt. 201 at 819:22-820:20.) Although the uncontroverted standard of care for hematuria is to perform a CT scan, Dr. Ritz explained he did not typically approve diagnostic tests in advance of specialty appointments because he did not want to "speculat[e] as to what" the specialist might order. (Dkt. 201 at 820:24-821:14.) Dr. Nawoor told Mr. Dean on February 10 that he needed a CT scan, but did not tell him when it would take place, or that it had not been approved by "Pittsburgh." (Dkt. 197 at 148:6-22, 150:10-151:18.) After experiencing hematuria for over six weeks with no treatment or help, Mr. Dean worried that Defendants "weren't going to do anything for [him]." (Dkt. 197 at 148:25-149:9.) Mr. Dean continued to experience—and was increasingly alarmed by—his bloody urine, and by the beginning of March, was distressed that Defendants had done nothing to "assure [him] something [and somebody] was gonna help [him]." (Dkt. 197 at 153:1-14; 158:8-15.)

Mr. Dean was taken to see urologist Dr. William Severino a month later, on March 10, 2016. (Dkt. 203 at 1158:12-17.) Pursuant to the standard of care, Dr. Severino ordered a CT scan and cystoscopy. (*Id.* 1159:1-8; Dkt. 263-3 at 94:13-22.) The CT scan was not even approved in collegial review until March 30 (Dkt. 201 at 754:21-25; Dkt. 263-3 at 105:2-108:11), and was not performed until April 12—more than three and a half months after Mr. Dean presented with bloody urine (Dkt. 263-3 at 108:16-109:3).

---

[4] Defendants' assertion that the ultrasound was misread does not mitigate their liability. The ultrasound could *never* have been used to rule out cancer; Defendants' reliance on it was contrary to their own understanding of the standard of care and risks Mr. Dean faced. Moreover, Dr. Nawoor and Dr. Einwohner did not review the ultrasound (Dkt. 263-3 at 49:9-13; Dkt. 264-4 at 42:9-43:7), and Wexford selected the radiologist interpreting the ultrasound (Dkt. 263-3 at 45:13-46:4, 49:6-8).

On April 14, Dr. Severino told Mr. Dean he had kidney cancer, and that he would need surgery to remove his diseased kidney as soon as possible. (Dkt. 195 at 101:13-102:19; Dkt. 203 at 1170:10-19.) Mr. Dean told Dr. Nawoor about his diagnosis, but Dr. Nawoor did not help Mr. Dean cope with his diagnosis or assure him that plans were being made for his surgery. (Dkt. 197 at 174:5-175:13.) Mr. Dean continued urinating blood, once passing a large blood clot that made the bathroom look like a "murder scene." (Dkt. 197 at 180:23-182:7.) Yet, each time he, or his wife, inquired about his surgery, they were told only that it had not been scheduled. (Dkt. 197 at 176:12-25, 191:12-192:5.) Mr. Dean felt he was "just sliding to the bottom to once again being put off all the time." (Dkt. 197 at 192:10-20.)

Mr. Dean finally received his surgery—a nine-hour procedure that involved cracking open his chest and stopping his heart—on July 19, 2016. (Dkt. 195 at 109:12-110:1; Dkt. 203 at 1156:25-1157:24, 1176:3-1178:6.) After surgery, Mr. Dean continued to face unnecessary delays in receiving treatment. Nurse Lisa Mincy, a Health Care Unit Administrator employed by the Illinois Department of Corrections, submitted an incident report documenting Dr. Nawoor's failure to request Mr. Dean's post-operative oncology referral, as requested by Dr. Severino, in a timely manner.[5] (Dkt. 201 at 888:11-891:7; PTX 180.) And even after receiving oncologist Dr. Perry Guaglianone's chemotherapy prescription, Wexford further delayed approving Mr. Dean's treatment, prompting a concerned Nurse Mincy to email her supervisor about the "lengthy amount

---

[5] This was not the first time Nurse Mincy formally reported issues relating to delays in Mr. Dean's care. In April 2016, Nurse Mincy notified Wexford's regional director, Dr. Roderick Matticks, that Dr. Nawoor forgot to write an order for a chest x-ray that had been requested for Mr. Dean to rule out metastases in his lungs. (Dkt. 201 at 881:9-882:8.) Nurse Mincy raised several additional issues relating to Dr. Nawoor's and Wexford's "ordering and scheduling outside procedures" to Dr. Matticks at this time. (Dkt. 201 at 878:6-886:19; PTX 395.) No evidence suggests Dr. Matticks did anything in response.

of time" Mr. Dean had gone without receiving any cancer-fighting medications. (Dkt. 201 at 891:23-895:11; PTX 168.) Mr. Dean did not receive his first dose of chemotherapy until November 14, 2016, even though it had been prescribed on October 19. (Dkt. 197 at 223:6-15.)

Before surgery, between December 2015 and July 2016, Mr. Dean's hematuria continued, at times culminating in large, painful blood clots. (Dkt. 195 at 85:23-86:6, 87:1-3, 88:3-92:10, 92:14-93:2; Dkt. 197 at 180:23-182:7.) During this time, and long after, Defendants did nothing to speed up Mr. Dean's care, ease his pain, or assuage his fears, causing him to experience severe mental anguish about his condition and the lack of care he was receiving. (Dkt. 197 at 147:12-18, 148:1-5, 148:17-149:3, 171:20-173:6, 187:15-189:19, 192:10-20, 258:5-22.) All the while, Mr. Dean's cancer continued to grow and spread—including through a tumor thrombus that advanced through his vena cava dangerously close to his heart—leading to a more complex surgery, higher-stage disease, and a worse prognosis. (Dkt. 197 at 385:12-386:2; *see also* Dkt. 197 at 343:23-347:8, 355:11-357:11, 361:23-363:12, 386:7-389:3; Dkt. 198 at 450:21-452:2; Dkt. 200 at 506:18-507:9, 509:1-15.) Mr. Dean, as a result of Defendants' indifference, began to blame himself, believing the poor treatment he received was "all [his] fault because [he was] in prison," and that if he were not prison, "somebody would [have] take[n] care of [him]." (Dkt. 197 at 147:12-18.) He envisioned what his death would look like in prison as his tears flowed before the jury. (Dkt. 197 at 172:17-173:6.)

## B. Proceedings in the District Court

### 1. The Lawsuit

On April 21, 2017, Mr. Dean brought suit against Defendants because of their indifference to his risk and diagnosis of cancer. (Dkt. 1.) He alleged Dr. Nawoor and Dr. Einwohner violated the Eighth Amendment through their deliberate indifference to his serious medical needs, and that Wexford's policies and practices—in particular, Wexford's collegial review policy—violated the

Eighth Amendment and caused him harm. (Dkt. 72.) He brought state-law claims of medical malpractice against Dr. Nawoor and Dr. Einwohner, a state-law *respondeat superior* claim against Wexford, and an institutional negligence claim against Wexford. (Dkt. 72.)

### 2. The Trial

Over the course of the seven-day trial, eighteen witnesses testified to, among other things, the care Mr. Dean received (and did not receive) from Defendants, Mr. Dean's pain and suffering, and the failures of collegial review.[6] The testimony presented by Mr. Dean—including the adverse testimony of Dr. Nawoor and Dr. Einwohner—went largely unrebutted by Defendants. In fact, the Doctor-Defendants never offered any testimony on their own behalf following their adverse examination during Mr. Dean's case-in-chief or during their own case-in-chief. (Dkt. 200 at 477:9-17; Dkt. 202 at 1111:18-1112:2; Dkt. 203 at 1302:22-1303:2; Dkt. 263-3 at 172:3-8.)

> ### a. The evidence at trial showed Defendants were deliberately indifferent to Mr. Dean's symptoms of cancer.

For more than a day, Mr. Dean testified about his symptoms, physical suffering, and the anguish and fear he experienced while Defendants delayed his diagnosis and treatment. He also spoke movingly about his determination to leave prison alive. Mr. Dean explained he felt he was on a "roller coaster" because "[e]very day was another day [he waited]. Every day was another day just thinking [he was] not gonna get approved [for treatment], [they were] gonna let [him] die. [They were] just gonna let [the cancer] grow." (Dkt. 197 at 226:10-18.) Mr. Dean at times became emotional when discussing what he went through, how it felt not to know his diagnosis or if anyone was going to help him, and how it felt to have his cancer left untreated for months.

---

[6] Fourteen of the eighteen witnesses who testified were called by Mr. Dean during his case.

Dr. Nawoor acknowledged that, despite telling Mr. Dean he might have cancer on December 23, 2015, and knowing the standard of care, he did nothing to diagnose or treat Mr. Dean for months. (Dkt. 263-3 at 17:15-18:9, 23:18-24:13, 39:14-25; 40:6-41:1; 55:23-56:7, 87:3-8; Dkt. 195 at 81:22-82:3.) Dr. Nawoor told Mr. Dean that "[i]f [he was his] patient out in the world, [he] would be in [the] hospital" (Dkt. 195 at 107:11-21), but was seemingly unperturbed that Mr. Dean remained untreated in prison. Dr. Nawoor admitted errors were made in Mr. Dean's treatment, but insisted they were "not [his] problem" or "fault." (Dkt. 263-3 at 44:11-15, 67:1-14, 72:24-76:24.) Dr. Nawoor instead blamed "Pittsburgh," collegial review, and the "Wexford system," offering no justification for his own failures, including failing to review Mr. Dean's medical records, failing to provide the medical data necessary to make possible the exercise of "clinical judgment" at collegial review, and failing to speed up the collegial review process for Mr. Dean pursuant to Wexford's guidelines. (Dkt. 263-3 at 19:22-21:20, 50:4-12, 63:1-13, 89:2-90:5, 145:1-147:19; Dkt. 201 at 708:24-709:9.)

Dr. Einwohner acknowledged that in January 2016, she knew cancer was a possibility, and hoped that "urology would have been contacted within a couple weeks." (Dkt. 263-4 at 31:11-32:17, 39:24-41:3, 58:2-4.) Yet, she did nothing to ensure that happened, or that Mr. Dean received any care at all. (Dkt. 263-4 at 33:10-24, 34:21-37:13, 39:13-23, 45:8-47:2.) Dr. Einwohner did not communicate with Dr. Nawoor or Dr. Ritz about Mr. Dean's condition, and did not even know Mr. Dean had cancer for over a month after his diagnosis. (Dkt. 263-4 at 9:15-10:14, 58:11-18; Dkt. 197 at 197:4-25.) Although a kidney specialist who had treated Mr. Dean in a renal teleclinic for several years, Dr. Einwohner believed she had no responsibility over his condition or care. (Dkt. 263-4 at 42:9-45:14.)

Mr. Dean testified that Dr. Nawoor repeatedly told him during his appointments that the next step in his care would be, not treatment or diagnostic testing, but a call to "Pittsburgh." (Dkt. 195 at 104:17-105:15; Dkt. 197 at 149:18-150:5, 151:2-6, 151:19-152:6, 155:21-156:3.) The evidence at trial demonstrated these calls had no medical purpose. On its own website, Wexford touts how effectively collegial review reduces offsite care requests and costs. (PTX 142.) Dr. Nawoor, who stated his time spent in collegial review had nothing to do with health care, testified it was up to Dr. Ritz—who never met Mr. Dean or other Taylorville patients—to make the "final decision[s]" about his patients' care, and that Dr. Ritz's suggestions always won out with respect to Mr. Dean. (Dkt. 263-3 at 9:19-10:20, 31:20-32:12.) Dr. Nawoor stated Wexford "failed" by not including Dr. Einwohner and other similarly-situated physicians in collegial review. (Dkt. 263-3 at 44:11-15.)

Dr. Nawoor additionally agreed that Mr. Dean was diagnosed after four months instead of four weeks "because of the policies and practices of Wexford." (Dkt. 263-3 at 19:22-21:8, 39:8-12, 50:4-12, 56:8-17, 63:1-13, 89:21-90:5.) Dr. Nawoor testified nothing had been done to rule out cancer during the six-week period after Mr. Dean presented with hematuria because Defendants had to "go[] through the motion[s]" of "talk[ing]" and "decid[ing] whether [Mr. Dean] need[ed] to go somewhere [to have] something done." (Dkt. 263-3 at 55:23-56:7.) Dr. Nawoor recognized collegial review delayed care far beyond what he would have accepted in private practice: "the way [they have to] do it in Wexford system, [he had] to go to collegial" before his patients could get the care they needed. (Dkt. 263-3 at 63:1-7.) Similarly, Dr. Ritz conceded it takes "time for the process to . . . play out." (Dkt. 201 at 773:17-18.) Even Dr. Richard Kosierowski, Defendants' expert oncologist, was unable to identify any reason—other than

collegial review—why a CT scan was not ordered for Mr. Dean in December 2015. (Dkt. 202 at 1029:14-18.)

Dr. Bruce Barnett, Mr. Dean's expert in family medicine and correctional healthcare, likewise opined that the delays in Mr. Dean's diagnosis and care were attributable to collegial review. (Dkt. 200 at 539:14-542:5.) Dr. Barnett testified that, although the "proper mission" of collegial review "is to protect the patient," in Mr. Dean's case, and throughout Wexford generally, collegial review was "dangerous as applied," failed to "promote proper health care," and "put barriers in front of the patient[s]" who needed outside care. (Dkt. 200 at 506:17-507:23, 514:24-515:11, 530:23-531:22, 539:18-540:3, 541:6-542:5.)

        *c.      The evidence refuted Defendants' claims that they exercised clinical judgment.*

At trial, Defendants attempted to show they were not deliberately indifferent to Mr. Dean's serious medical needs, but rather exercised their clinical judgment in determining how to diagnose and treat him. (Dkt. 203 at 1249:7-1250:9; Dkt. 263-2 at 12:11-13:2.) Defendants suggested they did not harm Mr. Dean because everything he needed was approved "eventually." (Dkt. 263-2 at 7:8-13; Dkt. 263-3 at 55:11-19.) However, every medical expert who testified was sharply critical of the inadequate care provided to Mr. Dean and the timing and consequences thereof.

Dr. Metwalli and Dr. Dhar, who testified on behalf of Mr. Dean, opined there was no medical reason to give him an ultrasound instead of a CT scan. (Dkt. 197 at 402:12-405:1; Dkt. 198 at 445:9-21, 463:2-464:5.) Dr. Metwalli additionally testified that it is "virtually unheard of" to wait "seven months before you get someone like that to the operating room," and that "nobody in their right mind would wait that long" because, with cancer, "time is of the essence." (Dkt. 197 at 342:17-343:16; 387:10-11.) Dr. Metwalli criticized Defendants' lack of clinical judgment, noting that Mr. Dean "underwent a more complicated operation that required a longer recovery

and was higher risk . . . because of the delay" in diagnosis and treatment.  (Dkt. 197 at 380:8-13,

402:12-405:1.)  Dr. Dhar testified that renal masses are typically diagnosed much earlier, and

agreed that the delays in Mr. Dean's care made his surgery riskier and more complex.  (Dkt. 198

at 468:17-469:3.)  Dr. Barnett testified that "not having the proper procedure, the proper testing,

and then the proper treatment meant that [Mr. Dean] suffered for seven months before relief."

(Dkt. 200 at 540:4-22.)  These experts agreed that Mr. Dean's cancer undoubtedly grew between

December 23, 2015, and April 12, 2016, and further between April 12, 2016 and July 19, 2016,

decreasing Mr. Dean's chances of surviving surgery and shortening his life expectancy.  (Dkt. 197

at 343:23-347:8, 355:11-357:11, 361:23-363:12, 385:12-389:3; Dkt. 198 at 450:21-452:2; Dkt.

200 at 509:1-15.)

Defendants' own experts agreed.  Dr. Michael Racenstein, Defendants' expert diagnostic

radiologist, testified that it took "surprisingly too long" for Mr. Dean to get a CT scan.  (Dkt. 202

at 1103:20-1104:7, 1105:25-1106:3.)  Dr. Kosierowski testified that the timing of Mr. Dean's care

"could have been tighter" and that "[t]here [was] plenty of blame to go [around]."  (Dkt. 202 at

1036:7, 1036:19-20.)

### 3.    The Verdict

The jury found in favor of Mr. Dean on his Eighth Amendment and professional negligence

claims against Dr. Nawoor and Dr. Einwohner, and on his Eighth Amendment, *respondeat*

*superior*,[7] and institutional negligence claims against Wexford.  (*See* Dkt. 180 at 1.)  The jury

---

[7] Mr. Dean's sole theory of vicarious liability at trial pertained to his state-law claims for professional
negligence; his *respondeat superior* claim on § 1983 liability, expressly premised on an argument to
overrule *Iskander v. Vill. of Forest Park*, 690 F.2d 126 (7th Cir. 1982), for the reasons stated in *Shields v.
Ill. Dep't of Corrections*, 746 F.3d 782 (7th Cir. 2014), was dismissed by the trial court three months before
trial, (*see* 9/13/19 Text Order).

awarded Mr. Dean $1,000,000 in compensatory damages, including $100,000 for physical pain and suffering, $500,000 for emotional pain and suffering, $100,000 for disability and loss of normal life/diminished life expectancy, and $300,000 for future medical expenses.  (*Id.* at 2-3.) The jury awarded Mr. Dean $10,037,500 in punitive damages, including $12,500 against Dr. Einwohner, $25,000 against Dr. Nawoor, and $10,000,000 against Wexford.  (*Id.* at 4.)  The district court entered judgment against Wexford, Dr. Nawoor, and Dr. Einwohner on December 18, 2019. (AA01.)[8]

### 4. Post-Trial Motions

At the close of trial, Defendants moved for judgment as a matter of law.  (Dkt. 203 at 1248:17-1252:19.)  The district court denied their motion.  (*Id.*)  After trial, Defendants renewed their motion for judgment as a matter of law, and moved in the alternative for a new trial, or in the alternative, for remittitur and setoff.  (Dkts. 206, 207.)  In a 55-page opinion issued on September 28, 2020, the district court denied Defendants' motions almost entirely, finding that "[a] reasonable juror could [have] conclude[d] that Defendants were recklessly, callously indifferent to the serious risk of substantial harm facing" Mr. Dean, and that Wexford's collegial review policy "caused delays in urgently needed care for no legitimate reason."  (AA10, AA17-18.)

The court found the evidence presented to the jury supported "the rational conclusion that the only acceptable medical approach to a patient like Plaintiff presenting with painless and visible blood in his urine was a CT scan to rule out cancer," but that "[t]his was not done until *months* after Plaintiff presented with gross, painless hematuria."  (AA06 (emphasis added).)  The district court further found the evidence supported the conclusions that "had Plaintiff been given a CT

---

[8] This brief cites to Defendants' appendix, AA or AB.

scan in the *weeks* after presenting with visible, painless blood in his urine, he would have been diagnosed with cancer months earlier and would have been able to have the surgery months earlier," that Mr. Dean's cancer "continued to grow and spread" in the time between Mr. Dean's presentation with hematuria and his surgery, and that the delay in getting a CT scan complicated Mr. Dean's surgery, recovery, and subsequent treatment. (AA09-10, AA18 (emphasis added).)

The court noted there was "ample evidence" of Dr. Nawoor's "personal responsibility for the delays in Plaintiff's receipt of the CT scan and other indisputably necessary tests and treatment," and that it was reasonable for the jury to conclude Dr. Einwohner's failure to do more than send "an ambiguous email" constituted deliberate indifference. (AA06-07.) Assessing the credibility of their testimony, the district court pointed to their demeanor at trial, observing that Dr. Nawoor appeared "disdainful and disinterested" and "sleeping at times," and that Dr. Einwohner could have been perceived as "evasive and defensive." (AA07, AA22.) With respect to Wexford, the district court found "ample" evidence "supported a finding that Wexford's practices were deliberately indifferent and that Wexford was on notice of this problem," including "[t]he testimony of Wexford's own doctors." (AA17-18.) The court denied Defendants' motions for judgment as a matter of law and for a new trial. (AA55-56.)

The court also denied Defendants' motion for remittitur of Mr. Dean's compensatory damages award and motion for set-off, but remitted the punitive damages award against Wexford to $7,000,000. (AA33-35, AA40-41, AA41-42.) In the court's judgment, $7,000,000—and not the $1,000,000 suggested by Defendants—was necessary to "recognize the reprehensibility of Wexford's conduct and the harm Plaintiff suffered" and "deter future similar conduct" while "stay[ing] within the bounds of due process." (AA40-41.)

### C.     Proceedings on Appeal

Defendants filed a notice of appeal on October 21, 2020.  (Dkt. 255.)  Mr. Dean filed a

notice of cross-appeal on November 2, 2020.  (Dkt. 258.)

## SUMMARY OF ARGUMENT

Defendants largely ignore the voluminous trial record supporting Mr. Dean's story, and ask this Court to disregard the jury's determination of the many factual issues presented by this case. But the evidence presented at trial demonstrates exactly why the jury's verdict must be affirmed. The jury did not decide this case based on *one* piece of evidence, or *two* reports, or even the testimony of a few doctors. The jury was more than reasonable to conclude Defendants violated Mr. Dean's Eighth Amendment rights through their individual indifference and indifference through custom.

The district court properly admitted short excerpts of the *Lippert* reports because they put Wexford on notice that its policy of collegial review, as applied, unnecessarily delayed care. The reports were also admissible because of Defendants' rampant discovery abuse. And as the district court noted—given the strength of the other evidence mounted against Defendants and the small role the *Lippert* reports played at trial—the excerpts' admission did not affect the outcome.

The jury's finding that Wexford violated the Eighth Amendment is well supported by the evidence. Numerous testimonies and documents showed the jury that collegial review, as applied to Mr. Dean and in general by Wexford, does not prioritize patient care, but instead is used to reduce costs. Wexford employees testified that costs drove Mr. Dean's treatment, including the decision to pursue an ultrasound instead of the standard CT scan, and Wexford's push to send Mr. Dean to hospice care instead of continuing his chemotherapy. The jury was justified in concluding that collegial review caused unconstitutional harms.

Similarly, the jury was entitled to find that Dr. Nawoor and Dr. Einwohner violated the Eighth Amendment. The evidence against the Doctor-Defendants demonstrated they repeatedly failed to schedule treatments or follow the standard of care. At trial, the Doctor-Defendants refused to accept personal responsibility, and constantly attempted to shift blame to other Wexford

employees or to Wexford itself.  The jury's conclusion to hold them deliberately indifferent in their treatment of Mr. Dean was grounded in the evidence, all of which was properly admitted.

Finally, the jury's original punitive damages award was a justified, constitutional award reflecting the jury's careful consideration of the facts of this case.  Contrary to Defendants' assertions, there was overwhelming evidence that the Doctor-Defendants, and Wexford itself through the collegial review process, relentlessly ignored or deprioritized Mr. Dean's care.  It is in spite of, not because of, Defendants' actions that Mr. Dean is still alive today.  The original punitive award was necessary in light of Defendants' conduct and the resulting harm to Mr. Dean.

## STANDARDS OF REVIEW

When reviewing a denied motion for judgment as a matter of law after a jury verdict, this court "must affirm unless there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *J.K.J. v. Polk Cty.*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc). This Court reviews evidentiary rulings and the denial of a motion for a new trial for abuse of discretion, and will reverse "only if no reasonable person would agree with the decision made by the trial court" and there is "a significant chance . . . that the ruling affected the outcome of the trial." *Smith v. Hunt*, 707 F.3d 803, 807-08 (7th Cir. 2013). When reviewing punitive damages awards, this Court will engage in *de novo* review for due process challenges and reviews for abuse of discretion for non-constitutional challenges. *Rainey v. Taylor*, 941 F.3d 243, 254 (7th Cir. 2019); *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016).

## ARGUMENT

### I. The *Lippert* Reports Were Properly Admitted to Show Wexford Was On Notice of the Deficiencies of Collegial Review.

Defendants misstate the proceedings below to create the misimpression that Mr. Dean's case was based almost entirely on excerpts of the *Lippert* reports, two expert reports about Wexford's practices.[9] That is not true.[10] The *Lippert* reports were two small pieces of a large trial record with many other exhibits and witnesses, including the Defendants themselves, which showed Wexford's collegial review policy was causing unconstitutional harms. The reports were not admitted into evidence until the fifth day of trial, were used with only one witness, were cited

---

[9] The *Lippert* reports were prepared for *Lippert v. Ghosh*, No. 10-cv-04063 (N.D. Ill.). The "Shansky" report was released in 2014, and the "Puisis" report was released in 2018. (Dkt. 264-3; 264-2.)

[10] The *Lippert* reports do not affect the jury's verdict regarding Mr. Dean's state law claims, which did not depend on Wexford's knowledge of the deficiencies of its policies.

only briefly in counsel's closing arguments, and were relevant only to Wexford's knowledge and actions. Only short excerpts were shown to the jury and made available for the jury's review in the jury room.[11]

Both reports were properly admitted by the district court. Even if they were not, given the small role they played at trial and the strength of the other evidence against Defendants, any error in their admission did not affect the outcome of the trial.

## A.    Both *Lippert* reports were admissible.[12]

The district court properly admitted short excerpts of the reports for notice.[13] Statements made outside of court are not hearsay if they are introduced only to show that a party was on notice of the statements. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 468 (7th Cir. 2008). The *Lippert* reports were properly admitted to show that Wexford was aware of substantial risk of unconstitutional harm caused by deficiencies in the collegial review process as it was implemented.[14] (AA13.) The Shansky report, written in 2014, unquestionably put Wexford on notice of problems with how it applied its collegial review process, and the Puisis

---

[11] For simplicity, this brief will refer to the excerpts of the reports that were admitted as the "reports."

[12] Defendants also suggest the reports were not authenticated. Not so. The party offering evidence is only required to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Before admission, Dr. Ritz testified he was familiar with the reports and affirmed Wexford was aware of their contents (Dkt. 201 at 740:16-741:14), and thus properly authenticated them.

[13] Although Defendants argue on appeal that the *Lippert* reports were hearsay (Op. Br. at 25), the reports were not admitted for their truth (AB14).

[14] There is some confusion over how the reports were introduced at trial, but as the district court made clear in its post-trial order, they were not the subject of judicial notice. (AA12.) Although the Court remarked "I thought judicial notice was taken," (Dkt. 201 at 743:7-8), Mr. Dean's counsel explained that he was going to follow the Court's limiting instruction - that is, only use the reports to show notice (Dkt. 201 at 742:19-22). The Court then admitted the reports for that purpose. (Dkt. 201 at 743:11.)

report was a continuation of the Shansky report. As Dr. Ritz testified, Wexford was aware of both reports when they were released. The district court's ruling that both *Lippert* reports were admissible (AA13-18) was correct. Further, the district court gave a limiting instruction[15] to the jury that the reports were only to be considered for notice, which Defendants do not challenge on appeal.

Both reports were also admissible through the residual exception, Fed. R. Evid. 807, due to Defendants' discovery abuses in this case. (*See* Dkt. 193.) In the months leading up to trial, Defendants frustrated and delayed Mr. Dean's discovery requests, and failed to provide many documents and deposition testimony that would have given Mr. Dean information about how the collegial review process *actually* worked and how it impacted his treatment. (*See* Dkt. 193, Ex. A.) For example, Dr. Ritz, Defendants' 30(b)(6) witness, was unable to testify to how collegial review was done in cases similar to Mr. Dean's despite a 30(b)(6) notice requesting testimony about cases of "hematuria, kidney stones, urinary tract infection, bladder infection, bladder cancer, kidney or renal cancer, and metastasis." (*See* Dkt. 193, Ex. A.).[16]

Defendants also failed to produce documents on the collegial review process itself, both about how it was generally conducted and how it was conducted for Mr. Dean. Wexford did not produce a single collegial review spreadsheet or email from 2016 or 2017, the years relevant to

---

[15] The jury instructions were clear that the *Lippert* reports were only to be considered for "notice and knowledge of the information in the reports." (Dkt. 182 at 13.) Defendants have not challenged any instruction on appeal. Below, Defendants offered an alternative jury instruction stating Wexford was not a party to the *Lippert* case. (Dkt. 201 667:9-17.) Defendants withdrew that instruction after the court discovered this was untrue. (Dkt. 201 737:1-738:2.)

[16] Defendants refused to produce Dr. Ritz or their other 30(b)(6) deponent, Mr. Nickolas Little, until the last possible date for 30(b)(6) depositions. (Dkt. 83 at 4-7; Dkt. 100-G.) Because of Mr. Dean's serious cancer, which Defendants were aware of, he had little remedy for Defendants' actions and Dr. Ritz's inadequate deposition. Mr. Dean could not risk delaying trial.

Mr. Dean's lawsuit. (Dkt. 193, Ex. A at 7-8.) And on December 6, 2019, the last business day before trial was to begin, Defendants produced 525 pages of documents regarding Mr. Dean's case. (Dkt. 193, Ex. A at 8; *see also* Dkt. 201 at 678:14-685:6 (colloquy on the last-minute production)). Dr. Nawoor testified that documents he created related to the January 13, 2016 collegial review must have been "misplaced" by Wexford. (Dkt. 263-3 at 75:11-17; 76:21-24; 78:10-21.) And Dr. Matticks testified Defendants' production was missing several key documents from the collegial review process. (Dkt. 200 at 654:22-658:17.)

Because this abusive discovery practice hampered Mr. Dean's ability to discover relevant information, Mr. Dean requested that the district court admit the two reports under Fed. R. Evid. 807. (Dkt. 193.) The district court never ruled on this request, and admitted the reports only for notice. However, the reports would have properly been admitted under the residual exception.

Federal Rule of Evidence 807 allows an otherwise inadmissible hearsay statement to be admitted if "(1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807; *United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016).

Here, the reports certainly carried circumstantial guarantees of trustworthiness. The experts who prepared the reports were impartial and appointed by the court through Rule 706. (*Lippert v. Ghosh*, No. 10-cv-04603, Dkts. 244 and 593 (N.D. Ill.).) Both reports were prepared by medical doctors whose jobs were to neutrally evaluate the Illinois prison medical system. The reports were probative of the material fact that Wexford was on notice that the collegial review process was substantially likely to cause unconstitutional injuries. Moreover, because Defendants'

discovery abuse prevented Mr. Dean from gathering evidence to support his case, the *Lippert* reports were more probative than other evidence he could acquire. Collegial review records from the time period covered by the Puisis report, the same time period relevant to this case, were simply never produced. In light of Wexford's refusal to produce relevant documents during discovery, it was not an abuse of discretion for the district court to admit the reports, in contrast to *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019), where under the circumstances of *that* case this Court declined to apply the residual exception.

**B.      The *Lippert* reports were not unfairly prejudicial to Defendants.**

Federal Rule of Evidence 403 permits a judge to exclude evidence as unfairly prejudicial only if the unfair prejudice "substantially outweigh[s]" the evidence's probative value. An appellate court "give[s] special deference to the judge's application of Rule 403's balancing test [and] will reverse only if no reasonable person could take the view adopted by the trial court." *Rainey*, 941 F.3d at 251 (internal quotation omitted); *see also Common v. City of Chicago*, 661 F.3d 940, 947 (7th Cir. 2011) ("After all, all evidence is prejudicial.").

Defendants cannot show the admission of the reports was unfairly prejudicial. They repeatedly assert it was unfair to allow the reports in because they "had no way to challenge the *Lippert* reports experts' opinions" and "[t]he jury was informed that Defendants 'denied' what was in the Reports without any further cross-examination." (Op. Br. at 29, 30-31.) To the contrary, Dr. Ritz testified about the reports on cross-examination and was free to explain why Wexford had reason to disbelieve the reports and dispute that they provided notice. He attempted to do so, testifying that "even though it was not reflected in the Shansky and the Puisis reports, every week, [he] had very good and vigorous discussions with [the] medical directors about cases from an academic standpoint." (Dkt. 201 at 777:11-14.) Whether to credit Dr. Ritz's dismissal of the reports was a jury question, inappropriate for reversal on appeal.

Moreover, any prejudice that resulted does not "substantially" outweigh the reports' probative value. Each report was probative of a piece of Mr. Dean's *Monell* claim against Wexford: that Wexford was on notice that the collegial review process, and its unnecessary delays in care, substantially risked causing unconstitutional harms. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc); *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004). (*See also* Dkt. 187 at 30 (Jury Instructions).) As Dr. Ritz explained, Wexford was aware of the two reports and their conclusions as they were released. (Dkt 201 at 746:2-17, 752:2-753:22.) If Defendants' argument—that evidence putting a municipality on notice of an unconstitutional policy is unfairly prejudicial if it also is evidence that the policy was unconstitutional—were to be accepted, it is not clear how *any* plaintiff would be able to show that a municipality had notice. Defendants' logic is circular.

### C.    Any error in admitting the *Lippert* reports was harmless.

"[E]ven where an error is demonstrated to exist, a jury verdict will stand if the trial court's evidentiary ruling was harmless error." *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003) (internal quotation omitted). Far from the purported "crux" of Mr. Dean's deliberate indifference claims at trial, the *Lippert* reports were mentioned in portions of just two days of the seven-day jury trial. The reports were not a part of counsel's opening statement. (*See* Dkt. 195.) No portions of the reports were admitted into evidence until the fifth day of trial. (*See* Dkt. 201 at 743:13.) Once admitted, only minimal excerpts of the *Lippert* reports were discussed before the jury during the testimony of only one witness, Dr. Ritz. (*See* Dkt. 201 at 740:16-18.) Even with Dr. Ritz, questions and answers pertaining to the *Lippert* reports appear on just 15 pages out of a total of 85 pages of his direct examination (and a trial record of approximately 1,600 pages). (*See* Dkt. 201 at 740:16-747:20, 750:4-753:22, 830:1-831:21, 837:20-22.) Similarly, references to the *Lippert* reports, their authors, or their conclusions appear on only five pages out

of counsel's closing arguments, which cover 63 pages. (*See* Dkt. 203 at 1311-12, 1330-31, 1359.) And as Petitioner points out, (Op. Br. at 29), Mr. Dean's counsel used the phrase "patient safety hazard" just six times in the course of the seven-day trial. (*See* Dkt. 201 at 746:4-17, 753:4-18, 831:12-21; Dkt. 203 at 1312:1-9, 1330:18-1331:5, 1359:8-14.) And the *Lippert* reports were not the only evidence that Wexford's collegial review policy had no valid penological or medical purpose and posed a substantial risk of causing constitutional violations, or that Wexford was aware of this risk. Other documents and witnesses, over pages of testimony, showed this as well. *See infra*, II.A, B.

Because the Shansky report was admissible for notice, there was no harm in admitting the Puisis report for notice. *See Wheeler v. Sims*, 951 F.2d 796, 805 (7th Cir. 1992) (finding harmless error in admitting evidence when related evidence was sufficient for liability). The Shansky report detailed delays caused by collegial review and difficulties in scheduling outside appointments. (AB29.) The Puisis report stated the risk more directly, (AB21), but it was not a fundamentally different risk for Wexford, which has a duty to provide prisoners with medical care. Any delay in treatment of an aggressive cancer serves no penological purpose, and the Shansky report was sufficient for the jury's verdict.

## II.     The District Court Properly Upheld the Jury Verdict and Denied Wexford's Motion for Judgment as a Matter of Law on Mr. Dean's *Monell* Claim Against Wexford.

Plaintiffs who wish to sue private corporations under 42 U.S.C. § 1983 must adhere to the requirements of *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).[17]

---

[17] *Iskander*, 690 F.2d at 128. Mr. Dean submits that *Iskander* was wrongly decided and it and should be overruled. Its holding does not promote federalism. *See J.K.J.*, 960 F.3d at 395 (Brennan, J., dissenting). Eliminating *Monell* for private corporations in cases where employees themselves are liable for deliberate indifference is consistent with traditional *respondeat superior*.

*Monell* liability is proper where violations of a plaintiff's constitutional rights were caused by: (1) an express policy, (2) a "widespread and persistent practice that amounted to a custom approaching the force of law," or (3) an official with final policymaking authority. *Howell v. Wexford Health Sources, Inc.*, No. 19-3210, 2021 WL 405006, at *4 (7th Cir. Feb. 5, 2021) (noting *Monell* is "creaky" and in need of repair). "A single memo or decision showing that the choice not to act is deliberate could [] be enough [for *Monell* liability]." *Glisson*, 849 F.3d at 381.

Mr. Dean's theory of liability is premised on Wexford's policy of collegial review: the policy as applied caused unconstitutional delays in his care for no valid penological or medical purpose. The testimony and exhibits at trial were more than enough to show that Wexford's collegial review policy, as applied in general and to Mr. Dean, resulted in repeated decisions to delay medically necessary care in order to control costs, was a sufficiently persistent and widespread policy, and caused Mr. Dean's constitutional injury.

**A.    Wexford's collegial review process imposed excessive, unconstitutional delays to Mr. Dean's care that did not serve a valid penological or medical purpose.**

"The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson*, 849 F.3d at 381. Mr. Dean easily answered this question of fact at trial. The evidence showed collegial review, as routinely applied (including to Mr. Dean), is actually the process by which Wexford imposes unnecessary delays in treatment in a misguided effort to control costs. This fundamentally *institutional* policy harmed Mr. Dean, and is sufficient to hold Wexford liable under *Monell*.

As shown by Mr. Dean at trial, Wexford's collegial review process repeatedly imposed unnecessary delays to his care. At every step of the way, before every necessary medical action, collegial review delayed the provision of care. Dr. Nawoor testified, repeatedly, that delays were

part of collegial review. (*See, e.g.,* Dkt. 263-3 at 67:1-14, 81:12-83:19, 84:19-23, 94:13-95:5, 105:9-110:15, 112:16-113:5, 116:2-119:9, 124:7-126:22, 128:3-130:1, 131:1-133:4, 133:15-135:6, 137:7-24, 139:12-142:9, 142:13-143:2, 143:24-144:3, 146:21-147:23, 149:4-150:2, 150:10-151:15, 156:1-158:6, 159:15-162:22, 164:6-167:15, 169:1-171:19.) Dr. Nawoor blamed the three-month delay in getting a CT scan (and untimely provision of an in-house ultrasound) on collegial review (Dkt. 263-3 at 39:8-12), as well as the delay in sending Mr. Dean to a urologist (Dkt. 263-3 at 21:21-22:25). He explained that as a matter of policy, only one procedure could be reviewed at a time during collegial review, adding additional, unnecessary delays. (Dkt. 263-3 at 37:13-24.) He further explained that the collegial review process disempowered him because decisions come from a remote Wexford physician (Dkt. 263-3 at 78:22-79:9), and that collegial review excluded the opinions of Dr. Einwohner, Mr. Dean's nephrologist (Dkt. 263-3 at 83:9-19). He noted that collegial review delayed Mr. Dean from receiving a CT scan *even after* an outside specialist requested one. (Dkt. 263-3 at 109:4-110:16.) And, Dr. Nawoor testified that, during these delays, Wexford discussed how to save money on Mr. Dean's care. (Dkt. 263-3 at 129:15-130:1; 159:2-160:4.) Tellingly, Defendants never elicited testimony from Dr. Nawoor to the contrary.

Dr. Nawoor's testimony was supported by other testimony the jury heard at trial. Dr. Einwohner explained that, although she was Mr. Dean's nephrologist and had treated Mr. Dean longer than any other Wexford physician at the time, Wexford excluded her from collegial reviews as a matter of policy. (Dkt. 263-4 at 19:1-20:14, 23:24-24:4, 50:15-52:20.) (Defendants also never examined Dr. Einwohner.) Mr. Little explained that collegial review was a way for Wexford to control its costs and testified that it is more costly for Wexford to send patients to offsite providers. (Dkt. 200 at 630:11-17, 632:9-633:9.) There was more than enough evidence for the jury to

conclude that Wexford's collegial review process was not about patient care at all, but rather a way to save money by delaying medically necessary care.

The delays in Mr. Dean's care caused by collegial review were not medically justified. Mr. Dean's expert Dr. Metwalli testified that "in aggressive cancers like this, we try to get to them as quickly as possible. Because it's strictly a numbers game." (Dkt. 197 at 380:16-19.) Dr. Metwalli testified that delay decreased Mr. Dean's chances of survival, noting "you wouldn't have data on delays of 12 weeks or more or up to 7 months in a locally aggressive and advanced stage kidney cancer because nobody in their right mind would wait that long." (Dkt. 197 at 387:8-11, 388:6-22.) The jury heard testimony from multiple witnesses that, although it was cheaper for Wexford, giving Mr. Dean an ultrasound in response to his gross hematuria was unjustified and below the standard of care. (*See, e.g.,* Dkt. 197 at 403:5-17; Dkt. 198 at 449:7-11; Dkt. 200, 514:21-23.)

Defendants' expert witnesses confirmed Mr. Dean's course of treatment was unjustifiably delayed. Dr. Kosierowski testified that "[t]here [was] plenty of blame to go along" (Dkt. 202 at 1036:7) and he was "sure everyone in this case would agree that things could have been tighter, even Wexford" (Dkt. 202 at 1036:19-22). Dr. Racenstein testified that one generally needs to treat cancer "[a]s soon as you possibly can" and agreed "the timeframe in this case actually was surprisingly too long." (Dkt. 202 at 1105:19-1106:3.)

Defendants may be correct when they claim that "each and every request" was approved by Wexford through the collegial review process, but they conveniently ignore the crux of this case: "each and every request" was approved *only after unwarranted delay*. These delays were not occasional or isolated; the vast majority of treatments were delayed by at least seven days. Most delays were longer. As shown during trial, over a 15-month period from Mr. Dean's first presentation with symptoms of kidney cancer to when he filed suit, there were *twenty* procedures

or treatments delayed by collegial review. (*E.g.*, Dkt. 201 at 753:23-754:11, 768:5-13, 895:2-9; Dkt. 263-3 132:10-25.)  Mr. Dean's experts explained that surgery should have been possible a little over a month after initial presentation.  Instead, Mr. Dean was forced to wait 207 days.  (Dkt. 203 at 1291:15-23.)  And despite his known desire to fight his cancer and leave prison alive, the evidence showed Wexford used the collegial review process to push for hospice care instead of costly chemotherapy (Dkt. 201 at 768:16-773:18), during which time Mr. Dean received *no treatment* for his Stage IV cancer.

Defendants' focus on the delays discussed by Dr. Severino ignores the crucial, and near-fatal, cumulative results of the months of prior delays.  Mr. Dean's surgery was delayed in part because a tumor thrombus developed, extending from his kidneys towards his heart.  (Dkt. 263-3 at 117:4-16.)  But the extension of the thrombus was itself caused by Defendants' failure to promptly diagnose Mr. Dean's cancer with a CT scan, the only test that could rule out cancer. (*See, e.g.,* Dkt. 263-3 at 117:12-16; Dkt. 197 at 388:12-389:3; 405:2-406:6.)  Even the collegial review approving Mr. Dean's surgery failed to account for the possibility of the tumor thrombus advancing towards Mr. Dean's heart, so another round of review was needed to approve a vascular surgeon.  (Dkt. 263-3 at 117:17-119:9.)

"[D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose.  The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  The delays imposed by collegial review served no valid penological purpose.  And as Mr. Dean's experts testified, they violated the standard of care for no medical reason.  Defendants' selective quotation of Dr. Barnett to support their claims is unavailing.  Dr. Barnett agreed that "[c]ost-effective medicine is safer medicine," but also made clear that "[d]oing the right thing is less expensive than

making mistakes." (Dkt. 200 at 615:18-19.)  If Mr. Dean had a CT scan immediately, had surgery sooner, and had fewer delays in receiving medications, his overall treatment plan would have been less costly and Mr. Dean would have had an easier surgery and a better prognosis.

The jury was entitled to credit this exchange when determining whether Mr. Dean's wellbeing was Wexford's primary interest:

> Q.  And it would have been cheaper if he died by not getting
>
> systemic therapy; right?
>
> A.  Well, in general, yes.  But depends who is making that decision.

(Dkt. 263-3 at 171:16-171:19.)  Collegial review did not cause Wexford to "[d]o the right thing." It caused Wexford to prioritize cost savings over prompt treatment.  It caused Wexford to waste time investigating hospice care instead of chemotherapy.  (Dkt. 263-3 at 161:18-162:22.)  It caused unconstitutional deliberate indifference to Mr. Dean's serious medical needs.

## B.  Collegial review, as applied to Mr. Dean, was Wexford's deliberate, generally applied policy.

Mr. Dean is not required by *Monell* or its progeny to give specific examples of how Wexford's collegial review policy caused constitutional harms to other prisoners, only that the policy, as applied, was its practice or custom.  *Glisson*, 849 F.3d at 382; *Woodward*, 368 F.3d at 929.  The evidence in this case, heard by the jury, showed that Wexford's collegial review policy was widespread and systemic.  For instance, Dr. Nawoor testified:

> Q.  And the reason it's three months later instead of two weeks is
>
> because of delays caused by Wexford practices; right?
>
> A.  Well, that's what they do.  I mean I have to comply with this.

(Dkt. 263-3 at 39:8-12.)

A reasonable jury could conclude that if a Wexford employee testifies delays are "what they do," then the delays caused by collegial review were part of that policy as applied generally. There was plenty of other evidence and testimony on collegial review in general: Dr. Ritz, for example, could *only* testify generally on collegial review because he could not recall participating in any review for Mr. Dean. (Dkt. 201 at 704:16-22.) Dr. Einwohner, the physician with the longest history and most familiarity with Mr. Dean, was excluded from collegial review under Wexford's policy. (Dkt. 263-4 at 19:1-20:17, 52:4-8.) The jury was free to draw the plausible inference that collegial review was primarily for controlling costs without regard to medically appropriate treatment, especially given the exclusion of specialists like Dr. Einwohner.

Moreover, if Defendants wanted to challenge Dr. Nawoor and Dr. Einwohner's descriptions of collegial review, they could have examined them at trial. They declined to do so, leaving unrefuted the testimony about collegial review elicited by Mr. Dean. Instead, they chose to argue (and continue to argue to this Court) that collegial review, applied generally and applied to Mr. Dean, is "a platform to review requests for patient offsite services and serves as a forum for doctors to discuss their patients' cases and courses of treatment while considering the patient's medical history." (Op. Br. at 33.) But Dr. Ritz testified that 85-90 percent of procedures requested through collegial review are approved "at face value," without any discussion. (Dkt. 201 at 748:1-7.) Given the contrary testimony, the jury was free to believe that Defendants' description of collegial review as a forum for discussion was implausible.

Mr. Dean provided evidence that collegial review, as applied, causes delays because Wexford attempts to divert patients from necessary treatments towards cheaper ones (or treatments reimbursed by the state of Illinois). Mr. Little explained in his testimony that Wexford is responsible for paying for offsite care, and that collegial review is used for "cost-management."

(Dkt. 200 at 630:11-17, 632:9-633:9.) It was also described that way on Wexford's website. (PTX 142.) Mr. Dean showed that Wexford would pay more for treatments that were done off-site. (Dkt. 201 at 724:10-727:1.) During Dr. Ritz's testimony, he admitted (after initially denying it) that he was involved in preparing internal emails gathering the costliest, sickest prisoners so that Wexford could reduce its medical costs by supporting petitions for executive clemency from the Illinois Governor's Office. (Dkt. 201 at 727:18-736:18.)

Mr. Dean demonstrated, through a mountain of testimony and documents, why a policy of delay is to Wexford's advantage. Collegial review was used to reduce prisoner visits to outside specialists to keep costs down; the delays in treatment resulted from prioritizing less expensive options first—like ultrasounds—that were below the standard of care. Collegial review was used to promote cheaper drugs or recommend hospice care. And this was not a case of rogue Wexford employees inflicting unconstitutional harms. Mr. Dean's case involved dozens of collegial reviews and months of delays for no justifiable medical reason. The jury was entitled to conclude that collegial review actively prevented timely, medically necessary treatments.

"One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care." *Glisson*, 849 F.3d 382; *see also Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 304 (7th Cir. 2010) ("The dangers of delayed responses to medical requests are readily apparent."). The same is true here. One does not need to be an expert to know that unnecessary, vexatious delays in diagnosis of an aggressive cancer and subsequent treatment will have extremely negative, dangerous results. Nor does one need expert knowledge to know that a policy explicitly designed to exclude treating physicians most familiar with the patient, in this case Dr. Einwohner, does not serve a valid penological or medical interest.

The dangers of delay caused by collegial review were obvious, and the evidence showed Wexford was aware of that. Mr. Dean submitted evidence from Nurse Mincy in which she notified Wexford executives about issues and delays caused by collegial review. (*See, e.g.,* Dkt. 201 at 881:9-882:8.) Nurse Mincy raised several additional issues relating to Wexford's "ordering and scheduling outside procedures" to Dr. Matticks. (Dkt. 201 at 878:6-886:22; PTX 395.) Nurse Mincy told Wexford that collegial review wasn't working, and was instead delaying patient care. And Wexford was on notice of the delays throughout the course of Mr. Dean's treatment through the collegial review process itself; numerous procedures were delayed or rescheduled due to the compounding delays of collegial review.

The *Lippert* reports also put Wexford on notice of the problems with collegial review. The Shansky report (AB29) which, again, Dr. Ritz confirmed Wexford was aware of, alerted Wexford that its collegial review policy had the potential to cause unconstitutional harms through unnecessary delays. The Puisis report, a continuation of the Shansky report, also put Wexford on notice. (AB21.) During trial, both sides had the opportunity to present what collegial review did and whether it was an unconstitutional policy. Dr. Ritz testified, at length, that the *Lippert* reports' conclusions about collegial review were wrong, and that the policy's purpose was not to prioritize cost of care over prompt treatment. (Dkt. 201 at 776:19-778:14.) The jury simply chose not to credit this description of collegial review.

### C. Wexford's argument that collegial review delays in treating Mr. Dean did not cause his unconstitutional injury is belied by the evidence and common sense.

Defendants argue that collegial review was not the "moving force" behind Mr. Dean's injuries because "Plaintiff does not argue, and the evidence cannot support [sic] that Wexford caused Plaintiff's kidney cancer." (Op. Br. at 36.)[18]

That argument—itself a demonstration of Defendants' heartlessness—is plainly wrong. The Constitution's protections do not end once a patient has a potentially terminal illness. Rather, the "Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc) (quoting *Estelle*, 429 U.S. at 103).

Defendants' opening brief contains many factual assertions outlining what they argue were the true causes of delays to Mr. Dean's care. Of course, these factual questions are best answered—and were answered—by the jury. While reviewing a jury verdict, this Court "do[es] not reweigh evidence, assess the credibility of any trial witness, or otherwise attempt to usurp the jury's role as factfinder." *J.K.J.*, 960 F.3d at 378. Defendants do not appeal any jury instructions that could call its verdict into doubt. The jury is entitled to credit or not credit conflicting testimony. That is their fundamental role.

Mr. Dean presented two expert witnesses, Dr. Dhar and Dr. Metwalli, who each testified that the delays caused by Wexford's collegial review process allowed the kidney cancer to spread through his body and greatly complicated Mr. Dean's treatment. For example, Dr. Metwalli testified that Mr. Dean "underwent a more complicated operation that required a longer recovery

---

[18] The jury instructions, not challenged on appeal, required Mr. Dean to show that, "[a]s a result of the policy described in paragraph 2, Plaintiff was harmed or was subjected to a significant risk of harm." (Dkt. 182 at 31.)

and was higher risk . . . because of the delay" in diagnosis and treatment.  (Dkt. 197 at 380:8-13.)  The delays allowed a tumor thrombus to grow through Mr. Dean's vena cava towards his heart, complicating surgery, increasing post-operation pain, and worsening his prognosis.  (Dkt. 197 at 343:23-347:8, 355:11-357:11, 361:23-363:12.)  Dr. Dhar confirmed that the delays in treatment made surgery more complex, and explained that in her private practice she rarely encounters tumors as large as Mr. Dean's because "we diagnos[e] them when they're a lot smaller . . . [because] we do CT scan[s] with and without IV contrast earlier."  (Dkt. 198 at 468:4-469:3.)

It is not this Court's role to get into any "battle of the experts" that is best left to factfinders.  *See, e.g., Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009).  The jury was entitled to find causation based on the evidence presented.

## III.    The District Court Properly Denied Defendants' Post-Trial Motion on Mr. Dean's Claims Against the Doctor-Defendants Because Overwhelming Evidence Supports the Jury's Verdict.

On *de novo* review of a district court's denial of a motion for judgment as a matter of law, the Court "must affirm unless there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party."  *J.K.J.*, 960 F.3d at 378 (en banc).  Based on the totality of the evidence, not the misleading snippets from Defendants, this Court "must affirm" the district court's decision.

The "Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering.'"  *Petties,* 836 F.3d at 727 (quoting *Estelle,* 429 U.S.at 103).  "[I]nexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference.  . . . That is especially so if that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering."  *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (internal quotation omitted).  "Inexplicable delay" is precisely what the evidence shows happened to Mr. Dean.

The Doctor-Defendants argue, first, that the evidence was legally insufficient to show that they acted with a culpable mental state, and, second, that because they provided Mr. Dean with *some* care, they cannot be found to be deliberately in different because "their treatment decisions sounded in their professional judgment." (Op. Br. at 37.) These arguments are belied by substantial evidence presented at trial, which the Doctor-Defendants conveniently ignore.

### A. There was legally sufficient evidence that the Doctor-Defendants were deliberately indifferent.

The Doctor-Defendants assert that "no evidence" showed they "acted with the 'culpable state of mind'" necessary to support a finding of deliberate indifference. (Op. Br. at 22.)[19] Subjective deliberate indifference is often established with circumstantial evidence because "except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge." *Petties,* 836 F.3d at 728. Juries are entitled to assess whether an unjustified delay in treatment serving no penological interest constitutes deliberate indifference. *See Grieveson v. Anderson,* 538 F.3d 763, 779-80 (7th Cir. 2008). Here, as the district court recognized (AA02), ample evidence supports the jury's verdict that both of the Doctor-Defendants were deliberately indifferent.

*Dr. Nawoor.* The jury heard evidence that Dr. Nawoor's treatment of Mr. Dean reflected deliberate indifference to Mr. Dean's medical needs, including his:

- failure to comply with the acknowledged standard of care for the condition presented by Mr. Dean on Dec. 23, 2015 (*see, e.g.,* Dr. Metwalli testimony, Dkt. 197; Dr. Dhar testimony Dkt. 198);
- failure to review Mr. Dean's medical history before December 23, despite notes about grossly bloody urine in his charts from his December 22 sick call visit, (Dkt. 263-3 at

---

[19] Defendants' statement of the law is incompatible with the jury instructions, which, again, are unchallenged on appeal. (Dkt 182 at 27.)

11:25-12:6), and failure to consider medical data from or consult with Dr. Einwohner, Mr. Dean's nephrologist since 2012 (Dkt. 263-3 at 42:16-44:17.);

- failure to set Mr. Dean's case for collegial review from December 23, 2015, to January 13, 2016 (Dkt. 263-3 at 21:23-22:7);

- failure *altogether* to submit required paperwork to set Mr. Dean's case for collegial review in January 2016, or to provide or consider Mr. Dean's medical history or comorbidities necessary to the exercise of physicians' "clinical judgment" in collegial review (Dkt. 263-3 at 22:10-23:17);

- failure to schedule Mr. Dean's ultrasound until February 2, 2016, despite on-site availability of ultrasound equipment (Dkt. 263-3 at 54:11-56:7);

- failure to initiate a urological referral for a CT scan and a cystoscopy to address gross hematuria in a timely fashion (Dkt. 263-3 at 17:15-18:9, 23:18-24:13);

- failure to write a timely order for a chest X-ray, after Mr. Dean's April 2016 diagnosis of kidney cancer, to rule out the possibility that cancer had spread to his lungs (Dkt. 201 at 881:9-882:8);

- failure to act on Dr. Severino's recommendation of an oncology referral until prompted to do so by Nurse Mincy (*id.* 888:11-891:7; PTX180); and

- failure to advocate effectively for Mr. Dean to receive new anti-cancer drug prescriptions promptly, despite knowledge that Mr. Dean wished to fight his cancer and to take all necessary measures to live (Dkt. 263-3 at 158:16-162:22; PTX181; PTX385).

This unrebutted evidence shows inexplicable departures from protocol and delays in treatment serving no penological interest or *medical* purpose. Given this litany of errors and oversights, it is unreasonable to suggest that "no rational jury could have found" for Mr. Dean. The arguments that Dr. Nawoor was "hindered by a misread ultrasound" or could not control delays in Mr. Dean's treatment while he was under the care of Dr. Severino ring hollow in light of this record. Indeed, the substantial damages award in the verdict, including punitive damages against Dr. Nawoor, makes it clear that the jury did not believe the case was a close call. Trial evidence showing a doctor "fail[ed] to exercise medical . . . judgment at all" is more than sufficient for a deliberate indifference claim. *See Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011).

**Dr. Einwohner.** The jury heard evidence that Dr. Einwohner recognized Mr. Dean's complaints of gross hematuria were a warning sign of cancer. (Dkt. 263-4 at 40:6-13.) The jury heard that Dr. Einwohner utterly failed to do anything about that condition beyond vaguely

emailing another doctor her "suggest[ion]" that he be referred to a urologist for "re-imaging." (PTX061-0061; Dkt. 263-4 at 31:1-32:22.) Importantly, the jury heard that Dr. Einwohner never followed up to find out whether her "suggest[ion]" to follow the recognized standard of care was followed. (Dkt. 263-4 at 58:11-18; Dkt. 201 at 835:2-24 (Ritz).) Additional evidence of her failure in treating Mr. Dean includes:

o failure to communicate with Dr. Nawoor, despite her extensive experience treating Mr. Dean and her expertise in kidney health and maladies (Dkt. 263-4 at 34:3-37:13, 50:15-53:12);

o failure to take any steps to communicate her impressions or recommendations to Dr. Ritz or Dr. Nawoor following her February 8, 2016 teleclinic appointment with Mr. Dean, (PTX061-0059-60; Dkt. 263-4 at 33:20-39:23); and

o failure to advise Dr. Ritz or Dr. Nawoor that they had not followed her expert "suggest[ion]" despite learning, by February 8, 2016, that Mr. Dean had not received a urology referral or a CT scan (Dkt. 263-4 at 39:5-12; 58:11-13).

As the district court noted, "[a] reasonable juror could have found that Dr. Einwohner, a nephrologist, knew that Plaintiff needed a CT scan and a urology referral but only suggested that course in an ambiguous email and did nothing further." (AA07.) The district court found this evidence supported the conclusion reached by the jury, appropriately denying the motion for judgment as a matter of law. Again, the award of punitive damages against Dr. Einwohner makes clear the jury believed the evidence against her was very strong.

The Doctor-Defendants also argue that the evidence presented at trial was contrary to the jury's verdict, and that it instead showed they "exercised professional judgment to make appropriate decisions for Plaintiff's care." (Op. Br. at 39.) While it is true that "a treatment decision based on professional judgment cannot evince deliberate indifference," that standard "does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." *Zaya v. Sood*, 836 F.3d 800, 805, 806-807 (7th Cir. 2016) (reversing grant of summary judgment for defendant physician because plaintiff

"point[ed] to some evidence that would permit a reasonable jury to reject [physician's] [professional judgment] explanation as a post hoc rationalization"). The Doctor-Defendants misconstrue the professional judgment standard and ignore the evidence that led the jury to reasonably conclude that the Doctor-Defendants failed to meet it.

"A medical professional acting in his professional capacity may be held to have displayed deliberate indifference [] if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Id.* (quoting *Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998))). The Doctor-Defendants are not protected from liability simply because they ordered *some* treatment of Mr. Dean, as the Doctor-Defendants suggest. *See Petties*, 836 F.3d at 731. The key inquiry is whether their actions, or, importantly, inactions, reflected a course of conduct that no competent professional would have pursued. *Id.* That question was for the jury to decide. Although the Doctor-Defendants cherry-pick the record, citing to examples of some treatment they provided, they ignore all of the steps they failed to take. A reasonable jury could have found that they "failed to take reasonable measures to provide treatment for the serious medical need." (Dkt. 182 at 27.)

Importantly, Mr. Dean also presented evidence to establish that the Doctor-Defendants failed to exercise medical judgment. For example, the jury heard testimony that the collegial review process the Doctor-Defendants engaged in was Wexford's method to manage its costs and had no clinical purpose. (Dkt. 200 at 635:14-636:17.) The jury heard testimony that the Doctor-Defendants had an incentive to recommend onsite treatment, such as an ultrasound, because Wexford was reimbursed for those costs, rather than offsite care, including consultations with specialists, for which Wexford is financially responsible. *See supra*, II.A, B. Dr. Metwalli, Dr.

Dhar, and Dr. Barnett offered expert testimony that the standard of care for treating hematuria requires a CT scan, and that an ultrasound alone is *never* enough. (Dkt. 197 at 403:5-17; Dkt. 198 at 449:7-11; Dkt. 200 at 514:21-23.) There was ample evidence supporting the jury's conclusion that the Doctor-Defendants' treatment was incomplete, not the result of medical judgment, and not the standard of care, amounting to deliberate indifference.

The Doctor-Defendants attempt to bolster their professional judgement argument retroactively by citing to testimony regarding their alleged concern about the impact a CT scan could have on Mr. Dean given his "compromised kidneys." (Op. Br. at 39-40.) But they put forth no corroborating evidence or documentation at trial to support this hindsight argument. And neither Dr. Dhar nor Dr. Metwalli, the only urology experts to testify at trial, found that Mr. Dean's kidneys were too compromised for a CT scan. The jury was not required to credit the Doctor-Defendants' contrary testimony or any other of the Doctor-Defendants' counter-arguments, especially absent proof.

Finally, Doctor-Defendants' reliance on *Duckworth* is misplaced. In *Duckworth v. Ahmad*, 532 F.3d 675, 677 (7th Cir. 2008), this Court was reviewing a grant of summary judgment. This case survived summary judgment because Mr. Dean put forth sufficient evidence to raise a triable dispute of fact on the Defendants' deliberate indifference towards Mr. Dean. That dispute was then properly put before a jury, which reasonably found for Mr. Dean.

**B.      The Doctor-Defendants' Failure To Address Evidence Supporting the Verdict Is Dispositive.**

The Doctor-Defendants fail to address any of the above evidence. This omission is dispositive because, under the standard of review, the Doctor-Defendants had to show that "the evidence 'supports but *one conclusion*—the conclusion not drawn by the jury.'" *Mejia v. Cook*

*County*, 650 F.3d 631, 634 (7th Cir. 2011) (quoting *Ryl-Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009)) (emphasis added).  In light of this evidence, they cannot.

Without addressing the evidence supporting liability, or the standard of review, the Doctor-Defendants' attempt to undermine the district court's ruling by suggesting it "improperly concluded" they were "deliberately indifferent based on their demeanors at trial."  (Op. Br. at 45.)  Yet as this Court has recognized, the resolution of a claim of deliberate indifference "requires a credibility determination."  *Turner v. Miller*, 301 F.3d 599, 604 (7th Cir. 2002).  "[A] jury [is] in the best position to judge witness credibility and demeanor."  *Passananti v. Cook Cty.*, 689 F.3d 655, 669 (7th Cir. 2012).  The jury was entitled, based on its observations, to discredit the testimony of the Doctor-Defendants, and the jury's verdict shows it did.  Moreover, Defendants' decision not to ask either Dr. Nawoor or Dr. Einwohner any questions to rehabilitate them left the jury with ample unrefuted evidence to support its verdict.

## IV.    **The District Court Properly Admitted Evidence About Dr. Nawoor's Conduct.**

When reviewing evidentiary rulings and a motion for a new trial this court will reverse "only if no reasonable person would agree with the decision made by the trial court," and there is "a significant chance . . . that the ruling affected the outcome of the trial."  *Smith*, 707 F.3d at 807-808.

The district court properly rejected Defendants' argument that evidence of Dr. Nawoor's conduct during the relevant period was "irrelevant and unfairly prejudicial character evidence" under Fed. R. Evid. 404(b) *three times* (Op. Br. at 46), not only because it is wrong, but also because Defendants' motion in limine, its trial objections based on that motion, and its Rule 59 motion failed to describe the documents it sought to exclude in any detail and failed to offer any argument beyond boilerplate invocations of the standards under Fed. R. Evid. 403 and 404(b).  (Dkt. 206 at 11-12; Dkt. 124 at 10-11.)  *See Williams v. Dieball*, 724 F.3d 957, 962 (7th Cir. 2013).

Defendants' current attempt is equally deficient because Defendants again fail to identify the evidence they contend was admitted in error. Defendants recite nothing more than vague descriptions of what the Federal Rules of Evidence prohibit, without addressing the district court's well-reasoned rulings. (Op. Br. at 46.) Such inadequately-presented arguments are waived. *See* Fed. R. App. P. 28(a)(8).

On the merits, the district court properly admitted the evidence that Defendants seem to be describing. First, "direct evidence" of the care Dr. Nawoor provided to Mr. Dean does not run afoul of Federal Rule of Evidence 404(b). *See United States v. Adams,* 628 F.3d 407, 414 (7th Cir. 2010). Nurse Mincy's email is "direct evidence" because it discusses how employees had to badger Dr. Nawoor to order a pre-surgery chest X-ray for Mr. Dean in April 2016, mere days after he was diagnosed with cancer, and also put Wexford on notice of Dr. Nawoor's inattentiveness. (*See* PTX395-0002.) And evidence that Dr. Nawoor was disciplined for sleeping on the job and flouting Wexford's rules shows Dr. Nawoor's "lack of accident" or "absence of mistake" regarding Mr. Dean, *Burton v. City of Zion,* 901 F.3d 772, 777 (7th Cir. 2018), which the district court properly recognized. (AA21.) Defendants do not even attempt to explain how the court abused its discretion in admitting the evidence.

Finally, even if this Court finds that it was an error to admit this evidence, which it was not, the error was harmless. As the district court observed, "the most damaging evidence against Dr. Nawoor was Dr. Nawoor's own testimony and demeanor throughout the trial. A reasonable juror could have found Dr. Nawoor's attitude disdainful and disinterested. Dr. Nawoor also appeared to be sleeping at times throughout the trial." (AA22.) Thus, a reasonable jury could find against Dr. Nawoor on all of Mr. Dean's claims without admission of this evidence.

## V. The Jury Had Ample Basis to Award Punitive Damages, and the Amount of Damages it Awarded Is Constitutionally Valid.

After considering the overwhelming evidence against Wexford and the Doctor-Defendants, the jury found for Mr. Dean on all state and federal claims and awarded $1,000,000 in compensatory damages and $10,037,500 in punitive damages—$10,000,000 against Wexford, $25,000 against Dr. Nawoor, and $12,500 against Dr. Einwohner. The district court, recognizing the "reprehensibility of Wexford's conduct and the harm Plaintiff suffered," upheld the jury's award of punitive damages, but remitted the amount against Wexford to $7,000,000. (AA40-41.) On appeal, Defendants claim that "any award" of punitive damages is improper and argue in the alternative that the remitted award remains unconstitutionally excessive. (Op. Br. at 47.) Those claims are meritless. To the contrary, the jury had sufficient evidence to award substantial punitive damages given the death sentence Defendants imposed on Mr. Dean. The jury's remitted award easily accords with the Constitution.

### A. Punitive damages are appropriate where a jury finds deliberate indifference.

For a claim under the Eighth Amendment, "[t]he level of culpability required for a liability finding is the same as the punitive damage standard: both require a determination that the defendants acted with deliberate indifference or reckless disregard" for Mr. Dean's constitutional rights. *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988); *see also Woodward*, 368 F.3d at 930 ("Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others. This is the same standard as for § 1983 liability.") (internal citation omitted). The district court recognized as much in denying

Defendants' motion for judgment as a matter of law. (AA10 ("The same evidence that supports the jury's finding of deliberate indifference also supports an award of punitive damages.").)

In other words, some amount of punitive damages are doubtlessly appropriate in cases like this, as this Court has repeatedly recognized. *See, e.g.*, *J.K.J.*, 960 F.3d at 376-77 (affirming punitive damages award in prisoner's Section 1983 case); *Hendrickson v. Cooper*, 589 F.3d 887, 894-95 (7th Cir. 2009) (same); *Estate of Moreland v. Dieter*, 395 F.3d 747, 758 (7th Cir. 2005) (same); *Woodward*, 368 F.3d at 930-31 (same); *Walsh*, 837 F.2d at 801-02 (same).

Defendants recognize that punitive damages are warranted so long as the jury had sufficient evidence to find deliberate indifference. That is why Defendants repeat, in conclusory fashion, they did not act with deliberate indifference. (*See* Op. Br. at 48.) As discussed more fully in Sections II-III, *supra*, substantial evidence supported the jury's verdict that Defendants acted with deliberate indifference, as the district court held in deciding the post-trial motions.

"All of this evidence established a corporation that had little regard for the inmates whose care it was charged with." *See Woodward*, 368 F.3d at 930. The jury, charged with evaluating witnesses' testimony in light of their interest or bias as well as their manner while testifying, rendered a verdict reflecting that evidence. "Because the standard required to demonstrate an Eighth Amendment violation meets the punitive damages standard, [Plaintiff's] success in establishing that the defendants' conduct violated the Eighth Amendment . . . also suffices to sustain an award of punitive damages." *Walsh*, 837 F.2d at 801. The evidence in front of the jury for Eighth Amendment liability—and therefore, punitive damages—was more than sufficient.

### B.     The remitted punitive damages award is constitutionally permissible.

The punitive damages award against Wexford, having been remitted by the district court from $10,000,000 to $7,000,000, is well within the confines of the Constitution. Punitive damages are intended to "punish blameworthy behavior and deter defendants from committing future bad

acts." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018). While the Constitution "prohibits the imposition of grossly excessive or arbitrary" punitive awards, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003), the award here is not excessive or arbitrary—all the more so where it has already been reduced by $3,000,000.

The Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. Of these, reprehensibility is the most influential. "[T]he more reprehensible a defendant's conduct … the higher the punitive damages" award should be. *Beard*, 900 F.3d at 953. Applying these guideposts to the facts, the post-remittitur award of $7,000,000 is not unconstitutionally excessive.

### C.     Wexford's conduct was plainly reprehensible.

The reprehensibility of the defendants' conduct is the "most important" guidepost in assessing a punitive damages award. *Rainey*, 941 F.3d at 254. Courts consider five factors in analyzing reprehensibility, including whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* (quoting *State Farm*, 538 U.S. at 419). Applying the reprehensibility standard to the facts of this case, the district court held that "all of these factors support a punitive damage award." (AA36.)

The harm Wexford caused Mr. Dean—failing to properly treat his life-threatening cancer—was physical in nature, as Wexford concedes. (Op. Br. at 49-50.) As already discussed

in detail—and as the jury concluded after a seven-day trial—the Defendants were indifferent to Mr. Dean's serious medical needs over a long period of time. That indifference is especially egregious because Mr. Dean was "vulnerable financially and at the mercy of Defendants," who were his only source of medical care. (AA36.) The delays were "repeated, not isolated." (*Id.*) Wexford's conduct was malicious—designed to favor its own bottom line over Mr. Dean's life— malice which the jury could have "inferred from Wexford's relentless and rigid application of corporate practices which served no legitimate purpose." (*Id; see also supra* II-III.)

Ignoring the evidence at trial, Defendants insist that "[a]t most, Plaintiff experienced delays common in the managed healthcare system," and describe the various tests, evaluations and treatments performed at the recommendation of Wexford's doctors. (Op. Br. at 50.) Wexford continues to raise factual arguments that the jury and the district court rejected, but the "appropriate standard of review" requires this Court to "assess the reprehensibility of [defendant's] conduct by viewing the facts as the jury found them." *See Gracia*, 842 F.3d at 1024 (criticizing defendant for failing to "come to terms with the facts as found by the jury"). Wexford's repeated focus on its own profits instead of Mr. Dean's life—embodied by the gross incompetence of its physicians and its phony collegial review process—is quintessentially reprehensible, and warrants the significant punitive damages award in this case.

### D. The ratio of punitive to compensatory damages is reasonable.

The propriety of a particular punitive award is driven by the "facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm*, 538 U.S. at 425. Because the analysis is highly fact dependent, the Supreme Court has not "set a fixed ratio to limit punitive damages." *Rainey*, 941 F.3d at 255. This Court's job is to "police a range, not a point." *Id.* (quoting *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003)). Even where compensatory damages are "substantial," a significant ratio is appropriate if the defendant's

conduct is "truly egregious." *Id.*; *see also State Farm*, 538 U.S. at 425 (expressing concern about awards "*exceeding* a single-digit ratio between punitive and compensatory damages, to a significant degree") (emphasis added).

Here, the district court held that a reasonable jury could have concluded "a substantial punitive damages award was required to deter Wexford from similar conduct in the future." (AA37.) Further, the court reasoned that a higher ratio of punitive to compensatory damages is warranted in this case because the jury could have reasonably concluded "that Wexford's practices will foreseeably continue to cause constitutional violations unless there is a change." (AA41.) Still, the court reduced the jury's punitive damages award from $10,000,000 to $7,000,000 to "stay[] within the bounds of due process." (AA39-40.)

Though Mr. Dean believes the district court erred in remitting the punitive damages, *see infra*, Wexford is not satisfied. It asserts that this court should order a "further remittitur of the punitive damages award against Wexford to a ratio of, at most, 1:1." (Op. Br. at 53.) But the district court rightly rejected Wexford's proposed 1:1 ratio because it "would arguably not deter or serve as adequate punishment." (AA37.) The punitive damages ratio after remittitur is well within the "single-digit ratio" range that typically satisfies due process. *See State Farm*, 538 U.S. at 425.

In truth, the punitive damages award post- remittitur is less than 5:1. The 7:1 ratio stated by the district court is inflated because it misclassifies the award of attorneys' fees and costs to Mr. Dean pursuant to 42 U.S.C. § 1988. (*See* AA52 (awarding $602,786.25 in attorney/paralegal fees and $31,077.53 in expenses).) These fees and costs are properly considered part of a plaintiff's compensatory damages amount when calculating the punitive damages ratio. *See, e.g.*, *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 236 (3d Cir. 2005); *In re USA*

*Commercial Mortg. Co.*, 802 F. Supp. 2d 1147, 1188-89 (D. Nev. 2011); *Blount v. Stroud*, 915 N.E.2d 925, 943 (Ill. App. Ct. 2009) ("[T]he majority of the courts across the country … have agreed that an award of attorney fees should be taken into account as part of the compensatory damages factor in the [Supreme Court's] *Gore* analysis"). Doing so here would reduce the ratio well below 5:1.

The district court found this analysis was "not warranted" because under the Prison Litigation Reform Act ("PLRA"), "the award of attorney fees will come from the judgment and reduce the amount of money received by Plaintiff." (AA39.) But even if they do not augment the total award, attorneys' fees change the ratio. The PLRA only permits 25 percent of a judgment to be applied against attorneys' fees. *See* 42 U.S.C. § 1997e(d)(2). While the first $250,000 of attorneys fees' can be substituted for $250,000 of Mr. Dean's $1,000,000 compensatory damage award, the remaining $383,000 must be taken from the punitive award, converting those punitive damages into compensatory damages. That conversion produces a ratio of $6,617,000 in punitive damages to $1,383,000 of compensatory damages, or approximately 4.75:1.[20]

Regardless of what precise ratio this Court applies, it is nowhere near the 145:1 ratio rejected by the Supreme Court in *State Farm*. 538 U.S. at 426. Indeed, ratios significantly higher than even the district court's mistaken 7:1 have been upheld. *See, e.g.*, *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 453 (1993) (526:1); *Mathias*, 347 F.3d at 678 (37:1); *Johnson v. Howard*, 24 F. App'x 480, 486-87 (6th Cir. 2001) (10:1); *Murphy v. Gilman*, 551 F. Supp. 2d 677, 685-86 (W.D. Mich. 2008) (10:1).

---

[20] Even if one accepts the district court's logic in full, at the very least, the district court's award of $33,337.67 in costs (AA55) should be added to Mr. Dean's compensatory damages because costs are not subtracted from his recovery under the PLRA. *See, e.g.*, *Willow Inn*, 399 F.3d at 236.

One of this Court's recent cases, *Rainey v. Taylor*, is particularly instructive. In *Rainey*, this Court affirmed a punitive damages award of $6,000,000 compared to a compensatory award of $1,130,000 where the defendant sexually assaulted the plaintiff in a public setting and continued to harass her publicly after the incident. 941 F.3d at 245-55. The Court, calculating that the punitive award was "approximately six times the compensatory award," noted that it had "upheld similar ratios in the past." *Id.* at 255. It recognized that many of those past cases "involved much smaller compensatory awards." *Id.* Taking into account the "truly egregious nature" of the defendant's conduct, the Court found that punitive award was appropriate, even with a compensatory award of more than $1,000,000. *Id.*

While the facts in *Rainey* are egregious, so too is what happened to Mr. Dean. Wexford's actions—or more specifically, Wexford's corporate policies promoting inaction—turned a prison sentence into a death sentence. That Mr. Dean dying would be good for Wexford's bottom line was not lost on Mr. Dean's doctors. (*See, e.g.,* Dkt. 263-3 at 161:18-162:22.) Wexford's conduct in this case, which hits on every reprehensibility factor, is also "truly egregious" and justifies a ratio of 7:1.

In support of its desired 1:1 ratio, Wexford primarily relies on *Saccameno v. United States Bank National Association*, 943 F.3d 1071 (7th Cir. 2019) and *Epic Systems Corp. v. Tata Consultancy Services Ltd.*, 971 F.3d 662 (7th Cir. 2020). But any punitive damages analysis is inherently fact-bound, and those cases are easily distinguishable.

*Saccameno*, for example, is a case about errors in loan servicing. 943 F.3d at 1078. This Court determined that the first two reprehensibility factors—physical harm and indifference or reckless disregard to the health or safety of others—did not apply. *Id.* at 1086. The presence of those factors make Wexford's conduct in this case significantly more egregious. The stress of

error-ridden loan servicing pales in comparison to the physical suffering and fear of death Mr. Dean suffered as a result of Wexford's institutionally-sanctioned indifference that will end Mr. Dean's life. The Court made its decision recognizing that "$582,000 is a considerable compensatory award for the indifferent, not malicious, mistreatment of a single $135,000 mortgage," especially where "nearly all this award reflects emotional distress damages that 'already contain [a] punitive element.'" *Id.* (quoting *State Farm*, 538 U.S. at 426). The remitted award here, on the other hand, reflects the repeated, malicious disregard for a man's life.

The facts of *Epic* are an even greater departure from this case. In *Epic*, a purely economic business dispute about theft of trade secrets related to health-record software, the jury awarded the plaintiff $140,000,000 in compensatory damages and $700,000,000 in punitive damages, which the district court reduced to $280,000,000 after trial based on Wisconsin's statutory punitive-damages cap. *Epic*, 971 F.3d at 667-68. After finding that the defendant's conduct was not reprehensible "to an extreme degree" this Court reduced punitive damages to $140,000,000, or a 1:1 ratio. *Id.* at 686. Obviously, nobody was hurt in *Epic* and the $140,000,000 compensatory damages award was vastly larger than any award here. (*See* AA37.) A 2:1 ratio in *Epic* exceeded the "outermost limit of the due process guarantee," but this Court based its holding on the $140,000,000 compensatory award and the specific facts of the case, explicitly distinguishing the more reprehensible conduct in cases like *Rainey* (and, implicitly, Mr. Dean's). 971 F.3d at 688.

### E. Comparable cases do not justify remittitur and Defendants have waived arguments to the contrary.

The final guidepost under *State Farm* directs this Court to consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." 538 U.S. at 416. "Awards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are

necessarily excessive." *Gracia*, 842 F.3d at 1023 (quotation omitted). Instead, the question is whether the defendant has been given "fair notice" as to its potential liability. *See BMW of N. Am. v. Gore*, 517 U.S. 559, 584 (1996). And "even if the punitive award is higher than those in comparable cases, this guidepost generally deserves less weight than the other two." *Rainey*, 941 F.3d at 255. As the district court reasoned, that guidance "makes sense, because comparing cases is an imprecise endeavor at best. Reading the facts of another trial on paper is quite different than experiencing a trial first-hand. Many of the factors that inform a punitive damages award do not translate well to paper." (AA37.)

At the outset, Plaintiff notes that Wexford does not discuss this guidepost at all on appeal, and has therefore waived any related arguments. *Rainey*, 941 F.3d at 255. Regardless, the award in this case is plainly reasonable. As *Rainey* makes clear, this Court has affirmed similar punitive damages awards when warranted by the defendant's behavior. *See, e.g.*, *id.* (affirming $6,000,000 punitive damage award); *Estate of Moreland*, 395 F.3d at 751 (affirming $27,500,000 punitive damage award when guard's use of excessive force against jail detainee caused his death). Wexford is a frequent defendant, and has previously consented to a judgment that included a $4,000,000 punitive damages award. *See* Consent Judgment, *Fox v. Ghosh*, No. 09-C-5453 Dkt. 396 (N.D. Ill. Oct. 25, 2012). It was "on notice" that it could face a significant punitive damages award because of its reprehensible conduct.

# CROSS-APPEAL

## I.    This Court Should Reinstate the Jury's Initial Punitive Damages Award.

In the alternative, and for the same reasons discussed in Section V, *supra*, this Court should reverse the district court's decision remitting the punitive damages award against Wexford to $7,000,000 from $10,000,000. The district court's decision to remit the punitive damages award seems mostly based on the Supreme Court's remark that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (AA37 (quoting *State Farm*, 538 U.S. at 425).) Beyond an effort to move punitive damages into this "single-digit" range, it is not at all obvious why a 7:1 ratio is constitutional whereas a 10:1 ratio is not, though the district court waded admirably through the murky precedent. Indeed, simply adding the $33,337.67 in costs awarded by the district court to the compensatory award— as is proper—would also have moved the initial award into the "single-digit" range.

The damages figure with the most meaningful connection to Wexford's conduct and the harm it caused to Mr. Dean is the damages award made by the jury, who sat through the seven-day trial and listened intently to the testimony of all eighteen witnesses. The decision to award punitive damages is "precisely the sort of judgment peculiarly within the province of the finder of fact." *Merriweather v. Family Dollar Stores*, 103 F.3d 576, 582 (7th Cir. 1996).

Even with a ratio on the higher end, the award may be permissible "if there is a risk that limiting recovery to barely more than compensatory damages would allow a defendant to act with impunity." *Saccameno*, 943 F.3d at 1089. That is the case here. A reasonable jury could have found, as the district court wrote, that Wexford "continues to be indifferent to how its practices put inmates with potentially life-threatening diseases at a substantial risk of serious harm." (AA35-36.) Wexford's conduct, which meets every test for reprehensibility, calls for a punitive damages award on the highest end of the constitutionally permissible range.

Assessing the "purpose of punitive damages and the conduct at issue," *id.*, the jury decided that $10,000,000 was the appropriate penalty to deter Wexford from continuing to prioritize profit over the lives of the patients in its care. Against a company that makes more than $100,000,000 every year from the state of Illinois alone, that decision was within the bounds of the due process clause. This Court should not substitute its own judgment—or the judgment of the district court— for the amply-supported judgment of the jury.

## CONCLUSION

For the foregoing reasons, Mr. Dean respectfully requests that the Court deny Defendants' requests to reverse the jury verdict entered in favor of Mr. Dean, order a new trial on any count, and remit Mr. Dean's punitive damages award, and grant Mr. Dean's request to reinstate the jury's punitive damages award.

February 16, 2021

Respectfully submitted,

*/s/ Craig C. Martin*

Craig C. Martin
  *Counsel of Record*
Chloe E. Holt
Christopher M. Walling
WILLKIE FARR &
GALLAGHER LLP
300 North LaSalle
Chicago, Illinois 60654
Tel.: (312) 728-9000
Fax: (312) 728-9199
cmartin@willkie.com
cholt@willkie.com
cwalling@willkie.com

Joel T. Pelz
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: (312) 923-2609
Fax: (312) 840-7609
jpelz@jenner.com

Robert J. Palmersheim
William M. Strom
PALMERSHEIM &
MATHEW LLP
401 N. Franklin Street, Suite 4S
Chicago, IL 60654
Tel: (312) 319-1791
Fax: (312) 878-2890
rjp@thepmlawfirm.com
wms@thepmlawfirm.com

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Plaintiff, William Dean, furnishes the following in compliance with Fed. R. App. P. 32(a)(7): I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) for a brief produced with a proportionally spaced font.  The length of this brief is 16,397 words.

*/s/ Craig C. Martin*
Craig C. Martin
  *Counsel of Record*

**CERTIFICATE OF SERVICE**

The undersigned, counsel for Plaintiff, William Dean, hereby certifies that on February 16, 2020, I electronically filed the foregoing Appellee/Cross-Appellant's Brief with the Clerk for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

The Electronic Case Filing system sent a "Notice of E-Filing" to the following recipients:

J. Timothy Eaton
Elizabeth E. Babbitt
Nicollette Liv Khuans
Direct: 312-527-4000
TAFT STETTINIUS & HOLLISTER LLP
Suite 2800
111 E. Wacker Drive
Chicago, IL 60601-0000

*/s/ Craig C. Martin*
Craig C. Martin
  *Counsel of Record*

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d) and (c), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in Defendants' appendix.

*/s/ Craig C. Martin*
Craig C. Martin
*Counsel of Record*